# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | Civil Action No. _____ |
| | ) | |
| | ) | |
| | ) | |
| JOHN R. WADE, III, SHARON WADE, JOHN | ) | |
| WADE IV, and TAYLOR WADE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| TRI-WIRE EMPLOYEE STOCK OPTION | ) | |
| TRUST, SCOTT PERRY, ROBERT R. | ) | |
| NEWELL, ROBERT LANDRY, DAVID | ) | |
| GESMONDI, CAPITAL TRUSTEES, LLC, | ) | |
| SPINNAKER TRUST, ROBERT GOULD, | ) | |
| JEANINE PENDERGAST, EMPIRE | ) | |
| VALUATION CONSULTANTS, LLC, SES | ) | |
| WINDING UP CORPORATION f/k/a SES | ) | |
| ADVISORS, INC., SES ESOP STRATEGIES, | ) | |
| LLC, as successor to SES ADVISORS, INC., | ) | |
| BELLMARK PARTNERS, LLC, JOHN MARSH, | ) | |
| LORI WENETTA, and RUBEN KLEIN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT AND JURY DEMAND

Plaintiffs John R. Wade, III ("Wade"), Sharon Wade ("Sharon"), John Wade IV ("John Jr.") and Taylor Wade ("Taylor") (collectively, Wade, Sharon, John Jr. and Taylor are referred herein as the "Plaintiffs"), by and through their attorneys, Fox Rothschild LLP, hereby files this Complaint against defendants Tri-Wire Employee Stock Option Trust ("ESOT" or "Trust"), Scott Perry ("Perry"); Robert R. Newell ("Newell"); Robert Landry ("Landry"); David Gesmondi ("Gesmondi") (Perry, Newell, Landry, Smith, and Gesmondi are referred to herein as the "Directors" or "Board"); Capital Trustees, LLC ("CTL" or "First Trustee"); Spinnaker Trust

("Spinnaker" or "Second Trustee"); Robert Gould ("Gould"); Jeanine  Pendergast ("

Pendergast"); Empire Valuation Consultants, LLC ("Empire"); SES Winding Up Corporation

f/k/a SES Advisors, Inc. ("SES"); SES ESOP Strategies, LLC, as successor to SES Advisors,

Inc. ("SES Successor"); BellMark Partners, LLC, ("BellMark"); John Marsh ("Marsh"); Lori

Wenetta  ("Wenetta"); and Rubin Klein ("Klein") (Marsh, Wenetta, and Klein are referred to

herein as the "Officers").

## I.   NATURE OF THE ACTION

1.       This action arises from the activities of the Defendants, who actively conspired to

defraud Wade, who had transferred of his 100% ownership interest in Tri-Wire Engineering

Solutions, Inc. ("Company" or "TES"), that he started nearly 20 years ago, to an employee stock

ownership plan ("ESOP") in exchange for a promise that the Company would pay him for his

stock over time and that he would operate the Company until that debt was repaid.  As sole

shareholder, officer, and director of the Company, Wade engaged attorneys and professionals,

who specialized in ESOP transactions, and, in turn, other professionals that they recommended,

to ensure that he had been protected in this transaction, but, despite these protections, certain of

them simply defrauded Wade.  Wade and the Company were honest, forthright, and thorough

when providing requested information to those parties involved with the transaction and worked

diligently with all such parties at that time to structure the deal, secure financing, and ultimately

execute the transaction to be effective on December 30, 2016.

2.       Initially, the Company continued its long history of success and met the targets

anticipated by the parties, but, over time, those in charge of the Company's daily operations

repeatedly failed to meet its forecasted goals, budgets, and more importantly failed to rectify

such failures nor make any necessary changes which eventually led the Company to default on

its covenant compliance obligations to its creditors putting the Company at risk to breach its

obligations to Wade and other known creditors.  In response, Wade proposed that the Company

take immediate action to reduce its costs by, *inter alia,* evaluating its staff, laying off

unproductive employees and executives, refining various departmental procedures and

structures, including the Board Directors.  These persons did not welcome Wade's initiatives.  In

fact, since they were unhappy with the prospect that their positions and salaries were no longer

secure, those Directors and Officers along with Spinnaker and others engaged in a concerted

campaign to undermine, discredit, malign, and ultimately oust Wade from his position as Chief

Executive Officer ("CEO"), Director, and Board Chairman, to systematically expel his family

members from the Company, and to make false allegations about Wade's behavior, management,

and honesty.

3.      As set forth more fully below, through this action, Plaintiffs seek to hold each of

the Defendants liable for their respective roles in their racketeering conspiracy to strip Wade of

his influence and contractual rights as a creditor, director, and officer of the Company; to destroy

Wade's name, reputation, and career; to disrupt the careers and livelihoods of Wade's family

members; and to seize control of the Company that Wade built from the ground up all for their

personal benefit and to the detriment of the Company and the Plaintiffs.  Defendants are liable to

Plaintiffs for, among other things, Racketeer Influenced and Corrupt Organization Act ("RICO"),

violations of the Employee Retirement Income Security Act ("ERISA"), fraud, breach of

fiduciary duty, conversion, business defamation, and civil conspiracy.

## II.      JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because

the action arises under the laws of the United States and 18 U.S.C. §§ 1962 and 1964(c) because

this action alleged violations of RICO and 29 U.S.C. §§ 1132(a)(2) and (a)(3) because this action

alleges ERISA violations.

5.       This Court has supplemental jurisdiction over the remaining causes of action

pursuant to 28 U.S.C § 1367.  Further, none of the supplemental state claims are related to the

administration of the ESOP, but rather the operation and management of the Company itself.

Thus, none of these claims preempted by ERISA; however, alternatively, such claims are

brought under federal common law.

6.       Venue exists in the District of Massachusetts pursuant to 28 U.S.C. § 1391

because a substantial part of the events giving rise to this action occurred in this district and

because the Defendants are subject to personal jurisdiction in this district.  Venue is further

proper in this jurisdiction pursuant to 18 U.S.C. § 1965 because Defendants implemented their

fraudulent scheme in this district and pursuant to 29 U.S.C. § 1132(e)(2), as the Company and

the Board reside in Massachusetts, the harm caused by the actions complained of herein were

suffered by a Massachusetts resident in the Commonwealth of Massachusetts, and the Trust that

administers the ESOP is situated in Massachusetts.

## III.      FACTUAL BACKGROUND

### A.      Parties.

#### 1.      Plaintiffs

7.       Plaintiff is the founder of the Company, and served as the Company's CEO and

Board Chairman since the Company began in 1999 until at least August 6, 2019, when the

Company's Board purportedly stripped Wade of his titles as Chairman and Director in violation

of the Company's contractual obligations.  Wade is an adult individual and a citizen of the

Commonwealth of Massachusetts with a residence located at 10 Acorn Drive, Andover, MA

01810.  As set forth in more detail below, Wade was TES' majority shareholder until December 30, 2016, he sold a portion of his shares to the Tri-Wire Employee Stock Ownership Trust ("ESOT") and allowed the Company to redeem the remaining portion of his shares, both in connection with pre-planned design resulting in the sale of all outstanding shares of TES to a newly established ESOP.  Wade is a creditor as a result of the sale of TES, and the debt is still outstanding as of the date of this filing since he is a secured subordinated creditor of TES as a result of the foregoing ESOP transaction.  Upon information and belief, Wade is a participant in the ESOP, and is a fiduciary by virtue of his position as Chairman of the Board Directors, who has the power to direct the Trustee.

8.      Sharon is a citizen of the Commonwealth of Massachusetts with a residence located at 10 Acorn Drive, Andover Massachusetts 01810.  Sharon was an employee of TES until she was wrongfully terminated from her role with the Company in or about May 2019.

9.      Taylor is an adult individual and is a citizen of the State of California with a residence located at Santa Monica, California.  Taylor was employed as acting Human Resources manager of the Company's corporate office until she was terminated from this position in or about May 2019.

10.      John Jr. is an adult individual and a citizen of New York state with a residence located at Brooklyn, New York.  John Jr. was employed as Operations Manager for the Company's Bronx office until he was forced to leave in February 2019.

11.

        **2.      Defendants**

12.      Defendant ESOT is organized under the laws of the Commonwealth of Massachusetts and federal law, and was established pursuant to the Tri-Wire Employee Stock Ownership Trust Agreement, effective January 1, 2017.  The Trust has a principal place of

business at Tri-Wire Engineering Solutions, Inc., 890 East Street, Tewksbury, Massachusetts 01876.

13.     Defendant Perry has served as a director of the Company since June 2017.  Perry is a citizen of the State of Connecticut with a principal  address located at 43 Valley Forge Rd, Weston, CT 06883.

14.     Defendant Newell has served as a director of the Company since June 2017. Newell is a citizen of the Commonwealth of Pennsylvania, with a principal  address located at 523 West 6th St, Lititz, PA 17543.

15.     Defendant Landry served as a director of the Company since February 28, 2019. Landry is a citizen of the Commonwealth of Massachusetts with a principal business address located at 4 Seminole Circle, Andover, MA 01810.

16.     Defendant Gesmondi served as a director of the Company from June 2017 until July 2019 and is a Managing Director at BellMark.  Gesmondi is a citizen of the Commonwealth of Massachusetts with a principal business address located at BellMark, 75 Central Street, 4th Floor, Boston, Massachusetts 02109.

17.     Defendant Marsh served as the Company's Chief Operations Office ("COO") until 2018.  Since 2010, Marsh has also served as the President of the Company's Fulfillment Service Division.  Marsh is a citizen of the State of New Hampshire with a principal address located at 2 Colleen Drive, Salem New Hampshire 03079

18.     Defendant Klein is the Company's Chief Financial Officer ("CFO"), and acted in concert with Newell, Perry, and Marsh.  He was appointed by the Board Defendants with the participation of the Second Trustee, Gould, and Pendergast, and with the assistance of Croscut and Devine Mellimet, to serve as interim  CEO in the months immediately following Wade's

ouster in August 2019.  Klein is a citizen of the Commonwealth of Massachusetts with a

principal address located at 2 Hamilton Way, Newburyport  MA 01950

19.     Defendant Wenetta is the Company's Senior Vice President.  Wenetta is a citizen

of the Commonwealth of Massachusetts with a principal address located in the Commonwealth

of Massachusetts.

20.     The First Trustee was the trustee of the Plan from January 1, 2017 until March,

2017, and is a limited liability company organized under the laws of the Commonwealth of

Pennsylvania.  It has a principal place of business located at 17 South Second Street, Suite 301,

Harrisburg, Pennsylvania 17101.  The First Trustee entered into contractual agreements as

trustee with the Company and the ESOT, both located in Massachusetts, performed under those

agreements, governed by Massachusetts law, in Massachusetts, and, to the extent that there was

any overpayment for the shares, committed and/or participated in the acts complained of herein

in the Commonwealth of Massachusetts in breach of their fiduciary responsibilities and the effect

of causing damage to Wade and the Company, both of whom are Massachusetts residents.

21.     The Second Trustee is and has been the trustee of the Plan since April, 2017.  The

Second Trustee is a corporation formed and existing under the laws of the State of Maine, and

has a registered address located at 254 Commercial Street, Portland, Maine 04101, and a

principal place of business located at 123 Free Street, Portland, Maine 04101.  At all times

relevant hereto, the Second Trustee entered into contractual agreements with the Company and

the ESOT, both located in Massachusetts, performed under those agreements, governed by

Massachusetts law, in Massachusetts, and committed acts that gave rise to this suit in

Massachusetts with the intent and/or effect of causing damage to Wade, ESOT, and the

Company, all being Massachusetts residents.

22.     Defendant Gould is the Executive Vice Present and a principal of the Second Trustee.  Gould is a resident of the Commonwealth of Massachusetts, and has a principal place of business located at 123 Free Street, Portland, Maine 04101.  At all times relevant hereto, Gould, along with the Second Trustee, did business in the Commonwealth of Massachusetts while serving as a fiduciary of the ESOT and committed and/or participated in the acts complained of herein in the Commonwealth of Massachusetts with the intent and/or effect of causing damage to Wade and the Company, all being Massachusetts residents.

23.     Defendant Pendergast is a Senior Vice President, ESOP Client Advisor of the Second Trustee and has a principal place of business located at 123 Free Street, Portland, Maine 04101.  Upon information and belief, Pendergast is a resident of the State of Maine and has a principal place of business located at 123 Free Street, Portland, Maine 04101. At all times relevant hereto, Pendergast, along with the Second Trustee, did business in the Commonwealth of Massachusetts while serving as a fiduciary of the ESOT, and committed and/or participated in the acts complained of herein in the Commonwealth of Massachusetts with the intent and/or effect of causing damage to Wade and the Company, all being Massachusetts residents.

24.     Defendant Empire is a limited liability company organized under the laws of the State of New York, and has its principal place of business located at One International Place, Suite 1400, Boston, Massachusetts, where it employs its Managing Director, Charles Coyne, who provided a fairness opinion to the Company and the ESOT  in connection with the ESOP transaction.  Further, at all times relevant hereto, Empire did business in the Commonwealth of Massachusetts, entered into agreements with the Company and/or the ESOT in the Commonwealth of Massachusetts, and committed and/or participated in the acts complained of

8

herein in the Commonwealth of Massachusetts with the intent and/or effect of causing damage to Wade and the Company, all being Massachusetts residents.

25.     Defendant SES is a corporation formed and existing under the laws of the Commonwealth of Pennsylvania and registered to do business in the Commonwealth of Massachusetts under the name SES Advisors, Inc.  SES Advisors, Inc. was an affiliate of and shared common ownership with SG&C between the time that the Company hired it to assist with the ESOP transaction and October 2018, when it combined with SG&C, Stevens & Lee, P.C. and Griffin Financial Group to form defendant, SES Successor, a limited liability company formed and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 555 City Avenue, Suite 910, Bala Cynwyd, Pennsylvania 19004, where SES and SES Advisors Inc., previously operated an identical business in conjunction with their affiliate, SG&C.  Upon information and belief, SES Advisors, Inc., SES and SES Successor share common ownership and/or management and are controlled by the same individuals, who controlled the various incarnations of SG&C, including, James G. Steiker, Esq., and Steven B. Greenapple, Esq.  At all times relevant hereto, SES conducted business in the Commonwealth of Massachusetts, provided financial counsel and transaction design advice to both the Company and Wade, and, in conjunction with its affiliate, SG&C, guided, counseled, and assisted both the Company and Wade in structuring, negotiating, and executing the ESOP Transaction in the Commonwealth of Massachusetts.  Further, SES Successor has a place of business located in Hingham, Massachusetts.

26.     Defendant BellMark is a limited liability company formed and existing under the laws of the State of Delaware with a principal place of business located at 75 Central Street, 4th Floor, Boston, Massachusetts 02109.  At all times relevant hereto, BellMark employed

Gesmondi in the Commonwealth of Massachusetts, conducted business in the Commonwealth of Massachusetts, and guided, counseled, and assisted both the Company and Wade in structuring, negotiating, and executing the ESOP Transaction in the Commonwealth of Massachusetts.

**B.      Non Party.**

27.      Non-party TES is a corporation organized and operated pursuant to the laws of the Commonwealth of Massachusetts. The Company's principal offices are located at 890 East Street, Tewksbury, Massachusetts 01876. The Company provides consumers with highly-skilled and tech-savvy customer service professionals specializing in high volume residential installs, low voltage security systems, commercial networking and repairs, OSP aerial and underground installs, underground construction, fiber optic splicing and testing, direct and retail sales management, ISP conduit, EMT and fiber installs, and customer support and dispatching.

28.      Non-party Tri-Wire Engineering Solutions, Inc. Employee Stock Ownership Plan ("TES ESOP") is, and at all times relevant hereto, was intended to qualify as (i) a stock bonus plan under Section 401(a) of the Internal Revenue Code of 1986, as amended ("Code"); and (ii) an employee stock ownership plan within the meaning of Section 4975(e)(7) of the Code and regulations thereunder. TES ESOP has a principal place of business at TES, 890 East Street, Tewksbury, Massachusetts 01876.

29.      Non-party Richard Smith ("Smith") served as a director of the Company from February 28, 2019 until August 2, 2019. Smith is a citizen of the Commonwealth of Pennsylvania with a principal business address located at Tri-Wire Engineering Solutions, Inc., 890 East Street, Tewksbury, Massachusetts 01876.

30.      Non-party Tabatha M. Croscut ("Croscut") is, upon information and belief, a shareholder of Devine, and a resident of the State of Vermont with a principal place of business

located a 77 College Street, Burlington, Vermont 05401.  Croscut was previously a shareholder of SG&C, and, at all times relevant hereto, provided legal services and counsel to both the Company and Wade in the Commonwealth of Massachusetts, and who took the acts complained of herein while situated in the Commonwealth of Massachusetts.

31.     Non-party Steiker, Greenapple & Croscut P.C. ("SG&C") is a professional corporation and law firm formed and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 555 City Avenue, Suite 910, Bala Cynwyd, Pennsylvania 19004.  At all times relevant hereto, SG&C conducted business in the Commonwealth of Massachusetts, provided legal counsel to both the Company and Wade, and, in conjunction with its affiliate, SES, guided, counseled, and assisted both the Company and Wade in structuring, negotiating, and executing the ESOP Transaction in the Commonwealth of Massachusetts through its then-partner and owner, Croscut.

32.     Non-party Devine is a law firm organized under the laws the State of New Hampshire, and has a principal business address located at 111 Amherst Street, Manchester, New Hampshire 03101.  At all times relevant hereto, Devine did business with the Company and provided it legal representation in the Commonwealth of Massachusetts through Croscut, and engaged in the wrongful acts described *infra* in the Commonwealth of Massachusetts.

### C.     Cable Television Industry and the Wiring of America.

33.     Up until the 1990s, cable television was a relatively simple business that relied on simple technology, and served only a portion of the United States population due to a number of factors, including, but not limited to, high subscription costs, a restrictive regulatory environment, and, critically, a lack of network coverage.

34.     Beginning in 1984 with the enactment of the Cable Act, that developed a more favorable regulatory framework for the industry, stimulating investment into cable plant and programming, the cable television industry began to grow at an exponential rate driven, in part, from the investment of approximately $15 billion into developing cable infrastructure across the country.

35.     Often touted as the largest private construction project undertaken in America since World War II, the cable wiring of America was largely completed between 1984 and 1992, one year after hypertext markup language was released to the public, kicking off the dawn of the world wide web and the advent of a new interconnected global economy.

36.     As investment into internet based businesses proliferated and e-commerce established its place in the global economy, businesses and users alike demanded affordable and reliable high-speed internet access, something that the country's traditional telecommunications infrastructure could not provide.

37.     Simply stated, data could only travel so quickly over America's existing and aging telephone lines and those limitations significantly hampered the utility of the internet during its early years.  As late as 1998, the top speed that users could hope to reach was 56Kbps.

38.     Further, by integrating internet access into America's telephone infrastructure, telecommunications companies, essentially, ensured that Americans could not access the internet on a secure, stable connection as intended or desired, especially at home, where residential internet service required users to either obtain a dedicated telephone line strictly for internet access or accept that they could only access the internet while they were not using their home telephone.

39.     The telephone industry responded to these challenges by innovating what it referred to as ADSL – short for "Digital Subscriber Line" – broadband in the late 1990s.  While DSL broadband provided consumers with persistent internet access at much higher speeds than those available through dial-up internet access, the aging copper wire telephone infrastructure limited maximum data speeds to a range between 250 Kbps and 100 Mb/s.

40.     Unlike the telephone companies, however, the cable industry had access to a brand new, state of the art network comprised largely of co-axial cable, which had the capability to transfer more data at higher speeds than traditional telephone lines.  Recognizing an opportunity, the cable industry, among other things, adopted industry-wide standards for cable modems and related technology that ensured the equipment being used throughout the industry was interoperable, ensuring functionality while driving down costs and increasing the rate of innovation as vendors across the industry vied to outperform each other.

41.     The cable industry also continued to develop and improve its infrastructure by investing an additional $65 billion between 1998 and 2002, specifically for the purpose of integrating high-capacity, high-speed fiber optic lines into its pre-existing coaxial cable network.

42.     Since it did not rely strictly on copper wire, cable internet quickly outperformed DSL broadband and realistically reached rates between 250 Mb/s and 400 Mb/s.  Most importantly, cable internet provided high-speed internet access that was both reliable and reasonably priced.

43.     Whether by chance, prescience, or a combination of the two, the cable industry capitalized upon the foregoing events by providing consumers with cheap, reliable internet access options through a practice typically referred to as "bundling" their cable television service with their internet service and charging the customer a reduced rate to subscribe to both.  This

practice proved so popular that by 2015 approximately 93% of Americans had access to high-speed internet connections through cable internet, and approximately 80% of those, who actually obtained high-speed connections did so through cable internet.

**D.    Wade's Entry into the Cable Business**

44.    As he watched the cable industry transform during the late 1990s, Wade recognized that the services and capabilities offered by traditional cable installers would be insufficient to service the needs of the cable industry or its rapidly expanding customer base.

45.    Historically, cable companies engaged small independent contractors to install cable for their customers, and often hired unskilled professionals, who could do little more than run cable from a junction box or pole into a customer's home.

46.    Given the trajectory of the cable industry and the expanding range of services available to their customers, Wade reasoned that cable installers would require a greater level of training, and would have to be both highly skilled and computer literate.  Given his experience in Broadcast Engineering, he saw an opportunity to start a business that would provide installers with those tools.

47.    In addition to providing cable installers with training and education, Wade also sought to transform the traditional cable installer model.  Rather than force cable installers to lead, essentially, transient lives as solo independent contractors, who took work as it came, Wade envisioned a more traditional employee-based system that would permit the installers to work for one company that would, in turn, contract with cable providers.

48.    That model offered benefits to all involved: the cable providers would receive more consistent levels of service and have the security of knowing that the installers were properly trained and carried appropriate liability coverage; the Company could ensure that it was

employing the right people who followed its policies, protocols, and procedures as well as take advantage of economies of scale; and the installers received job security, steady work and pay.

49.     With those goals in mind, Wade started the Company in 1999, with only six employees and one client, Continental Cablevision, now known as Comcast.  Given Wade's initial objectives, the Company sought to recruit the most highly skilled and capable workers available, requiring the Company to offer more to those workers than they could earn working independently.

50.     To that end, the Company implemented a substantial benefits package, including health insurance, a 401(k) plan, on the job training, access to education, and professional development opportunities, all previously not used in the industry.

51.     While it should seem unsurprising in retrospect, the Company's dual focus on customer and employee satisfaction proved successful, leading the Company to grow rapidly until it ultimately employed over 900 people across twelve states by the end of 2016.

**E.     Wade's Decision to Use an ESOP.**

52.     Under Wade's leadership, the Company established itself as Comcast's largest fulfillment service provider and an overall national leading broadband service installation company for the telecommunications industry. Through its success, TES influenced its competitors to follow a similar model, now the standard across the industry.

53.     Nonetheless, consistent with his employee-focused business strategy, in 2016, at the height of the Company's success, Wade decided to transfer his ownership interest in the Company to ESOP, making, the Company one of the largest broadband service companies to be owned by its employees.

54.     As the sole owner, director, and officer of the Company, Wade determined that the Company and its employees would benefit from the ESOP because it would not only motivate them to ensure that the Company continued to thrive, since they were part owners, but would also provide them with additional retirement security.

55.     During the summer of 2016, Wade engaged Croscut and SG&C to provide the Company with legal services in connection with the proposed ESOP transaction, and to assist the Company with structuring and planning the ESOP transaction, designing and implementing the ESOP, drafting and negotiating the documents necessary to carry out the ESOP's purchase of Wade's stock, and identifying and engaging the appropriate professionals to serve as ESOP trustees.

56.     Wade also engaged SES and BellMark as its financial advisors and to provide financial advisory services in connection with the ESOP Transaction, including, among other things, (1) assisting the Company to determine how to carry out the ESOP transaction; (2) develop financial and capitalization models to illustrate the ESOP transaction structures; (3) assist *both* the Company and Wade to meet their goals by illustrating and assessing the ESOP transaction; (4) coordinate, prepare for, develop materials, and participate in the due diligence process; (5) assist the Company with development, structuring, negotiating, and implementation of the ESOP transactions; (6) review documents and provide advice; and (7) assist with similar efforts to provide necessary information to financial institutions to obtain debt financing.

57.     Over the next several months, with the assistance of Croscut, Gesmondi, BellMark, SG&C, and SES, the Company and Wade developed and implemented the planned transaction along with participation from third parties, including JPMorgan Chase, N.A.

("JPMorgan") and Massachusetts Capital Resource Company ("MCRC"), both, ultimately, financing part of the transaction.

### F.   Wade's Attorneys Represented Him in the Transactions.

58.     At all times relevant hereto, Croscut, her firm, SG&C, and their affiliated company, SES, knew that Wade was the sole owner, a director, and an officer of the Company and communicated with him as if both he and the Company were their clients, leading Wade to reasonably believe that Croscut and SG&C were his personal attorneys and that SES was his personal financial advisor.  In fact, Croscut specifically stated to representing Wade in emails and correspondence.

59.     Over the ensuing months, Croscut, SG&C, and SES repeatedly reinforced that belief by advising Wade about the potential risks, rewards, and consequences that **both** he and the Company, respectively, faced regarding each decision that Wade had to make concerning the planning, negotiation, implementation, and execution of the ESOP Transaction.

60.     In addition to advising Wade how available options would impact both him, personally, and the Company, Croscut, SG&C, and SES also negotiated and drafted documents on behalf of both the Company and Wade, including various transactional documents where either both the Company and Wade were parties and the agreements at issue impacted Wade even more significantly than the Company.

61.     For example, Croscut, SG&C, and SES drafted, negotiated, and advised both Wade and the Company regarding 2 Intercreditor and Subordination Agreements that they both entered into with JPMorgan and MCRC.  A true and correct copy of the Intercreditor and Subordination Agreement between JPMorgan, the Company, and Wade is attached hereto as Exhibit 1.  A true and correct copy of the Intercreditor and Subordination Agreement between MCRC, the Company, and Wade is attached hereto as Exhibit 2.

62.     Notwithstanding the obvious conflict between Wade and the Company, Croscut, SG&C, and SES also provided advice to both the Company and to Wade regarding agreements that they entered into with one another in connection with the ESOP Transaction, including, but not limited to, an Executive Employee Agreement, 2 promissory notes, a stock redemption purchase agreement, and a loan agreement, among other documents.

63.     Similarly, Croscut, SG&C, and SES provided the Company with legal advice in connection with the drafting and negotiating of documents that Wade was not a party, individually, including, a number of loan documents between only the Company and JPMorgan, as well as loan documents entered into between only the Company and MCRC.

## G.     ESOT Establishment and Trustee Powers.

64.     Upon the advice of Croscut, SG&C, and SES, Gesmondi, and BellMark, Wade agreed, on behalf of the Company, to establish the ESOT and name the First Trustee as trustee of the ESOT effective January 1, 2017.  SG&C led Wade to believe that SG&C would represent his interest, and it was not necessary for him to retain separate counsel.  A true and correct copy of the Tri-Wire Employee Stock Ownership Trust Agreement ("Trust Agreement") is attached hereto as Exhibit 3.

65.     Pursuant to the terms of the Trust Agreement, the trustee of the ESOT "shall be directed by the Plan Administrator [the Company, per Section 10.5] with regard to all matters including the exercise of all fiduciary powers set forth in Section 2.3, and shall be fully protected under Section 403(a)(1) of ERISA for following the directions of the plan Administrator which are made in accordance with the terms of the [ESOP] and are not contrary to ERISA."  *See* Exhibit 3 at § 5.2.

66.     Section 2.3 of the Trust Agreement, in turn, enumerates the specific powers afforded to the trustee under the Trust Agreement in addition to fiduciary powers granted to the

trustee by law, including, the power to exercise voting rights on behalf of all stocks, bonds, and other securities held in the Trust. *See* Exhibit 3 at § 2.3(l).

67.     Section 5.3 of the Trust Agreement provides that the Trust's trustee "shall be fully protected in taking any action based upon a certificate signed by the Plan Administrator [i.e., the Company] or by any person authorized by the Plan Administrator to act on its behalf, ***and shall have no power, authority, or duty to interpret the Plan or to inquire into the decisions or determinations of the Plan Administrator, or to question the instructions given by the Plan Administrator*.**" *Id.* at § 5.3 (emphasis added).

68.     As such, the Trustee, who is a directed trustee that has a fiduciary duty to protect the interests of the participants and can only exercise its powers in that light, instead chose to slavishly follow the instructions of the management rump of the Company or the administrator appointed by the Company.  It had, and has no authority to act on its own, or to question these directions, let alone disobey, the directions that it receives from the Company or the administrator appointed by the Company, except as it relates to its fundamental duties to act in the best interests of the plan participants and follow the requirements of relevant law.

### H.     ESOP Transaction Due Diligence and Fairness Opinion.

69.     During the time prior to the ESOP Transaction, at the end of December 2016, Croscut, SC&G, SES, Gesmondi, BellMark, the First Trustee, JPMorgan, and MCRC, along with their chosen professionals, performed the due diligence that they believed necessary to carry out the ESOP Transaction, to confirm that the Company had the financial ability to fulfill its obligations, and to ensure that the Trust paid a fair price for Wade's shares. Wade paid over $700,000 thousand in advisory services for the transaction.

### 1.     Due Diligence Work

70.     Throughout that process and without exception, Wade and the Company provided each of the foregoing parties and their professionals with unfettered access to the Company's books and records, answered all of their inquiries fully and honestly to the best of their knowledge and ability, acted in good faith, and fully and honestly disclosed all facts that they believed to be relevant to the transaction.

71.     In connection with its due diligence, the First Trustee hired Empire Valuation to undertake an independent valuation analysis of the fairness of the intended ESOP Transaction, arriving at a valuation and negotiating it,  from a financial point of view, that would ultimately result in the ESOT owning the Company's outstanding common stock.

72.     Among other things, Empire reviewed the Company's financial statements for 2011-2015, income statement for the trailing twelve months ended October 31, 2016, and cash flow projections through 2021, as well as a multitude of documents relevant to and/or necessary to carry out the ESOP Transaction, and "conducted such other studies, analyses, and inquiries deemed appropriate."  A true and correct copy of Empire's December 30, 2016 Fairness Opinion is attached hereto as Exhibit 4.

73.     Additionally, while conducting its due diligence, Empire interviewed and communicated with Wade, Croscut, Gesmondi, the First Trustee's attorney, a representative of BellMark, SES, and the First Trustee.

### 2.      The Fairness Opinion

74.     Following its extensive due diligence, review, and testing, Empire issued a Fairness Opinion, dated December 30, 2016, where Empire concluded:  (1) the terms and conditions of the ESOP Transaction were "fair to the ESOP from a financial point of view;" (2)

"the consideration to be paid by the ESOP for shares of common stock" of the Company

"pursuant to the terms of the [ESOP] Transaction is not greater than the Fair Market Value of

such shares and does not exceed 'adequate consideration'" as defined in ERISA; (3) the financial

terms of the ESOP loan were at least as fair as those that it would have obtained in an arms-

length transaction; (4) the interest rate did not exceed a reasonable rate of interest; and (5) the

exercise price of the warrants issued by the Company in connection with the transaction is not

less than 90% of the fair market value of the Company's common stock after the transaction

would be completed.  *See* Exhibit 4.

74. 75.     As noted in its Fairness Opinion, Empire relied upon and assumed the accuracy

and completeness of the financial information provided to it without independently verifying

either and relied on Wade's representation that the Company's operations and financial

conditions had not materially changed since October 31, 2016.  Empire did not independently

value the Company's tangible assets and relied on the Company's and SES' financial projections

without additional testing, analysis, or confirmation.  *Id.* at 5-6.

76.     As an entity who bills itself as "one of the nation's leading and most respected

independent valuation consulting firms" and who claims that "[v]aluation is [their] only

business," Empire and its Managing Director, Charles Coyne, who boasts over thirty years of

experience and a tremendous level of expertise in ESOP valuations, Wade and, by extension, the

Company, trusted Empire to perform its duties correctly and objectively to ensure that the ESOP

Transaction was a fair deal.  Separately, Empire usurped its authority by injecting itself into an

internal Company dispute by siding with rump management over a made-up clam against Wade.

77.     During the period leading up to the ESOP Transaction, Empire expressed

confidence in its evaluation of the ESOP Transaction and issued an opinion that found that the

deal was fair, as detailed in the Fairness Opinion.  Empire would continue to hold that opinion

for nearly three years, as discussed *infra*.

78.     Based upon Empire's evaluation, though, and upon the advice of Croscut, SG&C,

and SES, who had performed their own due diligence and advised both the Company and Wade

that the ESOP Transaction would benefit each of them, and after both JPMorgan and MCRC

completed their own independent due diligence, the parties agreed to move forward with the

ESOP Transaction, as contemplated.

**I.     The Closing.**

79.     On or about December 30, 2016, Wade, the Company, JPMorgan, MCRC, and the

ESOP Trust, through the First Trustee, executed a number of agreements, notes, warrants, and

other documents necessary to consummate the ESOP Transaction and transfer Wade's ownership

interest in the Company to the ESOP.

80.     The Company, initially, redeemed an aggregate of 700,000 shares of common

stock in the Company from Wade, pursuant to a Stock Redemption Agreement, dated December

30, 2016, for a combined total of $17.5 million, that the Company agreed to pay back in

accordance with two notes: (1) a Series B Note in the aggregate sum of $13 million; and (2) a

Series A Note issued by the Company to Wade in the aggregate sum of $4.5 million.  A true and

correct copy of the Stock Redemption Agreement is attached hereto as Exhibit 5.  A true and

correct copy of the Series B Note is attached hereto as Exhibit 6.  A true and correct copy of the

Series A Note is attached hereto as Exhibit 7.  If the Company's performance differed from

certain financial benchmarks during the 2017 fiscal year through the end of the 2021 fiscal year,

the redemption price of $17.5 million would be adjusted upwards, if the Company's performance

exceeded projections, and downwards if the Company's performance did not meet projections.

*See* Exhibit 6 at Section 1.2(c) and (d).

### 1.    Subordinated Loan Agreement

81.    Regardless if the Company's performance exceeded or failed to meet expectations, the Redemption Agreement provides that the maximum amount the parties could alter the redemption price based on performance was $2 million.  *Id.*

82.    Contemporaneously, the Company also entered into a Subordinated Loan Agreement with Wade that detailed:  (1) the terms that the Company agreed to pay the aggregate $17.5 million redemption cost pursuant to the terms of the two Series A and B Notes; (2) the subordination in priority of the Company's debt to Wade in connection with the ESOP transaction to the financing provided by the Company's lenders; (3) the Company's representations, warranties, and agreement to certain restrictions regarding its financial activity moving forward; and (4) a number of representations made by Wade, none relevant to this dispute with the exception of those contained in the SPA.  A true and correct copy of the Subordinated Loan Agreement is attached hereto as Exhibit 8.

83.    Critically, the Subordinated Loan Agreement explicitly provides that the Company would be bound by the following governance provisions, which the Company was required to incorporate into its Bylaws:

> a.    The Company's Board of Directors must consist of at least four directors, three of whom must qualify as independent directors;

> b.    The Board of Directors must appoint a compensation committee chaired by an independent director and made up of a majority of independent directors;

> c.    For so long as the Series A and B Notes have not been paid in full, Wade would be entitled to serve as Chairman of the Board of Directors; and

> d.    For so long as the Series A and B Notes have not been paid in full, Wade possesses the tie-breaking vote if there is a tie vote among the Board.

*See* Exhibit 8 at Section 6.12.

84.     The Subordinated Loan Agreement further provides that an Event of Default occurs if: (1) the Company fails to make any payment within 5 days of the date when due and owing; (2) the Company fails to perform or observe any other term of the Subordinated Loan Agreement or the Series A or B Notes; (3) the Company's representations or warranties to Wade prove untrue or incorrect; (4) the Company dissolves, declares bankruptcy, or has judgments entered against it in the aggregate amount of $100,000 or more; (5) a change in control occurs; or (6) the Company defaults under its obligations to JPMorgan or MCRC under their related loan agreements and documents. *Id.* at Section 7.1.

85.     In the Event of Default, the Subordinated Loan Agreement provides that Wade could declare the amounts owed immediately due and payable and pursue enforcement of those debts, subject to the terms of the senior loan documents between the Company and JPMorgan and MCRC, and that the interest rates owed would increase. *Id.* at Section 7.1.

86.     The Subordinated Loan Agreement also provides that the Company is obligated to not only pay Wade for any direct or indirect loss that he suffers as a result of the Company's breach of the Subordinated Loan Agreement, but also that the Company must pay Wade's reasonable attorneys' fees, disbursements, and costs, including expert costs, that Wade incurs to enforce the terms of the Subordinated Loan Agreement. *Id.* at Sections 9.1 and 9.2.

## 2.     Series B Note and Warrants

87.     Pursuant to the terms of the Series B Note, the Company agreed to pay only the interest on the loan principal for the first 7 years, ending on December 30, 2023, and then pay Wade the principal owed with interest, accruing at a rate equal to the long-term applicable federal rate, plus 150 basis points, amortized over three years. *See* Exhibit 6.

88.     The Series B Note was also issued with detachable warrants ("Series B Warrants") allowing Wade to purchase Company common stock equal to 15% of the outstanding

fully diluted shares upon exercise.  The strike price for the Series B Warrants was set at $2.60 per share, a value equal to the post-closing fair market value of one share of Company common stock giving effect to the redemption, financing, and issuance of shares to the ESOP, as would the strike price for the Series A Warrants and Mezzanine Warrants.  True and correct copies of the  Warrants are attached hereto as Exhibit 9.  The Series B Warrants were exercisable immediately upon a change of control, but otherwise would be exercisable in three equal tranches on the first three anniversaries of the anticipated payment in full of the Series B Note, beginning on December 30, 2021 and expiring at 5:00 P.M on the later of December 31, 2023 or repayment in full of the Series A Note.  *See* Exhibit 9.

### 3.    Financing the Transaction

89.    The second step of the ESOP Transaction required Wade to sell 820,000 shares of Company common stock, the entirety of the Company's issued common stock following the redemption described *supra*, to the ESOT.

90.    To finance that portion of the ESOP Transaction and the foregoing redemption, the Company borrowed  from JPMorgan, which became the Company's senior lender, and borrowed an additional capital from MCRC in the form of a mezzanine loan.  The Company, JPMorgan, and MCRC signed a number of documents and agreements regarding their respective loan agreements.  The Company, in turn, then loaned the funds to the ESOT, who then purchased Wade's remaining stock for that amount, which was paid in cash at the time of closing on December 30, 2016.

91.    Given that the Company and Wade engaged in this transaction for the purpose of providing a benefit to the Company's employees, the Company loaned that money to the ESOT on favorable terms, including a nearly nominal 2.26% interest rate and repayment over a period of 20 years, beginning the following December 31.  To memorialize its agreement to purchase

those shares, the ESOT, through the First Trustee, entered into a Stock Purchase Agreement ("SPA") with Wade on December 30, 2016.  A true and correct copy of the SPA is attached hereto as Exhibit 10.

### 4.    Wade's Share Price

92.    Pursuant to the SPA, the ESOT agreed to purchase 820,000 shares of common stock from Wade at a price of $25.00 per share, subject to adjustments if the Company's actual working capital as of the end of the following fiscal year ending December 31, 2016 exceeded or failed to exceed the parties' expectations.  *See* Exhibit 10 at Section 1.2.

93.    To obtain a downward adjustment of that purchase price, the ESOT was required to provide a written statement setting forth the Company's actual final working capital as of December 31, 2016, and the downward adjustment that the Company calculated by subtracting the Company's actual working capital as of December 31, 2016 from the amount that the parties previously estimated the Company's final working capital would be.  *Id.*

94.    The ESOT was required to provide that written notice to Wade within 30 days of receiving its audited financial statements, but no later than April 30, 2017, of the Company's determination regarding whether its actual working capital exceeded the estimated working capital or not.  *Id.*  Wade then had 30 days to provide a written statement accepting or objecting to the adjustment, though if he did not deliver an objection within that time period, the SPA provided that the Company's determination regarding that adjustment "shall become final and binding upon all parties."  *Id.*

95.    In accordance with that provision, the Company and its CPA firm (BDO), ***audited*** and analyzed the Company's financial statementsfor the period in question and determined that Wade was owed an additional $1.5 million, which was reviewed and approved by the newly

hired Second Trustee and Board members. The Company paid the adjustment in the fall of 2017 by drawing down on its line of credit.

### 5.     The Parties' Representations

96.     Through the SPA, Wade, the Company, and the ESOT all made certain representations and warranties to each other. *Id.* at Art. 3-5.

97.     Wade represented and warranted that, at closing he: (1) would be the sole lawful, beneficial, and record owner of the shares purchased by the ESOT and that he could and would transfer good, marketable, and valid title those shares, free and clear of all claims and preemptive rights, to the ESOT; (2) would have the full right, owner, and authority to transfer those shares to the ESOT and that he was legally bound to do so; (3) had not declared bankruptcy; (4) was not aware of any action or potential action that could affect his right to fulfill his obligations under the SPA; (5) would not default on certain agreements or court orders to which he was a party or was bound by fulfilling those obligations; (6) did not require the consent of any governmental or regulatory authority to fulfill his obligations; and (7) did not withhold money withheld in connection with FIRPTA because he was not a foreign person. *Id.* at Art. 3.

98.     The Company represented and warranted that it: (1) was a Massachusetts corporation and was authorized to conduct business in the states where it conducted business; (2) had accurate ByLaws and Articles of Organization; (3) had only issued and authorized shares being transferred by Wade to the ESOT and they were not subject to any restrictions; (4) had no outstanding restrictions, options, contracts, or demands pertaining to the Company's stock or they had been waived by the people who had the right to enforce those restrictions; (5) did not have any previously unidentified affiliates or subsidiaries; (6) had not engaged in self-dealing transactions with Wade; (7) had the authority to perform; (8) also agreed to a number of representations almost identical to those found in Article III; and (8) that no material adverse

27

events happened between December 31, 2015 and December 30, 2016, the day of closing. *Id.* at Art. 4 at Sections 4.1-4.13.

### 6.      The Company's Financial Statements

99.      The Company and Wade also represented that the Company provided the ESOT with financial statements for the years 2013-2015 and internally prepared financial statements as of October 31, 2016, and that the Company regularly kept and maintained documents. *Id.* at 4.11.  All of the statements were prepared by accountants in accordance with generally accepted accounting principles, "fairly present as of the date indicated the financial condition, assets and liabilities and results of the operations of the Company," and that internally-prepared statements "have been prepared in god faith in a manner consistent with past practice." *Id.* at § 4.11(a).

100.      The Company did not have liabilities or obligations of any nature customarily reflected or provided for in a corporate balance sheet prepared in accordance with generally accepted accounting principles, other than those recorded in full on the Company's balance sheet as of December 31, 2015, those incurred in the ordinary course of business since that date, or those set forth on a schedule to the SPA. *Id.* at 4.11(d).

### J.      **The Company's Insurance Standards.**

101.      Starting, in or about 2015, the Company's auto insurance policy was a retrospectively rated insurance policy, meaning that unlike a traditional insurance policy, the Company's premium obligations are periodically adjusted according to a formula based on the cost of claims actually paid by the insurer under the policy.  The Company paid the standard premium that the insurer would normally charge under a traditional policy with similar coverage based upon the anticipated aggregate value of claims, referred to as a Loss Pick.

102.      If the amount paid by the insurer on the policy exceeded the Loss Pick, the Company's premiums for that period would be adjusted upward, but, if the insurer paid less than

the Loss Pick, the Company's premium would be reduced and the Company would receive a

credit against the premium it had paid.

103.    The Company executed that policy with the full knowledge and participation of a

number of the Company's executives and stakeholders, including its CFO, Klein, its Risk

Manager, and its Fleet Manager, along with Wade.  Each of those individuals, along with others

at the Company, not only fully understood the mechanics of the Company's auto insurance

policy, but served as the main point of contact in negotiating and assessing the auto insurance

policy when it came up for renewal annually.  Those Company executives and managers

determined that the Company's auto insurance policy was the best option available to the

Company under its risk profile, which made the Company difficult to insure.

104.    At the time of renewal, the Company found that numerous insurance carriers

either refused to bid to insure the Company or denied the Company's request for coverage.

Those insurance carriers that did express willingness to insure the Company refused to provide a

traditional guaranteed cost policy at a cost effective price.  Further, the Company needed to both

limit further Letters of Credit that would have been required of other types of policies and to

stabilize its monthly claim expenses to help it cope with cash flow fluctuations.

105.    Based on those considerations, the Company decided to purchase the

retrospective auto insurance policy.

106.    The Company reported all accruals of reserved claims relating to the policy were

reported on a monthly basis and recorded the reserve amounts set by its insurer in accordance

with GAAP and with its past practices.

107.    The Company's auto insurance policy and its entire related claims history were

available to both the First Trustee and its advisors, including Empire, during the due diligence

policy, as were the Company's books and records that properly recorded and identified the accruals of reserved claims related to the auto insurance policy.  Neither the Company nor Wade undervalued or concealed any known claims under the policy at the time of the ESOP Transaction.

108.    In fact, in addition to a number of other representations and warranties, the Company and Wade also represented that:  (1) the SPA and Schedule 4.20 thereto set forth a list and brief description of each of the Company's insurance policies; (2) the Company had properly accrued all insurance premiums on its books as of December 30, 2016; (3) all claims, if any, made against the Company covered by those policies have been or are being settled or defended by the insurer and no excess liability exists, subject to certain limitations; and (4) the Company will maintain the policies through December 30, 2016 and there was not an increase in premiums through that date.  *Id.* at § 4.20.

109.    Critically, the Company's and Wade's representations regarding the existence and status of claims were "limited to matters known to the Company and/or [Wade] as of Closing" on December 30, 2016.  *Id.*

110.    The Company and Wade specifically negotiated and included that carve-out because both were concerned that unknown and unexpected charges and insurance claims might become known in the future and give rise to attempted claims for indemnification under Article 9 of the SPA because of the nature of the Company's auto insurance policy, which could give rise to additional retroactive premiums.

111.    Although that information was available to the Trustee, neither the First Trustee nor Empire personally questioned Wade about any aspect of the auto insurance policy, nor did he make any affirmative representations regarding the auto insurance policy or its costs.  Similarly,

neither the Trustee nor Empire contacted the Company's insurance broker to learn more about the Company's auto insurance policy or the possibility that charges or claims related to that policy might occur.  At the time of the negotiations over the transaction, Wade had absolutely no knowledge of any expectation that the premiums would increase as they did later after the transaction.

> **K.** **The Trustee's Failure to Properly Review the Insurance Policy.**

112.    Nonetheless, when the Company received invoices for additional amounts owed for the pre-ESOP Transaction period in August 2018, the Second Trustee and Empire, without conducting any investigation, made the bogus claim that Wade somehow misled the ESOT and Empire about the Company's insurance policies.

113.    Wade and the Company provided the First Trustee and every other party to the transaction with the information that they requested about the insurance policy during the time leading up to December 30, 2016 and explicitly identified the policy in Schedule 4.20 to the SPA.  *Id.* at Schedule 4.20.

114.    The First Trustee or its expert valuation consultant, Empire, seemingly failed to review one insurance policy or ask questions about that policy, despite having access to the documents and information as well as the opportunity to interview Wade and others.

> **L.** **Company's Failure to Adhere to Its Obligations to Wade.**

115.    In addition to the foregoing agreements, among others, Wade and the Company also executed an Executive Employment Agreement ("Employment Agreement") on December 30, 2016.  A true and correct copy of the Employment Agreement is attached hereto as Exhibit 11.

116.    The Employment Agreement provided, that the Company would employ Wade as its CEO for 4 years, though Wade remained an employee-at-will, subject to provisions governing his termination and compensation in the event that either Wade resigned or the Company terminated his employment prior to the expiration of the 4 year term.  *See* Exhibit 11 at Sections 1-3.

117.    The Company agreed to pay Wade an annual salary, that could be adjusted upward or downward annually by 5% as determined by the Board of Directors or Compensation Committee, if the Board appointed one.  *Id.* at Section 4.1.  Further, the Employment Agreement entitled Wade to participate in all of the standard benefits available to all employees and in all of the group benefits available to management level employees, along with a vehicle allowance, tuition reimbursement up to $15,000 annually if pre-approved by the Board, necessary and reasonable travel, entertainment, and business expenses, and six weeks of paid time off.  *Id.* at Sections 4.3-4.5.

**M.    Board and Executive Unlawful Behavior Cause Wade's Removal**

118.    Following consummation of the ESOP Transaction, the Company began to experience financial difficulty and had trouble meeting its debt obligations to JPMorgan, repeatedly slipping into default status on a quarterly basis, leading Wade to advise the Officers and the Board in September 2018 that the Company would need to take drastic action, including terminating employees, if it did not make immediate operational and financial changes and improve performance.

**1.    The Board's and Officer's Unlawful Behavior**

119.    On or about April, the First Trustee was removed as trustee of the ESOT and replaced by the Second Trustee, who was bound to the same terms contained in the Trust

Agreement, and was granted the same limited powers to act as a directed trustee and follow the Company's instructions.

120.    In late August 2018, Wade confronted and warned Marsh, then the Company's COO, about multiple past and potentially ongoing sexual assault and harassment accusations made against Marsh from subordinate female employees that had come to Wade's attention.

121.    Further, Wade confronted Board Defendants Perry and Newell about continued personal conflicts of interest that had arisen between each of them and the Company due to their ongoing efforts to derive income from the Company in addition to their regular Board fees.  Both Perry and Newell had collectively billed TES nearly $200,000 per year to date for little to no valuable service.  Wade made it clear to both Perry and Newell that their efforts engage the company in this manner would no longer be tolerated.

122.    Wade then went on vacation in October 2018, when he returned only to be confronted by the Board.  Specifically Newell and Perry – the very two Board members who Wade recently warned – had approached Wade with "anonymous" complaints made to the Trustee about Wade's managerial practices, particularly accusations of theft through accounting expenditures, nepotism and hostility. Having never  received any such complaints during his 20-year history with the Company, knowing that the complaints were demonstrably false, and believing that the complaints originated with Marsh, who now feared for his future with the Company, Wade naively dismissed the accusations as desperate school-yard tactics.

123.    Separately within days, Marsh also confronted Wade admitting that his managerial team was the source of the complaints, and that he had orchestrated it because he felt that he was taken advantage of since the Board shared confidential documents with him, most notably, Wade's employment agreement, all while Wade was away. He then went on to demand

that Wade cut him a check for $380,000 or he was going to leave and take all of Tri Wire's

business with him. Wade said he could not pay that amount anytime soon due to the Company's

financial distress but he would address it as soon as it he could simply to buy himself some time.

Undeterred, Marsh, Perry, and Newell stepped up their efforts to undermine Wade, giving rise to

continuous ex-parte meetings, behind Wade's back, and against Board policy. Further dividing

the executive offices, Wade was to find out later that newly hired CFO Ruben Klien was also

having such inappropriate secret meetings with Marsh and the Board as well.

### 2.   The Second Trustee Fails to take Any Corrective Action

124.    In December 2018, as CEO and Chairman of the Board, Wade advised the Second

Trustee about the ongoing hostile manipulation  directed by Marsh, Perry, and Newell and the

possibility of long-term damage to the Company that might result. Wade, simply for professional

courtesy informed the Trustee that he thought it would be best to replace Newell and Perry as

they were the source of enabling Marsh's under-handed actions. At the December 2018 Board

meeting of which Wade personally invited the Trustee to attend, Wade further voiced such

concerns and also informed the Trustee of Marsh's history of inappropriate behavior including

potential illegal behavior with various subordinates.  The Second Trustee declined to take any

action based upon Wade's concerns.

125.    After being advised by Wade that the Company's senior executives and Board

members were interfering with the management and operations of the Company simply to save

their own jobs at any cost, the Second Trustee failed to even address the matter, let alone take

any independent action or seek Board leave to take appropriate action to prevent lasting harm to

the Company in furtherance of its fundamental duty to protect plan participants by safeguarding

the only asset of the very Trust it governed.

126.    The Second Trustee, Gould, and Pendergast both directly and indirectly caused and exacerbated division among the members of the Board, unnecessary  damage to the Company, the ESOP, and the ESOT, and called their own independence into question, along with their judgment, given how they repeatedly violated the fiduciary duties imposed on them by the Trust Agreement and by ERISA.

### 3.    The Board Defendants Undermine Company Changes

127.    By early January 2018, Wade persevered in reorganizing the Company. On Jan 8th, he shared a major draft restructuring plan with Marsh and Klien that would realign the Company's operations and involve significant layoffs.  Marsh objected to Wade's proposal, walked out of the building and texted Wade that he quit. He then proceeded to threaten Wade that he would be reaching out to Comcast, he plans to stay in the business regardless on his non-compete.  Lastly in defiance of Wade's specific directive, Marsh then communicated the reorganization plan to the rest of the Company's executive and non-executive management in an effort to gain support against Wade.

128.    It was at that that same time that  Wade learned that both Newell and Perry were conducting clandestine meetings with Marsh and other staff members in furtherance of their efforts to undermine Wade and secure their own futures with the Company.  The remaining two Board members, Gesmondi and Wade, objected to Newell's and Perry's behavior and advised the Second Trustee about it by informing Gould and setting up an emergency board meeting to try to resolve the recent months' events.

129.    While Newell denied these private meetings when confronted by Gesmondi and Wade, Marsh admitted that they occurred during an emergency Board meeting in which both Marsh and Gould had attended. .  Most troublingly, even after Marsh admitted to the complained of behavior and Newell was caught lying to the Board and the Trustee  Gould defended Newell,

threatened Wade that he would "add more Directors to the Board"  and, as evidenced by subsequent events, decided to blindly throw in his lot with Marsh, Newell, and Perry and support their efforts to seize control of the Company from Wade.

130.    Both Marsh and Klien then proceeded to offer ultimatums under the guise of "org chart options' in which Marsh would agree to return to work, all of which would position both Klien and Marsh to usurp Wade and answer only to the Board. This was unacceptable to both Gesmondi and Wade whom together had the majority vote. In a final effort to calm things down and refocus back on work matters Wade did agreed to allow Marsh strictly answer to Ruben Klien for day to day correspondence and that Wade would avoid any interaction with Marsh in the short term but also that all Board interaction with management would go through traditional channels of the Chairman and the CEO which remained to be Wade. Newell, Perry, Marsh were not pleased with the decision.  A formal Board letter was sent to Marsh indicating these terms for his return.

### 4.    The Board Unlawfully Ejects Wade

131.    One week later, in early February 2019, Perry contacted Wade indicating that new allegations were being made about Wade and that Perry was directed by the Second Trust, namely Gould, to conduct an independent investigation of Wade for which Wade did not have the privilege to participate and would allow the rest of the Board to continue to interact with management at will. Then, only a few days later, during a follow up Board meeting, Newell and Perry waited for Gesmondi to leave, providing them majority voting power, and voted to suspend Wade as CEO for one month and to appoint themselves to a two-person Special Committee, purportedly for the purpose of investigating the false accusations that they had either made themselves or fomented and obtained from others.  Within hours of suspending Wade, Newell

and Perry, with the support of the Second Trustee and Gould, directed management to seize control of Wade's banking and email authority.

132.   On or about February 12, 2019, the Second Trustee purported to take action as directed trustee and sole shareholder of the Company to add a fifth seat to the Company's Board and to elect Maurice Hryshko, Bob Newell's business partner, to the Board, something that it had no power to do so under the corporate structure of the Company and its agreements with Wade to remain as Board Chair.  By taking those actions, the Second Trustee, Gould, and Pendergast took action that exceeded the Second Trustee's authority as ESOP trustee, failed to follow the terms of the Trust Agreement, and violated their fiduciary duties to the Trust, the ESOP, and the ESOP's participants and the Company's employees.

133.   In addition, the Second Trustee's, Gould's, and Pendergast's support and facilitation of the Board's invalid creation of the Special Committee were taken in reckless disregard of the Company's governance documents and contracts, in that, the entire Board did not participate in this decision, including covenants in certain documents related to the ESOP Transaction that mandated that Wade retain his position as Board chair, placing the Company's financing arrangements in jeopardy since Wade's position was required under the various credit facilities provided to the Company along with the fact his removal was in violation of all of these agreements.

134.   On or about February 14, 2019, Wade, through his counsel, wrote to Gould and the Second Trustee and demanded that the Second Trustee acknowledge the invalidity of the events of February 12, including Wade's suspension and take steps necessary to remedy the unlawful expansion of an additional Board seat and to reverse the summary appointment of Hryshko.  A true and correct copy of that letter is attached hereto as Exhibit 12.

135.    The Trust responded two days later on February 16 through its counsel, who refused Wade's demand, and asserted that the Second Trustee had received complaints about Wade including unspecified alleged "potential misconduct… and diversion of the Company's funds to Mr. Wade's family."  A true and correct copy of that letter is attached hereto as Exhibit 13.

136.    The Second Trustee acknowledged that the Trust Agreement limited the scope of its power as a directed trustee, but refused to reverse or otherwise remedy its failure to abide by those limits, relying on inapposite law and somehow arguing that Wade allegedly provided the Second Trustee discretion over a decision on one occasion somehow granted the Second Trustee freedom from the shackles imposed upon it by the Trust Agreement.  *Id.*

137.    The next day, February 17, 2019, Wade responded through his counsel, Morgan Lewis, and refuted the Second Trustee's specious arguments regarding the nature and extent of its authority and the legality of its efforts to ignore the Company's direction and to act independently by demonstrating that the facts and circumstances alleged did not give the Second Trustee authority under ERISA to act as it did.  A true and correct copy of that letter is attached hereto as Exhibit 14.

138.    Accordingly, Wade once again demanded that the Second Trustee withdraw the actions undertaken on February 12, that were void in any event.  Wade also communicated to the Second Trustee that as a major creditor of the Company, he has significant interest in securing the Company's viability and prosperity, and, moreover, that he welcomed any investigation, however bogus, provided that it is fair and impartial and focuses on all of the Board members' and Officers  conduct of the last 6 months, not just Wade's, particularly given that Wade had

complained about the other Board members and executives to Gould on several other occasions to no avail.

139.    The Second Trustee responded through its counsel two days later on February 19, refused Wade's demands and incorrectly accused Wade of somehow obstructing the very investigation that he had welcomed only two days earlier.  Incredibly, the Second Trustee argued that Wade was hindering an investigation by demanding that the Second Trustee perform a complete investigation into not only the false allegations made about Wade, but also into the surrounding facts and circumstances, including the genesis of those allegations and the collusion between members of the Board and Company executives to undermine Wade and remove him from the Company for their own benefit. During the entire month of February 2018, Wade was unable to enter the corporate office, utilize his emails, and was ordered to not participate in any Comcast meetings. All the while Wade was never informed of any actual specific allegations nor the source of such and Newell and perry continued to work daily with Klien and Marsh with no official authority to do so.

140.    In a second effort to avoid long, costly litigation that would only serve to hurt Wade and the Company financially (the Second Trustee, Newell and Perry were forwarding all their cost onto the Company) Wade negotiated a compromise with Gould that would result in Wade taking a 30 day leave, voiding Hryshko's invalid appointment, and bringing on two additional independent Board members to investigate whatever these unknown claims.

141.    In the event of any termination of Wade's employment, the Company agreed to pay Wade the sum of any unreimbursed travel, entertainment, and business expenses and any of his  salary earned but unpaid, as well as any accrued but unused paid time off through the date of termination.  *Id.* at Section 5.1.  If the Company terminated Wade's employment for "Cause"

that would be the Company's only payment obligation under the Employment Agreement, which defines "Cause" as (1) dishonesty of a material nature, fraud or embezzlement of the Company's funds or assets; (2) conviction of a felony charge, including pleas of guilty or no contest; (3) failure to follow the Board's reasonable instructions; (4) breach of fiduciary duties owed to the Company; (5) a material violation of the policies in the Company's employee handbook; (6) willful misconduct in performance of his duties; or (7) abuse of alcohol or drugs that interferes with performance of his duties. *Id.* at Sections 5.1, 11. If the "Cause" for termination is any of those listed above other than reasons (1) or (2), the Employment Agreement requires the Board to give Wade written notice and a 30 day opportunity to cure. *Id.* at Section 11. If the Company terminated Wade's employment at any time during the four year term for any reason other than "Cause," provided that Wade executed a general release within 30 days after his employment, the Company was obligated to pay Wade an amount equal to 18 months of his salary at the time of his termination. *Id.* at Section 5.2.

### 5. Defendants Breached Their Fiduciary Duties

142. The Second Trustee, Gould, and Pendergast refused to fulfill their fiduciary duties to the Trust, the Company, and their respective beneficiaries and stakeholders, however, and instead chose to accept the allegations made by Newell, Perry, Marsh, and others working in consort with them, to support their efforts to usurp control of the Company at any cost, and to pin blame for the Company's floundering performance on Wade.

143. The Second Trustee, Gould, Pendergast, Newell, Perry and Marsh undertook those actions for their own benefit and in violation of their respective fiduciary duties of care and loyalty that they owed to the Company, the Trust, and the respective beneficiaries of and stakeholders in each.

144.    Critically, in January and February 2019, when the Second Trustee, Gould, Pendergast, Newell, Perry, and Marsh made their first combined effort to oust Wade from the Company, they justified their actions by claiming that they had a duty to investigate allegations that Wade had engaged in some unspecified misconduct in the months immediately preceding his suspension in February 2019, long after (two years) the ESOP Transaction occured.

145.    With Wade out of the picture, at least temporarily, Newell and Perry seized control of the Board and, with reckless disregard for the Company's precarious financial position, caused the Board to, once again, take actions specifically designed to enrich themselves while weakening the Company and increasing the likelihood that the Company would further default on its obligations to both the Senior Lenders and to Wade.

146.    Specifically, during Wade's 30 day leave, the Board (1) voted to overturn Wade's previous motion to adjust Board fees giving themselves an actual raise  by increasing their own compensation during a time when the Company should have been reducing its expenses; (2) They also overturned previous Wade's previous motion to freeze certain managerial salaries based on Marsh's earlier objections; (33) voted to incurred additional debt to add 48 new trucks to the Company's fleet, despite Wade and Smith's adamant objection regardless that only Smith and Wade were the only two qualified industry executives on the Board and that Wade presented a list of scores of trucks that were in inventory but not being used. The Company  had no need for those vehicles and was already struggling to meet its debt obligations before that transaction; (4) overrode Wade's previously negotiated salary for CFO  Ruben Klien illegally voted to give Klein an additional $30,000 in additional salary 5 months into the new job;   and (5) incurred nearly $1 million of legal expenses through the excessive and unnecessary use of multiple, attorneys, accountants, and consultants

147.    The Board also capitalized upon Wade's suspension by harassing  the employment of Wade's son and daughter, John Jr. and Taylor,, who the Company employed as Operations Manager in New York City and HR manager respectively.  Both whom had a stellar employment records with the Company, both college educated and driven by the business ' legacy. Two employees  Tri Wire could little afford to lose since at that time competent and capable employees were in high demand during this tumultuous period.  Both, John Jr. and Taylor  posed a threat to Newell, Perry, and Marsh, who were determined to expel the Wade family from the Company.  Like every member of the Wade family employed by or associated with the Company, in the run-up prior to his termination, John Jr. and Taylor were subjected to harassment, and, ultimately, either forced to leave or terminated by the Company at the direction of Newell, Perry, and Marsh, all of whom were driven by revenge and self-interest in their efforts to punish Wade's family members for exposing the behind the scene incompetence's.

148.    At the April 20, 2019 Board Meeting, Perry, Newell, Landry, Smith, and Gesmondi, voted to terminate Wade "Without Cause"  as the Company's CEO, President, Treasurer, and Secretary citing nothing specific but with input and advice from Croscut and her new firm, Devine, both of whom had acted as counsel to both the Company and to Wade personally at all times relevant hereto.

149.    On May 2, 2019, the Special Committee wrote to Wade through counsel, demanding that Wade pay the Company "an unsubstantiated  $1,412,611.88 and provided Wade with minutes of an April 20, 2019 Board Meeting proving that Newell's and Perry's scheme to oust Wade from the Company and seize control had reached fruition.  A true and correct copy of that May 2, 2019 letter and the Exhibits thereto is attached hereto as Exhibit 15.

42

150.    Having previously terminated Wade's son, the Board also voted at the April 20, 2019 meeting to terminate the employment of Wade's wife, Sharon, and Wade's daughter Taylor simply due to her relationship with Wade and their desire to purge anyone related to Wade from the Company.

### 6.      The Out of Control Board Makes Up New Allegations Against Wade

151.    Although their investigation into Wade's behavior and management of the Company following the ESOP Transaction proved meritless, as Wade knew it would, the Board and the Special Committee chose to pivot and to then refocus their efforts on questioning pre-ESOP Transaction business activity that had been conducted openly and properly recorded in the Company's books. Essentially this charade became a full on witch hunt.

152.    Initially, the Board and Special Committee contended that Wade received $1,118,093.30 in cash at closing and left the post-ESOP Transaction with a corresponding equal debt that was immediately due and owing to one of its customers for an alleged overpayment that the Board incorrectly concluded that Wade concealed both internally and from the Company's lenders.

153.    The Board and Special Committee speculated that if the ESOT or the Company's lenders had known about the overpayment, they would have insisted that the Company repay it or insisted upon liquidity restrictions on the payment of the Working Capital Adjustment to Wade to account for the debt.  Alternatively, they speculated that the Board would not have approved the Working Capital Adjustment or the Company's use of its line of credit to pay Wade the $1.5 million Working Capital Adjustment if they had been aware of the overpayment.

154.    The Board and Special Committee, however, failed to recognize that (1) overpayments like this occurred frequently throughout the Company's history; (2) the Company recorded a credit memo regarding that overpayment in its accounts receivable ledger which was

43

consistent with the Company's practice; and, (3) critically, the Board and Lenders had every opportunity to examine the Company's books and investigate that overpayment and credit in advance of the ESOP Transaction, as did the First Trustee and its valuation expert, Empire.

155.     Similarly, the Board had full access to the Company's books and had the opportunity again to investigate and question that overpayment and the corresponding credit while the Company was in the process of determining the Working Capital Adjustment under the parties' contract, which required the Company and the First Trustee to engage an independent auditor to confirm the accuracy of the Company's finances before paying Wade.

156.     As discussed above, Wade's entitlement to the Working Capital Adjustment based upon the audited financial statements became "final and binding upon all parties" before the Company paid that amount to Wade.  Nonetheless, eager to manufacture a reason for Wade's termination and grasping at straws after investigating the false allegations raised toward the end of 2018, the Special Committee and Board demanded that Wade pay the Company the total amount that the Company's client had overpaid and began to lay the groundwork for their future efforts to lay the blame for the Company's troubles at Wade's feet.

157.     The May 2, 2019 letter also demanded that Wade repay $83,150 to the Company to reimburse it for tuition payments that it made to New York University ("NYU") on Wade's behalf for his attendance at the Stern School of Business Executive MBA Program.  Pointing to the terms of the Employment Agreement, entitling Wade to receive $15,000 in tuition benefits from the Company per year, the Board and Special Committee claimed that Wade was obligated to repay the Company the difference between the $113,150 paid by the Company for three semesters of tuition and the $30,000 that Wade was entitled to under the Employment Agreement.

158.     Although Wade had presented the Special Committee with minutes of the
December 2017 Board Meeting, where Wade sought and received Board approval to modify that
term of the Employment Agreement to lift the $15,000 annual cap and have the Company pay
for him to obtain his MBA at NYU, the Special Committee demanded repayment based upon the
language of the Employment Agreement.

159.     Incredibly, the Special Committee argued that the Board was unaware of the
tuition cap contained in the Employment Agreement, although they had approved the same
contract only one year earlier, after it had been placed on the agenda and brought it up for Board
vote specifically because Wade sought the tuition cap waiver.

160.     Finally, the Company demanded that Wade pay $211,368.58 to the Company to
reimburse it for state taxes allegedly owed to Connecticut, Maryland, and Vermont, unpaid
federal income taxes, and uncashed payroll check that allegedly should have been remitted to the
Commonwealth of Massachusetts.

161.     Again, the Special Committee and Board demanded that Wade repay those
amounts based upon the contention that he somehow unfairly benefited from the Company's
alleged failure to pay those taxes when they were purportedly due and owing, even though:

        a.      Wade had no obligation to indemnify the Company or alter the purchase
price by May 2, 2019, more than two years after the ESOP Transaction;

        b.      they had no proof that Wade knew about these alleged underpayments, let
alone concealed them with or without any requisite level of animus; and

        c.      the Company's supposed obligation to pay the relatively paltry amounts
identified in the May 2 letter were not recognized or identified by any of the parties to the
ESOP Transaction or their skilled professionals during the time leading up to the ESOP
Transaction, while they were conducting exhaustive due diligence and examining the
Company's books and records down to the smallest detail.

N.     **Wade's Lawyer's Obvious Conflict of Interest.**

162.     In June of 2019 Wade learned that JPMorgan issued a forbearance letter to the Company, further escalating the Company's financial crisis, prompting Wade to reach out to Croscut on May 10 to discuss various issues related to the status of his employment and as both Chairman and Creditor.

163.     That same day, Wade's counsel, had a teleconference with Croscut, where they discussed Wade's belief that Croscut represented both Wade and the Company, particularly as she had personally given Wade legal advice up to and at the time of the ESOP Transaction.

164.     Following that call, Croscut finally responded on May 14, 2019 to Wade's written communications to her, but only after consulting with Timothy Madden, Esq., who represented the Special Committee, that continued its existence even after supposedly completing the investigation of the post-ESOP Transaction HR allegations against Wade.  Croscut opined that there was no immediate need for Wade to respond to the May 2 letter and noted that she was focusing on other issues for the Company.

165.     Wade's counsel wrote to Croscut on May 17, 2019, reiterating Wade's position that Croscut represented both him, personally, and the Company, and formally advising that Wade did not give informed consent to Croscut's continued representation of the Board or the Company in connection with actions adverse to Wade, including, among other things, the unlawful employment actions taken by the Board, the Board's communications with the Special Committee, any matters relating to Wade's Chairmanship, or any issues related to Wade's status as creditor.

166.     Notwithstanding those conflicts, Croscut and Devine continued to represent the Board and the Company and to provide them legal advice and assistance in their dispute with Wade.

O.     **Wade's Attempts at Correcting Defendants' Mess.**

167.    Through June and July 2019, Wade made multiple attempts to convene a special meeting of the Board, the Second Trustee, and the Company's Lenders to address the Company's ongoing financial crisis and continued default under its loan covenants and to address the failure of the Board and management to address those issues.  Newell, Landry, and Perry, all members of both the Board and the Special Committee, refused to attend and claimed that there was no need to hold such a meeting.

168.    Shortly thereafter, at the beginning of July 2019, Gesmondi, the Director most knowledgeable about the Company's financial affairs, abruptly resigned and advised Wade that he did not want to be associated with the Board given the recent behavior of the other Directors.

169.    Faced with little other choice and an viable extra vote due to Gesmondi's open seat, Wade moved for a vote to not renew Newell and Perry's seats since they had expired in June 2019, just 40 days prior,  and then motioned to expire the seats in order to bring the Board back to the originally agreed 4 person Board.  The Board voted 2-2, leaving Wade with the tie-breaker as Chairman pursuant to his agreements with the Company.  Wade then proceeded to direct the Second Trustee to give notice that Newell's and Perry's respective terms would not be renewed upon expiration of their terms and that their seats would be retired.

170.    Unsurprisingly, the Second Trustee, Gould, and Pendergast ignored the Board's instruction and then purported to remove Wade as Director and Chairman with the assistance of its chosen Board members, causing the Company to violate its loan covenants to Wade and, by extension, its senior creditors.

171.    On August 2, 2019, attorneys from Tucker Ellis LLP, who purported to represent the axis of powers aligned against Wade, including but not limited to the Company, the Special Committee, Croscut, and the Second Trustee, wrote to Wade's attorneys with further demands of

cash payments and accusations of fraud.  A true and correct copy of that letter is attached hereto as Exhibit 16.

172.    When Wade did not respond to the ridiculousness, they purported to remove him as Chairman of the Board in violation of the various agreements between the Company, the ESOT, and Wade, entitling Wade to remain as Chairman of a very specific 4 seat Board. and to hold enhanced voting rights, that Wade specifically bargained when agreeing to finance the ESOP Transaction, so he could exert the authority and control necessary to ensure the Company repaid its debt to him.

173.    At this time, Rich Smith, the Company's last remaining Director, outside of Newell, Perry, and Wade, abruptly resigned.  Although the Second Trustee, the Board, and the Special Committee made incredible, sweeping demands of Wade and made serious allegations that Wade had defrauded the Company and the ESOT, they failed to describe Wade's alleged misrepresentations or omissions with any actual facts and were unable to provide any proof in support of those claims. Rich Smith tried to appeal to the Second Trustee, specifically Gould, that Newell Perry and Landry were (1.) misleading the Trustee, (2.) were vastly inexperienced to manage as such,(3.) were strictly motivated by their animosity for Wade, thirst for power and financial benefit (4.) while Marsh had orchestrated the entire ordeal in order to seize control through Ruben who clearly serves as Marsh's puppet and the Board's official empty suit.

**O.    The Board and its Attorneys Continue to Make Up Allegations Against Wade**

174.    The attorneys representing the Second Trustee, the Board, and the Special Committee summarily alleged that Wade made affirmative misrepresentations to Empire "and others involved in the due diligence" regarding the nature of the Company's auto insurance policy.  However, those allegations have no basis in fact and, moreover, contradict available

evidence demonstrating that Wade and the Company disclosed the existence of the auto insurance policy during the due diligence process and answered any questions directed to him.

175.    Wade had relied on the full and fair ESOP transaction process that required Empire and the other skilled professionals retained by the Trustee, among others, to conduct due diligence, including, but not limited to, Croscut and SG&C to analyze documents requested from and produced by the Company and when posed answered any questions directed to him.

176.    As valuation experts with particular knowledge, skill, and expertise at analyzing and assisting with the structuring and implementation of ESOPs, Empire had a duty on behalf of the Trust to investigate the Company's history, finances, and projected future value, necessarily requiring Empire to analyze the Company's insurance policies and outstanding claims as well as to assess the Company's risk and the impact on the Company's value.

177.    Based upon the Second Trustee's letters of May 2, 2019 and August 2, 2019, and Wade's personal knowledge about what Empire and the First Trustee did or did not ask about in advance of the ESOP Transaction, it is apparent that the Second Trustee believes that the ESOP Transaction was not properly valued in advance of and in connection with the December 30, 2016 transaction.

178.    Consistent with their past behavior, the Second Trustee, Gould, and Pendergast apparently accepted Empire's self-serving accusations at face value and in disregard of proof that the Company and Wade had provided information regarding the Company's auto insurance policy to Empire and to every other entity that conducted due diligence in advance of the ESOP Transaction.

179.    When confronted by the Second Trustee about its failure to properly investigate the nature of the auto insurance policy and the Company's potential future risk to have increased

premium obligations, Empire realized its error and attempted to shift blame to Wade by falsely alleging that Wade had affirmatively misrepresented the nature of the insurance policy.  To the contrary, neither Empire nor any other party involved with the ESOP Transaction or the due diligence process made any affirmative inquiry to Wade regarding the auto insurance policy, nor did Empire question anyone with information about the policy, including, but not limited to, the Company employees or the Company's insurance broker.

180.    In addition to their previously disproven allegations regarding the Company's auto insurance policy, the Second Trustee, Special Committee, and Board also asserted that Wade failed to disclose that the Company employed Sharon; had created a construction division; and had paid bonuses of $2,835,500 to Wade and others, including Wade's family members.

181.    Contrary to the Second Trustee's unsupported allegations, Wade did not make any representation regarding his willingness to terminate the employment of his wife or other family members prior to the ESOP Transaction, nor was the issue raised by any of the other parties thereto, and no such representations or covenants are set forth in the transaction documents.    All transactional closing payments were not only consistent with the cash free/debt free nature of the ESOP Transaction, but was closely managed by all parties to the ESOP Transaction, their advisors, and was performed with the full knowledge, consent, and participation of, BDO, the First Trustee, JP Morgan, Empire, MCRC, and BellMark Partners.

182.    Further, the Second Trustee's allegation that Wade has some liability to the ESOT or the Company as a result of those closely monitored and agreed upon payments further underscores the Second Trustee's abandonment of its fiduciary duties to the Company in favor of its efforts to support and facilitate the efforts of the Board and the Special Committee to malign and discredit Wade.  Wade similarly refuted the Second Trustee's claims regarding the

Company's new construction division, which the First Trustee and other parties to the ESOT

Transaction knew and approved of prior to the ESOT Transaction as part of the Company's

efforts to diversify revenue.

183.    In fact, the Company's plan to start that construction division was, specifically,

discussed with Empire, the First Trustee, and the Company's creditors prior to the closing of the

transaction, yet neither the First Trustee nor any other party raised ay concerns or asked any

questions about the division or the potential inadequacy of the Company's capital reserves.

Moreover, the Second Trustee and the Board reviewed issues related to the construction division

just three months after its launch and did not raise any concerns at that time.  The Second Trustee

also knew full well that any losses attributable to the construction division were attributable to

the post-transaction implementation of that division and had no immediate impact at the time.

184.    Faced with mounting liquidity problems, floundering operations, and an openly-

stated fear of the prospect of defending claims for breach of fiduciary duty as the ESOP Trustee,

the Second Trustee has belatedly attempted to shift blame for the Company's financial problems

to Wade and away from the First Trustee and Empire, who had a fiduciary responsibility to

ensure that the ESOT paid not more than fair market value for the shares.  To the extent any

overpayment occurred, such overpayment is attributable to the parties who failed in their due

diligence, and from the Board and management, who exacerbated the Company's financial

problems.

185.    By failing to investigate the facts and evidence at hand, blindly accepting

unsupported allegations as true, supporting the Board's efforts to oust Wade from the Company,

and communicating about these issues with others, failing to seek any redress from the parties

legal responsible to ensure the First Trustee not overpay, the Second Trustee has abandoned its

objective independence, damaged the Company's reputation as a stable service provider, and worsened the Company's financial position, putting it at further risk to default on its obligations.

### P.     Defendants' Defamatory Statements Regarding Wade.

186.    Based upon many statements made by Gould to both Wade and to others, it is apparent that the Second Trustee, Gould, and Pendergast also allowed their judgment to be clouded by personal animus against Wade, prioritizing these personal feelings over the duties that they owe to the ESOT, the Company, and the respective beneficiaries and employees of each.

187.    The Second Trustee, Gould, and Pendergast believed that Wade would simply accept their demands once he saw that all sides were now aligned against him because any defense he could mount to their combined allegations would damage the Company and the ESOT, as well as impair the Company's ability to repay its debt to Wade.

188.    The Second Trustee, Gould, and Pendergast, along with Newell, Perry, Marsh, and Empire have also published defamatory statements to others involved in the ESOP Transaction and to the Company's clients, including Comcast, by falsely alleging, among other things, that Wade defrauded the Company and the ESOT and Wade engaged in self-dealing behavior to the detriment of the Company and the ESOT.  Those statements have irreparably injured Wade's once sterling reputation in the cable industry, that he earned over the course of his 25 year career, and have adversely affected Wade's ability to earn a living.

189.    Further, on August 6, 2018, Croscut and Devine communicated false and defamatory statements regarding Wade in connection with his purported removal from the Board to JPMorgan's counsel.  In connection with that communication, Croscut also sent JPMorgan's counsel an email analysis that she drafted in support of her continued representation of the Company and the Board as well as the legal counsel she provided to same in support of their

efforts to invalidate the removal of Perry and Newell from the Board and to effectuate Wade's removal.

190.    Despite knowing that both she and her firm were prohibited by the Massachusetts Rules of Professional Conduct from representing the Company in any action adverse to Croscut's client Wade, Croscut and Devine continued to serve as counsel to the Company and to provide the Board with legal advice and assistance in connection with their dispute with Wade.

191.    Consistent with that course of action, on August 6, 2019, Croscut communicated with Wade's counsel on August 6, 2019 on behalf of both the Second Trustee and the Company, advised that Wade had been removed as a Board member, forwarded the pertinent Board resolution, and directed Wade to limit further communication with the Board to his position as a subordinated noteholder.

192.    Communications received from Croscut around that same time also demonstrate that Croscut had assisted the Board and the Company in their efforts to negotiate a forbearance with JPMorgan without Wade's participation as Chairman of the Board, in violation of the Company's governance documents and contracts and in violation of her fiduciary duties to Wade.

193.    Subsequently, on October 1, 2019, the Second Trustee and the Special Committee wrote to Wade through their counsel at Tucker Ellis LLP reiterating the demands set forth in their August 2 letter and threatening to cancel the Series A and Series B Notes on behalf of the Company and the ESOT.

## IV.    CLAIMS

## COUNT I
## [RICO ACT: WIRE FRAUD PREDICT ACT AGAINST

**ALL DEFENDANTS]**

194.     Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 192 as if fully set forth herein.

195.     Defendants knowingly conducted and/or participated, directly or indirectly, in the above described conduct through a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(5).

196.     Defendants engaged in a pattern of racketeering activity as alleged herein, including but not limited to, racketeering constituting wire fraud under 18 U.S.C. § 1343.

197.     Defendants intentionally formed and participated in a scheme or artifice to defraud Plaintiff of his ownership and property interest in, including, among other things: (1) the Company; (2) his position as Chairman of the Board; and (3) his position as CEO by making false allegations regarding his behavior and management of the Company.

198.     As alleged herein, Defendants conspired against Wade with the intent of ousting him from the Company and depriving him of his ownership interest therein without paying him the consideration agreed upon and engaged in an extended pattern of fraudulent concealment, making of fraudulent statements, and extortion towards that end.

199.     In particular, the Board, the Officers, the Second Trustee, Gould, Pendergast, and Empire made false statements about Wade as described at length.  Further, Defendants intentionally formed and participated in the scheme for the purpose of ousting Wade from the Company, seizing his ownership interest in the Company, and/or in his contractual right to control and manage the Company, a condition precedent to Wade's decision to consummate the ESOP Transaction, and to his rights as a creditor to be repaid.

200.    Moreover, the Board, the Officers, the Second Trustee, Gould, Pendergast, and Empire attempted to extort Wade into abandoning his interest in the Company, his position as CEO, and his position as Director and Chairman by threatening to take action against Wade personally, and by threatening to diminish the value of the Company as well as to impair the Company's ability to generate sufficient debt obligations to meet its obligations and to drive it into insolvency.

201.    In connection with those efforts, Empire falsely represented that Wade had made certain misrepresentations or omissions of material fact that would have altered its valuation. Wade neither misrepresented nor omitted material facts to Empire, who had access to the very information it claimed it did not received when confronted about its alleged valuation errors by the Second Trustee.

202.    Defendants engaged in multiple acts of wire fraud in violation of 18 U.S.C. § 1343, by transmitting and causing to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures or sounds for the purpose of executing the scheme.  Specifically, Defendants' violated the wire fraud statute when Defendants falsely accused Wade of engaging in unlawful behavior, failing to manage the Company properly, misappropriating, diverting, and/or embezzling funds from the Company, or misrepresenting material facts regarding the Company's insurance policy, total potential risk, and operations, so that there could be no purpose served other than to damage Wade and benefit Defendants.  Many such instances of such wire fraud have involved the Board, the Officers, the Company, the Second Trustee, Gould, and Pendergast who communicated principally through telephone and e-mail while concocting and implementing their conspiracy.

203.    The purpose of Defendants' scheme was to illicitly and illegally enrich Defendants while defrauding and destroying Wade.

204.    All of the predicate acts were and are related, establishing a pattern of racketeering under 18 U.S.C. § 1962(c), as their common purpose was to defraud and take money and property, through unlawful means, from Plaintiffs.

205.    Further, Defendants intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity.  Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

206.    Defendants and the non-party participants in the illegal scheme, personally or through their agents, directly or indirectly, directed and/or participated in the acts alleged herein and employed the same or similar methods in their direction and/or participation of said acts.

207.    Defendants had specific intent to deceive and defraud Plaintiffs.

208.    As a direct and proximate result of Defendants' racketeering, Plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT II
## [FRAUD AGAINST ALL DEFENDANTS]

209.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 207 as if fully set forth herein.

210.    Defendants intentionally, knowingly, fraudulently, and with an intent to deceive, have made false and misleading statements designed to injure Plaintiffs and the Company, to strong-arm Plaintiffs into silently accepting those allegation as if they were true, to oust Wade as

CEO, Director, and Chairman, and to cause the Company to assert false claims against Wade and remove him from the Company's control.

211.   Those false allegations, that are detailed in the e-mails attached to this Complaint as Exhibits 13, 15 and 16 damaged not only Wade, who was stripped of his ownership interest, title, and livelihood, but also the Company, who was left in a weakened and vulnerable a financial state such that it defaulted on the Senior Loans on several occasions and demonstrated that it cannot repay its debt to Wade.

212.   Defendants knew the representations to be false when made or that they had an insufficient basis for making the representations.

213.   Wade did, in fact, reasonably and justifiably rely upon the foregoing material misrepresentations as true and acted upon them by agreeing to the Company's suspension as CEO that led to his ultimate removal of him as CEO pending an investigation, consenting to an investigation into the meritless claims made against him.

214.   Had Wade known the nature of Defendants' false and fraudulent misrepresentations and conduct, Wade would not have relied and acted upon them.

215.   As a result of Defendants' fraudulent misrepresentations and conduct and Wade's justifiable reliance and action thereon, Plaintiffs have sustained compensatory damages and been injured in an amount to be determined at trial.

## COUNT III
## [BREACH OF FIDUCIARY DUTIES UNDER ERISA
## 29 U.S.C. §§ 1109, 1132(A)(2), 1132(A)(3) AGAINST THE
## SECOND TRUSTEE, GOULD AND PENDERGAST]

216.   Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 214 as if fully set forth herein.

217.     The Second Trustee, Gould and Pendergast have various duties to the ESOT and, by extension, to the ESOP participants and beneficiaries (including Plaintiffs), including but not limited to, the duty of loyalty, the duty to act prudently, and the duty to act in accordance with plan documents.

218.     The Second Trustee, Gould and Pendergast have violated their duties under ERISA by:

    a.     Failing to discharge their duties with respect to the ESOP solely in the interest of the ESOP participants, including Plaintiffs;

    b.     Failing to investigate the allegations or take any independent action or seek Board leave to take appropriate action to prevent lasting harm to the Company after being advised by Wade that the Company's senior executives and Board members were interfering with the management and operations of the Company simply to save their own jobs at any cost;

    c.     Directly and indirectly causing and exacerbating division among the members of the Board and damage to the Company, the ESOP, and the ESOT, calling their own independence and judgment into question;

    d.     Blindly supporting Marsh, Newell, and Perry in their efforts to seize control of the Company from Wade and refusing to examine any wrongdoing and in so doing abandoning any sense of objectivity;

    e.     Overstepping their authority as ESOP trustee by purporting to take action as trustee and sole shareholder of the Company to add a fifth seat to the Company's Board and electing Maurice Hryshko to the Board, despite not having the power to do so;

    f.     Supporting and facilitating the Board's invalid creation of the Special Committee taken in reckless disregard of the Company's governance documents and contracts;

    g.     Endangering the value of the Company by its participation in a personal agenda driven crusade by key executives of the Company and the Company's Board members;

    h.     Failing to ensure that the Special Committee was dissolved following the completion of its investigation into Wade's alleged behavior;

    i.     Failing to follow the direction of the Board with respect to the non-renewal of Perry's and Newell's terms as Director;

j.      Working in concert with Directors and Officers to cause the Company to breach its obligations to JPMorgan, MCRC, and Wade, to attack and harm Wade personally, and to permit the Directors and Officers to incur debts that the Company cannot afford, to raise their own pay, and to engage in self-dealing behavior; and

k.      Attempting to hold Wade responsible for breaches of misrepresentations and warranties in connection with the purchase of his shares in the Company, while totally ignoring the actions or failures to act by parties with fiduciary responsibilities and liabilities to ensure that the ESOT did not overpay for the Company

219.    As a reasonable and proximate result of the foregoing violations, harm has been done to both the ESOP and Plaintiffs, and the Company, in violation of ERISA.

220.    The Second Trustee, Gould and Pendergast are personally liable to reimburse Plaintiffs for harm caused thereto as a result of their fiduciary duty breaches.

221.    Plaintiffs are also entitled to such further equitable relief as may be available to enforce their rights under the ESOP, including, without limitation, equitable relief sought: equitable restitution, imposition of constructive trusts, disgorgement of ill-gotten gains made at the expense of the plan, injunctions, or specific performance.

222.    Plaintiffs are also entitled to their attorneys' fees and costs.

### COUNT IV
### [BREACH OF FIDUCIARY DUTIES UNDER ERISA
### 29 U.S.C. §§ 1109, 1132(A)(2), 1132(A)(3) AGAINST THE BOARD DEFENDANTS]

223.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 222 as if fully set forth herein.

224.    The Board and each individual member are fiduciaries as a result of their direct control over the Company, who is the Plan Administrator of the Plan pursuant to the ESOP and ESOT documents, with the responsibility to direct the Trustee.

225. The Board has various duties to the ESOT and, by extension, ESOP participants and beneficiaries (including Plaintiff), including but not limited to, the duty of loyalty, the duty to act prudently, and the duty to act in accordance with plan documents.

226. The Board has violated their duties under ERISA by:

    a.    Failing to discharge their duties with respect to the ESOP solely in the interest of the ESOP participants, including Plaintiff;

    b.    Engaging in self-serving transactions and self-dealing to the foreseeable detriment of the Company and its shareholders, including by disseminating false information concerning John Wade to further their own interests; and

    c.    Ignoring warnings regarding serious concerns over actions taken by the Second Trustee to the detriment of the Company and its shareholders, and failing to remove the Trustee as a result of the Trustee's continued breaches of the fiduciary duties it owed to the Company and its shareholders.

227. As a reasonable and proximate result of the foregoing violations, harm has been done to the ESOP, to Plaintiffs and the ESOP and to the Company, in violation of ERISA.

228. The Board is personally liable to reimburse Plaintiffs and the ESOP for harm caused thereto as a result of their fiduciary duty breaches.

229. Plaintiffs are also entitled to such further equitable relief as may be available to enforce their rights under the ESOP, including, without limitation, equitable relief sought: equitable restitution, imposition of constructive trusts, disgorgement of ill-gotten gains made at the expense of the plan, injunctions, or specific performance.

230. Plaintiffs are also entitled to their attorneys' fees pursuant to 29 U.S.C. §1132(g).

## COUNT V
## [KNOWING PARTICIPATION IN THE BREACH OF FIDUCIARY DUTIES UNDER ERISA 29 U.S.C. § 1132(A)(3) AGAINST THE BOARD DEFENDANTS AND THE OFFICERS]

231. Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 230 as if fully set forth herein.

232.     As previously alleged herein, the Second Trustee, Gould and Pendergast owed and breached their fiduciary duties under ERISA.

233.     The Board Defendants and Officers had knowledge that the Second Trustee, Gould and Pendergast were breaching their fiduciary duties under ERISA.

234.     The Board Defendants and Officers further assisted the Second Trustee, Gould and Pendergast to violate their fiduciary duties under ERISA by:

    a.     Making false and misleading representations regarding purported claims and misconduct against John Wade;

    b.     On information and belief, failing to administer and operate the ESOP for the exclusive benefit of the Participants (including Plaintiff);

    c.     Engaging in self-serving transactions and self-dealing to the foreseeable detriment of ESOP participants (including Plaintiffs), including by disseminating false information concerning John Wade to further their own interests; and

    d.     Allowing their conflict of interest to cause harm to the ESOP, Plaintiff and the Company.

235.     As a reasonable and proximate result of the foregoing violation, harm has been done to both the ESOP, to Plaintiffs, and the Company personally, in violation of ERISA.

236.     As a result of the Board Defendants and Officers' knowing participation in the breach of the Second Trustee, Gould and Pendergast's fiduciary duties under ERISA, Plaintiffs are entitled to equitable relief as may be available to enforce its rights under the ESOP, including, without limitation, equitable relief sought: equitable restitution, imposition of constructive trusts, disgorgement of ill-gotten gains made at the expense of the plan, injunctions, or specific performance.

## COUNT VI
## [BREACH OF FIDUCIARY DUTIES UNDER COMMON LAW AGAINST SECOND TRUSTEE, GOULD AND PENDERGAST]

237.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 236 as if fully set forth herein.

238.    The Second Trustee, Gould and Pendergast owed and continue to owe fiduciary duties of care, loyalty, candor, good faith and independence to the ESOT, Plaintiffs, and the Company.

239.    The Second Trustee, Gould and Pendergast have knowingly or recklessly and in bad faith violated their fiduciary duties of care, loyalty, candor, good faith, and independence owed to the ESOT, Plaintiffs, and the Company and have acted to put their personal interests ahead of the interests of the ESOT, the participants of the ESOP (including Plaintiffs) and the Company.

240.    By the acts, transactions and courses of conduct alleged herein, the Second Trustee, Gould and Pendergast knowingly or recklessly and in bad faith are attempting to unfairly deprive the ESOP, the participants of the ESOP, including Plaintiffs, and the Company of the true value of the Company, by:

      a.     Failing to discharge their duties with respect to the ESOT solely in the interest of the ESOP participants, including Plaintiffs;

      b.     Failing to investigate the allegations or take any independent action or seek Board leave to take appropriate action to prevent lasting harm to the Company after being advised by Wade that the Company's senior executives and Board members were interfering with the management and operations of the Company simply to save their own jobs at any cost, the Second Trustee;

      c.     Directly and indirectly causing and exacerbating division among the members of the Board, damage to the Company, the ESOP, and the ESOT, and calling their own independence and judgment into question;

d.      Blindly supporting Marsh, Newell, and Perry in their efforts to seize control of the Company from Wade;

e.      Overstepping their authority as ESOP trustee by purporting to take action as trustee and sole shareholder of the Company to add a fifth seat to the Company's Board and electing Maurice Hryshko to the Board, despite not having the power to do so;

f.      Supporting and facilitating the Board's invalid creation of the Special Committee taken in reckless disregard of the Company's governance documents and contracts; and

g.      Endangering the value of the Company by its participation in a personal agenda driven crusade by key executives of the Company and the Company's Board members.

241.    As a direct and proximate result of the Second Trustee, Gould and Pendergast's breaches of their fiduciary obligations, Plaintiffs have sustained significant damages, as alleged herein.

242.    Plaintiffs have no adequate remedy at law.

## COUNT VII
## [BREACH OF FIDUCIARY DUTIES UNDER COMMON LAW AGAINST THE BOARD DEFENDANTS AND THE OFFICERS]

243.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 242 as if fully set forth herein.

244.    The Board Defendants and Officers, separately or together, owe fiduciary duties of care, loyalty, candor, good faith and independence to the ESOT, Plaintiffs, and the Company.

245.    The Board Defendants and Officers, separately or together, have knowingly or recklessly and in bad faith violated their fiduciary duties of care, loyalty, candor, good faith, and independence owed to the ESOT, the participants of the ESOP, including Plaintiffs, and the Company and have acted to put their personal interests ahead of the interests of the ESOT, Plaintiffs, and the Company, by:

a.      Making false and misleading representations regarding purported claims and misconduct against Wade;

b.      On information and belief, failing to administer and operate the ESOP for the exclusive benefit of the Participants, including Plaintiffs;

c.      Engaging in self-serving transactions and self-dealing to the foreseeable detriment of Wade, including by disseminating false information concerning Wade to further their own interests;

d.      Ignoring warnings regarding serious concerns over actions taken by the Trustee to the detriment of the ESOT and the ESOP participants, and failing to remove the Trustee as a result of the Trustee's continued breaches of the fiduciary duties it owed to the ESOP, the Company and Wade; and

e.      Allowing their conflict of interest to cause harm to the ESOT, the Company and Wade.

246.    As a direct and proximate result of the Board Defendants and Officers' breaches of their fiduciary obligations, the ESOT, the participants of the ESOP, including Plaintiffs, and the Company have been and will be irreparably harmed.

## COUNT VIII
## [WASTE, MISMANAGEMENT AND MISAPPROPRIATION OF CORPORATE ASSETS AGAINST THE COMPANY, THE BOARD AND THE OFFICERS]

247.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 246 as if fully set forth herein.

248.    As a result of the misconduct alleged herein, the Board and Officers have wasted corporate assets by:

a.      Seizing control of the Board and, with reckless disregard for the Company's precarious financial position, causing the Board to take actions specifically designed to enrich themselves while weakening the Company and increasing the likelihood that the Company would default on its obligations to both the Senior Lenders and to Wade; and

b.      Following Wade's suspension from the Board:  (1) voting to give themselves a raise and to increase their own compensation during a time when the Company should have been reducing its expenses; (2) incurring additional debt to add 48 new trucks to the Company's fleet, even though it had no need for those vehicles and was

already struggling to meet its debt obligations before that transaction; (3) overriding Wade's proposal that the Company lay-off employees and freeze management pay; and (4) incurring nearly $1 million of legal expenses through the excessive and unnecessary use of attorneys.

249.    By virtue of the waste, mismanagement and misappropriation, the Company, the Board and the Officers have caused harm to Plaintiffs, the Company and its shareholders.

250.    As a direct and proximate result of the Company, the Board and the Officers' waste, mismanagement and misappropriation, Wade, the Company and its shareholders have suffered substantial and material harm.

251.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT IX
## [UNJUST ENRICHMENT AGAINST THE BOARD DEFENDANTS AND THE OFFICERS]

252.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 251 as if fully set forth herein.

253.    By wrongful acts and omissions, the Company, Board Defendants and Officers have been unjustly enriched at the expense of and to the detriment of Plaintiff and other Company shareholders.  The Board Defendants and Officers were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Plaintiffs, the Company and its shareholders.

254.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT X
## [AIDING AND ABETTING TORTIOUS CONDUCT AGAINST THE BOARD DEFENDANTS AND THE OFFICERS]

255.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 254 as if fully set forth herein.

256.    The Board Defendants and Officers played a significant and vital role in the tortious conduct of the Second Trustee, Gould and Pendergast alleged herein, with actual knowledge.

257.    The Board Defendants and Officers knowingly participated in the Second Trustee, Gould and Pendergast's breaches of fiduciary duties or provided substantial assistance to the Second Trustee to accomplish its breach of fiduciary duties by disseminating false information and allegations concerning Wade's conduct that the Trustee subsequently relied upon to terminate Wade as the CEO of the Company and remove Wade from the Company's Board of Directors.

258.    Plaintiffs suffered damages in an amount to be proven at trial as a result of the Board's aiding and abetting the Second Trustee's fiduciary duties.

### COUNT XI
### [CIVIL CONSPIRACY AGAINST SECOND TRUSTEE, GOULD, PENDERGAST, THE BOARD DEFENDANTS, THE OFFICERS AND EMPIRE]

259.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 258 as if fully set forth herein.

260.    The Second Trustee, Gould, Pendergast, the Board Defendants, the Officers, and Empire engaged in an actionably conspiracy via either an explicit or a tacit agreement.

261.    Specifically, the Second Trustee, Gould, Pendergast, the Board Defendants, the Officers, and Empire undertook concerted action with the intent to accomplish an unlawful objective for purposes of harming Plaintiffs as described herein by falsely accusing Wade of engaging in wrongful conduct prior to and after consummation of the ESOP Transaction, relying on those false accusations to oust Wade from the Company as CEO, Director, and Chairman, causing the Company to breach its agreements with Wade, and, by extension, the Company's

senior creditors, and communicating those false allegations to others, including the Company's senior creditors and clients.

262.    As a direct and proximate result of the Second Trustee's, Gould's, Pendergast's, the Board's, the Officers' and Empire's conspiracy, Plaintiffs have suffered damages in an amount to be proven at trial.

**COUNT XII**
**[DEFAMATION AGAINST SECOND TRUSTEE, GOULD, PENDERGAST, AND THE BOARD DEFENDANTS]**

263.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 262 as if fully set forth herein.

264.    Wade was CEO of the Company for twenty years, and, during that time, he enjoyed an excellent reputation as both CEO, and a leader in the cable industry.

265.    The Second Trustee, Gould, Pendergast, the Board Defendants, and Empire, maliciously contriving and intending to injure Wade and deprive him of the respect, confidence, and esteem and contriving and intending to deprive the Wade of his good name and reputation, wrongly and publicly disseminated unsubstantiated accusations regarding Wade's conduct to others involved in the ESOP Transaction and to the Company's clients, including Comcast, by falsely alleging that Wade defrauded the Company and the ESOT, engaged in self-dealing behavior to the detriment of the Company and the ESOT, mismanaged the Company, concealed and/or misrepresented material information to inflate the value of his ownership interest in the Company, and misappropriated and/or diverted Company assets for his own benefit.

266.    The Second Trustee, Gould, Pendergast, the Board Defendants, the Officers, and Empire knew that the accusations made were false and disseminated them with reckless

disregard of the truth or falsity or the consequences to Wade, entitling Wade to an award of punitive damages.

267.    By reasons of the wrongful and public dissemination of the information contained in the accusations made by the Second Trustee, Gould, Pendergast, the Board Defendants, the Officers, and Empire, Plaintiffs have suffered irreparable damage, including but not limited to, his ability to earn a living.

## COUNT XIII
### [BREACH OF FIDUCIARY DUTIES UNDER ERISA 29 U.S.C. §§ 1109, 1132(A)(2), 1132(A)(3) AGAINST FIRST TRUSTEE]

268.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 267 as if fully set forth herein.

269.    The First Trustee in its capacity as Trustee of the ESOT, had various duties to the ESOP participants and beneficiaries, including but not limited to, the duty of loyalty, the duty to act prudently, and the duty to act in accordance with plan documents.

270.    The First Trustee violated its duties under ERISA by failing to ensure that the ESOP Transaction was protective of the interests of the ESOP and its participants, including Plaintiffs.

271.    As a reasonable and proximate result of the foregoing violation, harm has been done to both the ESOT and to Plaintiffs personally, in violation of ERISA.

272.    The First Trustee is personally liable to reimburse Plaintiffs for harm caused thereto as a result of their fiduciary duty breaches.

273.    Plaintiffs are also entitled to such further equitable relief as may be available to enforce their rights under the ESOP, including, without limitation, equitable relief sought:

equitable restitution, imposition of constructive trusts, disgorgement of ill-gotten gains made at the expense of the plan, injunctions, or specific performance.

274.    Plaintiffs are also entitled to their attorneys' fees.

## COUNT XIV
## [BREACH OF FIDUCIARY DUTIES UNDER COMMON LAW AGAINST FIRST TRUSTEE AND EMPIRE]

275.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 274 as if fully set forth herein.

276.    The First Trustee owed fiduciary duties of care, loyalty, candor, good faith and independence to the ESOT, the participants of the ESOP, including Plaintiffs, and the Company in that it had an obligation to avoid knowing participation in a fiduciary breach.

277.    As an expert in valuation hired by the First Trustee to assist it in valuing the Company and fulfilling its fiduciary duties to the ESOT, Empire owed the same fiduciary duties to the ESOT and its beneficiaries, including Plaintiffs.

278.    The First Trustee and Empire knowingly or recklessly and in bad faith violated their fiduciary duties of care, loyalty, candor, good faith, and independence owed to the ESOT, the participants of the ESOP, including Plaintiffs, and the Company and has acted to put their personal interests ahead of the interests of the ESOT, the participants of the ESOP, including Plaintiffs, and the Company.

279.    By the acts, transactions and courses of conduct alleged herein to the extent the ESOP overpaid, the First Trustee knowingly or recklessly and in bad faith attempted to unfairly deprive the ESOP, the participants of the ESOP, including Plaintiffs, and the Company of the true value of the Company, by failing to ensure that the ESOP Transaction was protective of the interest of the ESOP and its participants.

280.     As a direct and proximate result of the First Trustee's breaches of its fiduciary obligations, the ESOP, the participants of the ESOP, including Plaintiffs, and the Company have sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, the First Trustee is liable to the Company.

281.     Plaintiffs have no adequate remedy at law.

## COUNT XV
## [BREACH OF CONTRACT AGAINST THE COMPANY]

282.     Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 281 as if fully set forth herein.

283.     Pursuant to the Subordinated Loan Agreement between the Company and Wade, Wade has a contractual right to remain as Chairman of the Company's Board of Directors, so long as the Series A and B Notes have not been paid in full.  *See* Exhibit 8 at Section 6.12.

284.     Wade's agreement to finance the ESOP Transaction was predicated, in part, on Wade's ability to ensure repayment of his loan through the authority and control he is able to exercise from his position as chairman of the Company's Board.

285.     Wade's removal as Chairman of the Board was in violation of the Subordinated Loan Agreement, as the Series A and B Notes have yet to be paid in full.

286.     Furthermore, the Company was obligated under the terms of the Stock Purchase Agreement, Stock Redemption Agreement, and the Series A and Series B Notes to pay Wade in accordance with the schedules and on the terms stated therein.  *See* Exhibits 5-7.

287.     The Company has failed to fulfill those obligations and, as a result, has breached its contracts with Wade.

288.    The Company also entered into an Employment Agreement with Wade that required the Company to pay Wade, *inter alia*, 18 months wages if he was not properly terminated for cause.  *See* Exhibit 11.

289.    The Company terminated Wade as CEO on false grounds, and, therefore, did not terminate Wade for cause.

290.    The Company, nonetheless, failed to pay Wade the wages owed for terminating is employment during the term of the Employment Agreement for any reason other than cause, thus, breaching its agreement with Wade, causing Wade to suffer damage.

291.    The Subordinated Loan Agreement also provides that the Company is obligated to not only pay Wade for any direct or indirect loss that he suffers as a result of the Company's breach of the Subordinated Loan Agreement, but also that the Company must pay Wade's reasonable attorneys' fees, disbursements, and costs, including expert costs, that Wade incurs to enforce the terms of the Subordinated Loan Agreement.  *Id.* at Sections 9.1 and 9.2.

292.    As a direct and proximate result of the Company's breaches of a number of contracts with Wade, Plaintiffs have suffered damages as alleged herein.

**COUNT XVI**
**[INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AGAINST SECOND TRUSTEE, GOULD PENDERGAST, THE BOARD DEFENDANTS AND THE OFFICERS]**

293.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 292 as if fully set forth herein.

294.    The Subordinated Loan Agreement, Stock Purchase Agreement, Series A and B Notes, and Employment Agreement entered into between Wade and the Company were valid and existing contracts.

295.    Defendants the Second Trustee, Gould, Pendergast, the Board Defendants, and the Officers had knowledge of those contracts.  The Second Trustee, Gould, Pendergast, the Board Defendants, and the Officers intentionally and maliciously engaged in acts intended or designed to disrupt Wade's contractual relationship with the Company.

296.    The Second Trustee's, Gould's, Pendergast's, the Board Defendants', and the Officers' interference with those contracts involved fraud and other tortious conduct as described herein.

297.    The Second Trustee's, Gould's, Pendergast's, the Board Defendants', and the Officers' conduct resulted in the actual disruption of those contracts insofar as the Company breached those agreements.

298.    The Second Trustee, Gould, Pendergast, the Board Defendants and the Officers lacked justification for their interference with said contracts.

299.    As a direct and proximate result of the Second Trustee's, Gould's, Pendergast's, the Board Defendants', and the Officers' conduct, Plaintiffs suffered, and are entitled to recover compensatory and punitive damages in an amount to be determined at trial.

**COUNT XVII**
**[WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY AGAINST THE COMPANY]**

300.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 299 as if fully set forth herein.

301.    Following consummation of the ESOP Transaction, the Company began to experience financial difficulty.  As a result, Wade advised the Board in September 2018, that the Company would need to take drastic action, including terminating employees, if it did not make immediate operational and financial changes and improve performance.

302.   At or around that same time, Wade confronted Marsh about ongoing sexual harassment accusations against Marsh.  Also around that time, Wade confronted Board Defendants Perry and Newell about personal conflicts of interest that had arisen between each of them and the Company due to their efforts to derive income from the Company in addition to their Board fees, making it clear that this conduct would no longer be tolerated.

303.   Wade then went on vacation until October 2018, when he returned only to be confronted by Newell and Perry with "anonymous" complaints about Wade's managerial strategy that had allegedly been communicated to the First Trustee.

304.   In December 2018, Wade advised the Second Trustee about the ongoing hostility being caused by Marsh, Perry, and Newell and the possibility of long-term damage to the Company that might result.  The Second Trustee declined to take any action based upon Wade's concerns.

305.   In or around late 2018, Wade increased his efforts to initiate much needed reforms to address the Company's then-present financial woes, including indicating that the Company needed to make drastic changes which would include the elimination of unproductive personnel.

306.   Subsequently, in early February the Board voted to suspend Wade for a month and immediately formed Special Committee to investigate Wade.  In May 2019, Wade was terminated as the Company's CEO.

307.   The termination of Plaintiff from employment with the Company constitutes a wrongful termination in violation of public policy.

308.   As a direct and proximate cause of Wade's wrongful termination, Wade has suffered damages to be determined at a trial in this matter.

**COUNT XVIII**
**[WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY AGAINST SECOND TRUSTEE, THE BOARD DEFENDANTS AND THE OFFICERS]**

309.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 308 as if fully set forth herein.

310.    During 2019, the Board Defendants and Officers falsely asserted and disseminated allegations of misconduct against Wade, which were ultimately relied upon by the Second Trustee, and served as the basis for Wade's wrongful termination as CEO of the Company and removal as the Chairman of the Company's Board.

311.    In 2019, in retaliation based entirely on the familial relationship with Wade, Taylor was subjected to harassment and ultimately terminated by the Company at the direction of Newell, Perry, and Marsh, who were driven by revenge and self-interest in their efforts to punish Wade's family members for Wade's refusal to cede control and by their selfish desire for power, riches, and security.

312.    Similarly, on April 20, 2019, the Board terminated the employment of Sharon simply due to her relationship with Wade and their desire to purge anyone related to Wade from the Company.

313.    The termination of plaintiffs Taylor and Sharon from employment with the Company constitutes a wrongful termination in violation of public policy, and are entitled to damages in an amount to be determined at trial.

**COUNT XIX**
**[UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER M.G.L. C. 93A AGAINST ALL DEFENDANTS]**

314.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 313 as if fully set forth herein.

315.     Plaintiffs were, at all material times, engaged in the conduct of a trade or commerce within the Commonwealth of Massachusetts, as those terms are defined and used in M.G.L. c. 93A, §§ 2 and 11.

316.     The Defendants were, at all material times, engaged in the conduct of a trade or commerce within the Commonwealth of Massachusetts, as those terms are defined and used in M.G.L. c. 93A, §§ 2 and 11.

317.     The common law fraud, breach of contract, conspiracy and negligence engaged in by each and every Defendant, as described herein, constituted unfair and deceptive trade practices un M.G.L. c. 93A § 2.

318.     Plaintiffs sustained a loss of money or property as a direct and proximate result of those unfair and deceptive acts of each Defendant.

319.     The unfair and deceptive acts committed by each Defendant were willful and knowing violations of M.G.L. c. 93A, § 2.

## COUNT XX
### [BUSINESS DEFAMATION AGAINST SECOND TRUSTEE, GOULD, PENDERGAST, AND THE BOARD DEFENDANTS|

320.     Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 319 as if fully set forth herein.

321.     As described herein, Defendants Second Trustee, Gould, Pendergast, and the Board Defendants repeatedly made false and defamatory statements about Wade's business, including, but not limited to, statements to other involved in the ESOP Transaction and to the Company's clients, including Comcast, by falsely alleging that Wade defrauded the Company and the ESOT and that Wade engaged in self-dealing behavior to the detriment of the Company and the ESOT.

322.    Defendants Second Trustee, Gould, Pendergast, and the Board Defendants made an unprivileged statement to third persons, both including Wade's own employees but also, upon information and belief, Wade's customers.

323.    Defendants Second Trustee, Gould, Pendergast, and the Board Defendants are at fault for the publication of the defamatory statements.

324.    Defendants Second Trustee, Gould, Pendergast, and the Board Defendants defamation imputed Wade's fitness for trade, business, and profession, and tended to injury Wade in his business, and therefore, is defamation per se and damages are presumed.

325.    As a result of Defendants Second Trustee, Gould, Pendergast, and the Board Defendants' conduct, Plaintiffs suffered, and are entitled to recover, compensatory damages in an amount to be proven at trial.

326.    Defendants Second Trustee, Gould, Pendergast, and the Board Defendants are guilty of oppression, fraud, and malice when it defamed Wade.  Accordingly, Plaintiffs should be awarded punitive damages in an amount to be determined at trial.

327.    Plaintiffs suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

### COUNT XXI
### [CONVERSION AGAINST SECOND TRUSTEE, GOULD, PENDERGAST, THE DIRECTOR DEFENDANTS AND THE OFFICERS]

328.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 327 as if fully set forth herein.

329.    As described herein, Defendants Second Trustee, Gould, Pendergast, the Director Defendants and the Officers engaged in one more distinct acts of dominion wrongfully exerted

over Wade's personal property.  Specifically, Defendant caused Wade to be stripped rights to control the Company.

330.    Defendants Second Trustee, Gould, Pendergast, the Director Defendants and the Officers' acts were in denial of, or inconsistent with Wade's title or rights therein or in derogation, exclusion or defiance of such title or rights.

331.    As a result of Defendants Second Trustee, Gould, Pendergast, the Director Defendants and the Officers' conduct, Plaintiffs suffered, and is entitled to recover, damages in an amount to be proven at trial.

## COUNT XXII
## [RICO ACT:  THEFT OF TRADE SECRETS AGAINST ALL DEFENDANTS]

332.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 331 as if fully set forth herein.

333.    Defendants knowingly conducted and/or participated, director and indirectly, in the above described conduct through a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(5).

334.    Without authorization, Defendants knowingly, willfully, maliciously, and without authorization, used third parties to download, copy, or duplicate and thereby steal and without authorization appropriate and take, Wade's and/or the Company's trade secrets.  Specifically, as discussed in detail above, Defendants took, without authorization, Wade's trade secrets (as defined by 18 U.S.C. § 1839(3)), as well as other proprietary and/or confidential information, for Defendants' own use after Defendants wrongfully ousted Wade from the Company.

335.    Defendants stole Wade's and/or the Company's trade secrets stealing or taking without authorization, and through fraudulent means, Wade's and/or the Company's trade secrets in violation of 18 U.S.C. § 1832(a)(1).

336.    Defendants received and possesses Wade's and/or the Company's trade secrets knowing those trade secrets have been stolen, appropriated, obtained, or converted without Wade's authorization in violation of 18 U.S.C. § 1823(a)(3).

337.    Additionally, in the alternative, Defendants further attempted to steal Wade's trade secrets as detailed herein in violation of 18 U.S.C. §1832(a)(4).

338.    In violation of 18 U.S.C. §1832(a)(5), Defendants have conspired to commit to steal Wade's trade secrets as described herein.

339.    Defendants knew that the information contained Wade's and/or the Company's trade secrets.

340.    Defendants knowingly stole Wade's and/or the Company's trade secrets to gain an economic benefit for Defendants.

341.    Defendants knew that by stealing Wade's trade secrets, Defendants could cause injury to Wade's business.  Indeed, Defendants intended to damage or destroy Wade and/or his business.

342.    Wade uses the trade secrets that Defendants stole from Wade in interstate commerce because Wade operates a business with employees throughout the United States and the trade secret information that Defendants stole is used through the United States.

343.    Plaintiffs seek an award of damages in an amount to be determined at trial for Defendants' wrongful, willful, and malicious conduct as described herein.

## COUNT XXIII
## [COMPUTERS AND FRAUD ABUSE ACT AGAINST ALL DEFENDANTS]

344.    Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 343 as if fully set forth herein.

345.     Defendants' conduct as alleged herein violation 18 U.S.C. § 1030(a)(2). Specifically, and as described in detail above, Defendants, themselves and/or through third parties acting at their direction: (1) intentionally accessed Wade's and/or the Company's computers, (2) without authorization or exceeding authorized access, and (3) thereby obtained information (4) from several protected computers involved in interstate communication, causing (5) a loss to Wade and/or the Company during a one-year period aggregating at least $5,000 in value.

346.     Defendants' conduct as alleged herein violated 18 U.S.C. § 1030(a)(4). Specifically, and as described in detail above, Defendants, themselves and/or through third parties acting at their direction: (1) accessed a protected computer, (2) without authorization or exceeding such authorization that was granted, (3) knowingly and with intent to defraud, and thereby (4) furthered the intended fraud and obtained something of value, causing (5) a loss to Wade and/or the Company during a one-year period aggregating at least $5,000 in value.

347.     Defendants conduct as alleged herein violated 18 U.S.C. § 1030(a)(5). Specifically, and as described in detail above, Defendants, themselves and/or through third parties acting at their direction: (A) knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caused damage without authorization, to a protected computed; (B) intentionally accessed a protected computer without authorization, and as a result of such conduct, recklessly caused damage; and/or (C) intentionally accessed a protected computer without authorization, and as a result of such conduct, caused damage and loss.

348.     Further, Defendants have violation 18 U.S.C. § 1030(b) by conspiring to commit or attempt to commit the above detailed offenses under 18 U.S.C. § 1030(a).

349.     Pursuant to 18 U.S.C. § 1030(g), Plaintiffs seek an award of damages in an amount to be determined at trial resulting from Defendants' violations of 18 U.S.C. § 1030(a) and (b), plus injunctive relief or any other equitable relief the Court deems appropriate.

## COUNT XXIV
## [NEGLIGENT MISREPRESENTATION AGAINST ALL DEFENDANTS]

350.     Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 349 as if fully set forth herein.

351.     Defendants supplied false information in the course of Defendants' business. Specifically, as part of their scheme to systematically loot Wade of the Company, Defendants made false and misleading statements designed to injure Plaintiffs and the Company, to strong arm Plaintiffs into silently accepting those allegation as if they were true, to oust Wade as CEO, Director, and Chairman, and to cause the Company to assert false claims against Wade and remove him from the Company's control.

352.     Those false allegations, that are detailed in the e-mails attached to this Complaint as Exhibits 13, 15, and 16, damaged not only Wade, who was stripped of his ownership interest, title, and livelihood, but also the Company, who was left in a weakened and vulnerable a financial state such that it defaulted on the Senior Loans on several occasions and demonstrated that it cannot repay its debt to Wade.

353.     Defendants supplied information that was false to induce Wade to agree to the Company's suspension and ultimate removal of him as CEO pending an investigation, consenting to an investigation into the meritless claims made against him, and, ultimately, resign from the Company.

354.     Further, the Second Trustee and other members of the Board justifiably relied upon Defendants' false representations to act similarly in suspending Wade and ultimate removal of Wade as CEO.

355.     Defendants failed to exercise reasonable care or competence in obtaining and communicating the false information.

356.     Plaintiffs have suffered damages in the amount to be determined at trial as a result of Defendants' false representations.

**COUNT XXV**
**[INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC**
**ADVANTAGE AGAINST ALL DEFENDANTS]**

357.     Plaintiffs restate and incorporate by reference all of the allegations in the foregoing paragraphs 1 through 356 as if fully set forth herein.

358.     Defendants had knowledge of Wade's prospective contractual relationships.

359.     Defendants maliciously and intentionally interfered with Wade's prospective contractual relationships.  Defendants' interference with Wade's prospective contracts involved fraudulent misrepresentation, defamation, civil conspiracy, and other tortious conduct as alleged herein.

360.     Defendants' actions were not justified and not privileged.

361.     As a result of Defendants' conduct, Plaintiffs suffered, and are entitled to recover, compensatory and punitive damages in an amount to be proven at trial.

362.     Plaintiffs suffer and will continue to suffer irreparable harm for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief against Defendants as follows:

1.      An award of compensatory, exemplary, and punitive damages against Defendants in an amount to be proven at trial;

2.      Statutory double and treble damages as applicable;

3.      Preliminary and permanent injunctive relief;

4.      An award of attorneys' fees and costs incurred in the instant litigation;

5.      An award of prejudgment and post-judgment interest against Defendants; and

6.      For such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a

trial by jury on all issues contained in this Complaint (and any Answer filed in response

thereto).


Respectfully submitted,

By: /s/ Ernest Edward Badway, Esq. _____
   Ernest Edward Badway
   BBO #562641
   Fox Rothschild LLP
   101 Park Avenue, Suite 1700
   New York, New York 10178
   Telephone: (212) 878-7986
   Facsimile: (212) 692-0940
   Email: ebadway@foxrothschild.com

Dated: March 16, 2020