# EXHIBIT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN R. WADE, III, SHARON WADE, JOHN WADE IV, and TAYLOR WADE,<br><br>Plaintiffs,<br><br>v.<br><br>TRI-WIRE EMPLOYEE STOCK OPTION TRUST, SCOTT PERRY, ROBERT R. NEWELL, ROBERT LANDRY, DAVID GESMONDI, CAPITAL TRUSTEES, LLC, SPINNAKER TRUST, ROBERT GOULD, JEANINE PENDERGAST, EMPIRE VALUATION CONSULTANTS, LLC, SES WINDING UP CORPORATION f/k/a SES ADVISORS, INC., SES ESOP STRATEGIES, LLC, as successor to SES ADVISORS, INC., BELLMARK PARTNERS, LLC, JOHN MARSH, LORI WENETTA, and RUBEN KLEIN,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 1:20-cv-10523-DLC<br>)<br>)<br>)<br>)    **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>) |

## [PROPOSED]
## COMPLAINT OF INTERVENING PLAINTIFF
## TRI-WIRE ENGINEERING SOLUTIONS, INC.

Intervening Plaintiff Tri-Wire Engineering Solutions, Inc. ("Tri-Wire" or the "Company"), for its Complaint against John R. Wade, III ("Wade"), states as follows:

### NATURE OF THE CASE

1.     This dispute arises out of Wade's manipulation, control, deceit, fraud, material misrepresentations, and material omissions in connection with Wade's redemption and sale of 100% of the shares of the Company.

2.     As the sole shareholder of Tri-Wire (and its sole director and Chief Executive Officer), Wade exerted unilateral and extreme control over the Company and its employees.

3.     In or around 2006 to 2015, Wade desired to sell the Company. After engaging with several potential buyers and receiving offers that he disregarded as too low, Wade decided that the best way to maximize the sale price (to his exclusive benefit) was to create an ESOP and sell the business to the employees. Wade used his manipulation, control, deceit, fraud, material misrepresentations, and material omissions to materially and artificially inflate the value of the shares of the Company, which has in turn imposed a significant debt obligation on the Company. Just as he had done for decades within the Company, Wade unilaterally controlled the dissemination of information to the valuation firm, independent trustee, and other advisors retained for purposes of the Transaction, so he could manipulate the perceived financial state of Tri-Wire, and ultimately the share price, to his exclusive benefit.

4.     On December 30, 2016, Wade sold 100% of the issued and outstanding shares of the Company (the "Transaction") in two interrelated transactions: (a) Wade sold 700,000 shares of Tri-Wire stock to the Company under a Stock Redemption Agreement ("SRA"); and (b) Wade sold 820,000 shares of Tri-Wire stock to the newly-created ESOP under a Stock Purchase Agreement ("SPA"). As a result, the Company's employees became the 100% owner of the business.

5.     In connection with the Transaction, at the closing Wade received $20,500,000 in cash and entered a Subordinated Loan Agreement and two related Subordinated Notes (the "Subordinated Notes") with the Company in the total amount of $17,500,000, and later received a working capital adjustment in excess of $1,500,000, for total consideration in excess of $39,500,000 (plus payment of cash interest of at least $1,600,000 to date on the Subordinated Notes).

6.      Both the SPA and SRA contain numerous representations and warranties by Wade, including (among other things) his representation that all of the Company's liabilities have been disclosed, that all of the Company's insurance premiums have been paid or properly accrued, that since December 31, 2015 there have been no obligations incurred that could be materially adverse, that the Company's internally-prepared financial statements through October 31, 2016 were prepared in good faith, and that the Company's financial projections that he controlled and provided contained no "knowingly false information or material omissions and were prepared in good faith."

7.      After an investigation, a Special Committee of the Company's Board (the "Special Committee") and Spinnaker Trust, in its capacity as Trustee of the Tri-Wire Employee Stock Ownership Plan ("Spinnaker" and the "ESOP"), uncovered that not only were the representations Wade made as selling shareholder materially false, but that Wade intentionally withheld the truth from the advisors to the Transaction in order to materially inflate the value of Tri-Wire's shares to his own benefit and to the detriment of the ESOP and the Company.

8.      As set forth below, Wade lied and/or omitted to state accurate information about the nature of the Company's auto insurance and his intention to start a dew division of the Company (that would require additional capital to get started), he covered up a double payment from a customer (and his related failure to return that double payment) of over $1 million, and paid himself undisclosed bonuses – to name just four issues – in order to materially inflate the purchase price for the Company and the amounts he received from selling his shares in the Transaction.

9.      Had the truth been properly disclosed by Wade, the terms of the Transaction would have been materially different.  Based on the information obtained to date, the Company was overvalued in the Transaction in excess of $18 million as a result of Wade's acts and omissions, and he should not have received the working capital adjustment of $1.5 million, or been paid interest on the Subordinated Notes of more than $1.6 million.

## THE PARTIES

10.      Intervening Plaintiff Tri-Wire is a company organized under the laws of Massachusetts with its principal place of business in Tewksbury, Massachusetts.

11.      Defendant/Plaintiff-in-Counterclaim Spinnaker is a non-depository trust company organized under the laws of Maine with its principal place of business in Portland, Maine.

12.      As part of its business, Spinnaker provides independent trustee, fiduciary, custodial and investment management services for employee stock option plans.

13.      Spinnaker was appointed as the Trustee of the Tri-Wire ESOP on March 22, 2017. Spinnaker replaced Capital Trustees, LLC ("Capital Trustees") as Trustee of the ESOP following the Transaction, and was not involved in the Transaction.

14.      Upon information and belief, Plaintiff/Defendant-in-Counterclaim/Defendant Wade is an individual who resides in New York.  Prior to the Transaction, Wade was the sole shareholder of the Company.  Wade was also formerly Tri-Wire's Chief Executive Officer, and Chairman of the Company's Board.  The claims alleged herein, however, are asserted by the Company against Wade in his capacity as selling shareholder.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 38 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds $75,000.

16.     In addition, this Court has supplemental jurisdiction over the Company's claims pursuant to 28 US.C. § 1367(a) because all Counts of the Company's complaint are based on state law and arise from the same nucleus of operative facts at issue in the claims currently pending before this Court, so as to constitute the same case or controversy.

17.     Venue is properly in this judicial district pursuant to 28 U.S.C. §§ 1391(b) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this Judicial District.

## WADE'S CONTROL OF TRI-WIRE AND SCHEME TO DEFRUAD

18.     Wade founded Tri-Wire in 1999.

19.     Tri-Wire is a business that focuses on residential telecommunications installations. Currently, the Company has over 550 employees in the eastern part of the United States.

20.     Wade was the sole shareholder of the Company from 1999 up to the time of the Transaction.  Wade also served as the Company's Chief Executive Officer and was the sole member of the Company's Board.

21.     Prior to the Transaction, as the Company's sole shareholder and sole decision-maker, Wade had access to and direct and complete ultimate control over Tri-Wire's bank accounts, e-mail servers, Quickbooks and/or other accounting and financial systems, American Express and/or other credit accounts, and all other accounts and property.

22.     Wade repeatedly made unilateral revisions to financial documents without involvement from Tri-Wire's Chief Financial Officer or others at the Company.

23.     Between 2006 and 2015, Wade desired to sell his shares of Tri-Wire. During that time, Wade engaged with several potential buyers, but was never satisfied with their valuations of the Company.

24.     Upon information and belief, Wade came to believe that the way he could maximize his payout in connection with the sale of the Company was to manipulate the Company's value and sell his shares to an ESOP.

25.     Wade, without involving others at the Company, hired advisors to represent and advise the ESOP and/or the Company for purposes of the Transaction.

26.     Wade originally hired a different trustee (not Capital Trustees or Spinnaker) to serve as the representative for the ESOP participants in the Transaction, and the trustee in turn hired Empire Valuation Consultants LLC ("Empire"), as the valuation firm to assist in the determination of the fair market value of the shares of Tri-Wire in connection with the Transaction.

27.     Indicative of his manipulation and control, Wade ensured he was the exclusive line of communication to the trustee and valuation firm.  For example, at a due diligence meeting with the initial trustee that occurred at Tri-Wire on September 12, 2016, Wade was the only attendee who had any knowledge of the Company's financial state and other relevant issues.

28.     After the September 12, 2016 due diligence meeting, at which Wade was the sole source of Company information and the selling shareholder, and indicative of his manipulation

and control, Wade fired the initial trustee. Wade then hired Capital Trustees on or about November 11, 2016.  Empire continued to serve as the valuation firm.

29.     Capital Trustees conducted an additional due diligence meeting on November 14, 2016, at which Wade was again the sole source of Company information.  Wade, of course, was also the selling shareholder.

30.     All responses to due diligence questions and all Company information considered in the due diligence process was provided by Wade.

31.     Wade's unilateral control over the advisors, the content and availability of information (particularly projections and financial statements), and the due diligence process generally, resulted in incorrect fundamental assumptions and inputs being used in the valuation, resulting in an over-valuation of the shares of the Company.

## THE ESOP TRANSACTION

32.     At the time of the Transaction, Wade owned all 1,520,000 issued and outstanding shares of the Company.

33.     On or about December 30, 2016, the Company redeemed and retired 700,000 shares obtained from Wade pursuant to the SRA.

34.     At the same time, the ESOP purchased 100% of the remaining issued and outstanding shares of Tri-Wire (820,000 shares) from Wade pursuant to the SPA.

35.     As a result, on December 30, 2016, Wade redeemed and/or sold all of his shares of the Company, and the ESOP became the Company's sole shareholder.

36.     In connection with the Transaction, and based on the information given to Capital Trustees and Empire by Wade, the Company's shares were valued at $25.00 per share.

Accordingly, the Company paid approximately $17,500,000 to redeem 700,000 of Wade's shares, and the ESOP separately paid approximately $20,500,000 to purchase the remaining 820,000 shares.

37.     The total consideration paid or owed to Wade as a result of the Transaction is in excess of **$39,500,000**.  Wade received $20,500,000 in cash at the closing of the Transaction, and entered the Subordinated Notes with the Company in the amount of $17,500,000.

38.     The cash paid to Wade at closing was financed by the Company, *inter alia*, by a Credit Agreement with JP Morgan Chase Bank, N.A. in the amount of $15,500,000 and a subordinated Note and Warrant Purchase Agreement with Massachusetts Capital Resource Company in the amount of $5,000,000.  After borrowing these funds, the Company loaned them to the ESOP Trust, so that the ESOP Trust could pay Wade for the shares it was purchasing under the Stock Purchase Agreement.

39.     In the fall of 2017, Wade also received from the Company a Working Capital Adjustment, deemed additional purchase price under the SPA, in the amount of approximately $1,500,000.

40.     However, but for Wade's material misrepresentations and omissions described herein, he would not have received such a Working Capital Adjustment payment.  Instead, Wade would have owed the Company a Working Capital Adjustment of approximately $1,600,000.

41.     In addition, knowing of the material misrepresentations and omissions described herein, and knowing that the Company incurred tens of millions of dollars in debt in connection with the Transactions that it should not have incurred had Wade honestly disclosed the true facts,

Wade caused the Company to take on approximately $1,800,000 of additional debt in order to finance the fraudulently procured Working Capital Adjustment payment.

42.     Wade has also received interest payments from the Company on the Subordinated Notes in excess of $1,600,000.

## REPRESENTATIONS AND WARRANTIES BY WADE THAT WADE KNEW OR SHOULD HAVE KNOWN WERE FALSE

43.     As part of the Transaction, in the SPA Wade made certain representations and warranties, including but not limited to:

i.      SPA section 4.11(a), representing and warranting that the financial statements of Tri-Wire "**fairly present as of the date indicated the financial condition, assets and liabilities and results of operations of the Company**" and "[a]ll internally-prepared **financial statements have been prepared in good faith** in a matter consistent with past practice";

ii.     SPA section 4.11(d), representing and warranting that Tri-Wire had **no undisclosed liabilities or obligations**, other than those listed in Schedule 4.11(d) of the SPA;

iii.    SPA section 4.12, representing and warranting that the provisions made for taxes on the balance sheet "are **sufficient for the payment of all accrued and unpaid federal, foreign, state, county and local taxes** of the Company";

iv.     SPA section 4.20, representing and warranting that "[a]ll such **insurance premiums in respect of such coverage have been, and to the Closing Date will be paid, or if not due, properly accrued on the books of the Company as of the Closing date**";

v.      SPA section 4.24(a), representing and warranting that between the warranty date and the date of the Transaction, the Company did not incur any obligation or liability other than in the "ordinary course" of the Company's business, and that any of those obligations or liabilities would be "**not materially adverse**" to the Company's business; and

vi.     SPA section 4.32, representing that Tri-Wire's "**financial projections provided to the Trustee's independent financial advisor contain no knowingly false information or material omissions and were prepared in good faith**."

44.     Section 3.7 of the SRA incorporates by reference each of the representations set forth in Article 4 of the SPA , including those outlined above, and states that the representations in the SPA "are true, accurate and complete on and as of the date hereof."

45.     Section 3.8 of the SRA also includes the representation by Wade that "[n]o information, report, financial statement, exhibit or schedule prepared or furnished by or on behalf of [Wade] . . . contained or contains any material misstatement of fact, or omitted or omits to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading."

46.     In addition, on December 30, 2016, Wade certified that the Company's financial projections provided in connection with the Transaction "contain no knowingly false, incomplete, or misleading statements or omissions."

47.     Pursuant to Article 8 of the SRA, Wade agreed to indemnify the Company for "any and all liabilities, losses, damages, costs, charges, reasonable attorneys' fees and other expenses of every nature and character . . . resulting or arising out of any inaccuracy in or breach of any representation" made by Wade in the SRA.  A parallel provision is contained in Article 9 of the SPA, providing for Wade's indemnification of the ESOP.

### WADE'S FAILURE TO DISCLOSE MATERIAL INFORMATION

48.     As described in more detail below, Wade withheld and/or actively concealed material information in order to intentionally inflate the value of Tri-Wire's stock and as a result inflate the consideration paid to him by the ESOP and the Company in connection with the Transaction.

49.     Wade intentionally and fraudulently withheld this material information from Capital Trustees, Empire and other advisors, including during the due diligence meetings that occurred on September 12 and November 14, 2016, where he was the sole communicator of information about the Company.

50.     Wade also fraudulently failed accurately to reflect the items described below in Tri-Wire's financial statements and manipulated the financial projections relied upon by Capital Trustees and Empire in determining the fair market value of the shares of the Company.

51.     Representations and omissions made by Wade to Capital Trustees, Empire, and other advisors were reasonably relied upon to induce Capital Trustees and the Company to enter the Transaction.

52.     The full extent of the fraud and concealment is not yet known, and may never be known.  To date, the below actions have been uncovered.

***Wade Concealed Material Information Concerning Tri-Wire's Automobile Insurance Expense.***

53.     In connection with the Transaction, Wade withheld information regarding the nature of Tri-Wire's automobile insurance policy and the potential for significant, additional retroactive premiums to be incurred after the Transaction, including for pre-Transaction years.

54.     Premiums for insurance on Tri-Wire's fleet of hundreds of vehicles is by far one of the Company's greatest non-compensation expenses.

55.     For the policy years leading up to 2015, Tri-Wire's automobile insurance policy was a fixed-premium policy, with no cap on claims that could be submitted.

56.     At the conclusion of policy year 2014 (*i.e.*, December 31, 2014), the Company's insurer informed Wade that if the Company wished to continue with a fixed premium policy, the

premium would roughly double to approximately $3,200,000 per year, due to the high level of claims in the preceding years.

57.     In order to avoid significantly increasing the Company's automobile insurance premiums in 2015, and to push additional automobile insurance premiums until after the Transaction, for policy years 2015 (beginning February 1, 2015), Wade caused the Company to purchase an automobile insurance policy that cost only slightly more than what the fixed premium policies previously cost – but included the possibility of retroactive premiums that would be assessed in future years based on claims made against the policy.

58.     Likewise, for policy year 2016 Wade again caused the Company to purchase a retroactive insurance policy – a policy that would initially cost less than what a fixed premium policy would cost, but included the possibility of retroactive premiums that would be assessed in future years based on claims made against the policy.

59.     For 2016, the estimate of losses used to determine the initial premium for the Company's retroactive premium insurance policy was even lower than the estimate for 2015. The Company had 12% fewer vehicles in 2016 than it had in 2015 – but the Company used a 29% lower loss estimate to lower its initial premium even further, and shift even more risk that additional premiums for pre-Transaction policies would be paid after the Transaction.

60.     When Wade made the decision to purchase retroactive premium automobile insurance in 2015, he fully understood the mechanics of those retroactive premium policies, including the possibility of the assessment of additional, retroactive premiums in future years.

61.     As reflected in Empire's fairness opinion (Exhibit 4 to the Complaint in this action, Dkt. 1), Empire and the ESOP trustee(s) came away from the September 12 and

November 14, 2016 due diligence meetings (at which Wade was the sole communicator of information regarding the Company) with very different understandings about the Company's automobile insurance, because Wade failed to disclose the true (retrospective) nature of the Company's automobile insurance policies for 2015 and 2016.

62.     On information and belief, the only insurance information provided to the ESOP's trustee and to Empire and included in the data room for the Transaction – the document attached as Exhibit 4.20(a) to the SPA (Dkt. 1, Exh. 10 at 59) – did not disclose that the Company's automobile insurance policy was a retroactive premium policy as opposed to a fixed premium policy.  The document is simply a Certificate of Liability Insurance.

63.     On information and belief, the ESOP's trustees and Empire did ask Wade about the Company's automobile insurance.  The trustees' and Empire's only understanding of the Company's automobile insurance is reflected on page 6 of Empire's December 30, 2016 valuation report, which describes "cost savings initiatives to improve profitability" that included insurance savings.  Empire's understanding of the Company's automobile insurance at the time of the Transaction – which it obtained from Wade – was that the Company installed GPS devices in vehicles, which "resulted in a decrease in insurance and gas expense, as the Company's insurance company lowered its premiums for safer drivers and drivers were not able to claim as much for fuel reimbursement."

64.     Prior to the Transaction (which closed December 30, 2016), Wade knew that the level of claims for policy years 2015 and 2016 would likely cause the Company to incur additional, retroactive premiums following the close of the Transaction, that some portion of such retroactive premiums should rightly be paid for by the pre-Transaction Company (*i.e.*, those

portions related to pre-Transaction years), and that such retroactive premiums were likely to be in material amounts and have a material impact on the valuation of the Company's shares.

65.     Yet Wade did not disclose this information.  It was not disclosed to the initial ESOP trustee; it was not disclosed to Capital Trustees; it was not disclosed to Empire.

66.     The retroactive premium nature of the Company's automobile insurance policy was also not disclosed to the Company's outside accountants.  Because the retroactive nature of the Company's automobile insurance was not disclosed to the Company's outside accountants, the Company's financial statements did not disclose, as required, that additional retroactive premiums could be incurred, which could materially increase the Company's liabilities.

67.     In addition, the change to a retroactive premium insurance policy was not reflected in the projections of the Company's estimated future performance, which Wade controlled and provided, and upon which those involved in the Transaction relied.

68.     Prior to the Transaction, Wade was specifically put on notice of additional retroactive premiums, for the policy year 2015.  On or about October 18, 2016 – more than *two months* before the ESOP Transaction and before the October 31, 2016 internal financial statements were finalized and submitted to Empire – the Company received an invoice from its insurance company for the policy year 2015 in the amount of $230,184.

69.     On and after October 18, 2016 – prior to delivery of the October 31, 2016 financial statements and prior to the November 14, 2016 due diligence meeting – it was no longer a mere possibility that the Company might receive retroactive premiums: Wade did in fact receive an invoice for retroactive premiums and thus received actual notice prior to the

Transaction that an analysis and accrual of future retroactive premiums would be necessary to accurately reflect the Company's true financial position.

70. Moreover, prior to the Transaction, Wade had in his possession information from the Company's insurer from which Wade could have calculated an estimate of the retroactive premiums that might become due in future years.

71. Wade actively concealed and/or failed to disclose the foregoing information in connection with the Transaction (including not disclosing the existence of the 2015 retroactive premium bill to Capital Trustees or Empire).

72. Wade actively concealed the foregoing information by not breaking out automobile insurance premiums in the financial information provided in connection with the Transaction and by telling Empire and Capital Trustees that there was a *decrease* in premium and overall automobile insurance costs to the Company due to the installation of GPS and other systems to determine and improve driver safety, as noted on page 6 of Empire's valuation for the Transaction.

73. Even more, Wade affirmatively represented to the Company that all insurance premiums for pre-Transaction years were paid or properly accrued, per section 4.20 of the SPA and related section 3.7 of the SRA, which representation was false.

74. Had Wade accurately disclosed the likelihood – or even the possibility – of retroactive premiums, Empire's valuation would have taken that material information into account.

75. Upon information and belief, Wade concealed the foregoing information concerning the Company's automobile insurance policies and premiums to artificially inflate the

value of the Company's shares and the consideration paid to him in connection with the Transaction.

76.     Predictably, after the Transaction the retroactive premiums continued to increase, culminating with a $1,981,441 retroactive premium invoice received in 2018.   To date, the Company has received invoices in excess of $2,800,000 for retroactive premiums for the policy years 2015 through 2017.   Of that amount, at least $1,700,000 of relates to the pre-Transaction periods 2015 and 2016.

77.     Even though Wade was on notice of the likelihood of significant retroactive premiums for years prior to the Transaction (and in fact could have calculated a range of possible retroactive premiums), no portion of this $2,800,000 debt was properly included in the projections or accrued on the financial statements, and as a result was not factored into Empire's valuation of the Company's shares. As such, this expense was paid for by the post-Transaction Company.

78.     Had Wade revealed the truth regarding the auto insurance and accurately disclosed the possibility of retroactive premiums, Capital Trustees and Empire would have taken that information into account for the Transaction, and it would have had a material negative impact on the valuation of the Company's shares and the consideration paid to Wade as selling shareholder in the Transaction.

***Wade Failed to Disclose His Intentions to Create a Construction Division.***

79.     Prior to the Transaction, Wade failed to disclose his intention to create a construction division of Tri-Wire that required significant working capital – and as a result would have materially impacted Tri-Wire's valuation and working capital calculation.

16

80.     As previously described, Tri-Wire is a company that performs residential telecommunications installation. It provides fulfillment services, in other words, bringing telecommunications services into the homes of customers.

81.     Upon information and belief, prior to the Transaction Wade decided to start a new division of the Company, which would involve the installation of fiber optic cables along utility poles in various communities. This new division (the "Construction Division") requires an entirely different set of trucks, equipment, skills and capital than the cable fulfillment services business requires.

82.     The Construction Division was created in early 2017 by Wade without disclosing those plans and their financial impact on the Company to Capital Trustees or Empire in the period leading up to the December 30, 2016 Transaction, and without accounting for this new division in the financial statements or projections provided by Wade and relied upon for purposes of the Transaction.

83.     On information and belief, in the period leading up to the Transaction the ESOP trustees and Empire asked Wade about growth initiatives and the Company's prospects for the future.  Wade's answer is reflected in Empire's valuation report at page 16, which mentions adding "home security" to the Company's installation services, and that "the Company is also preparing to enter the fiber industry."  Those references were to customer-focused growth initiatives – delivering these products into homes – and not the industry-focused purpose Wade was actually planning, where the Construction Division would install wires on poles throughout neighborhoods.

84.     Consistent with the customer-focused nature of the growth initiatives, Wade asserted, as reported by Empire at page 16 of its report, that the Company had no capital expenditures, that its depreciation expense was zero, and its working capital needs would be consistent with its historical performance.   In truth, the creation of a Construction Division would require additional expenditures and cause the Company to incur significant financial losses for a new line of business.

85.     Had the true facts regarding the foregoing issues been known and accurately reflected in the financial statements and projections provided by Wade, the valuation of the Company in connection with the Transaction would have been significantly reduced. In addition, Empire's estimate of the working capital required to operate the Company would have significantly increased.

***Wade Intentionally Concealed Duplicate Payments and Swept the Cash at the Close of the Transaction.***

86.     In 2016, Wade was made aware of potential duplicate payments received from a Tri-Wire customer. Rather than disclosing this fact in connection with the Transaction, Wade instead told employees of Tri-Wire's accounting department that he would handle the situation, but he never did.  Instead, Wade manipulated the financial statements to maximize the amount of cash he received as part of the Transaction. As a result, Wade received from the Company in excess of $1,000,000 more cash at the closing of the Transaction than he should have.

87.     On January 25, 2016, an individual in the Company's accounting department emailed Wade, forwarding an email with the Company's bank about a potential reversal of a duplicate payment and said "Please note, the deposit of $997,895.04 on 1/20/15 [*sic* – 1/19/2016] should be reversed."   In the same January 25, 2016 email, this individual wrote "I received

notification of a payment today in the amount of $1,330,894.20 for the majority of the same invoices.  So this is a duplicate payment…."

88.    Wade did not take or direct any action to return the overpayment.

89.    Six months later, on July 12, 2016, the same accounting employee emailed Wade and another accounting employee to follow up and again inform Wade of "duplicate payments from [the customer]" in the amount of $1,021,299, including the $980,093.30, which was listed as "duplicate payment on 1/19/16."

90.    The other recipient of the email referenced in the preceding paragraph (*i.e.*, not Wade, but another accounting employee) responded, stating "This could be awkward.  A million dollars is a significant amount.  Since these are all 2016 duplicate payments, [the customer] may not get around to auditing until Q1 2017.  Theoretically, the ESOP should be closed by then.  We will have to account for both the liability and the cash during the transaction."

91.    Wade responded saying: "Has everybody got their 2 cents in now?  I already told both of you we will reconcile it before year's end."  In other words, Wade told the Company's employees that he would deal with the overpayment prior to the Transaction.

92.    That reconciliation, however, never took place. Wade did not take or direct any action to return the overpayments, alert the customer to the overpayments, or appropriately reflect the issue in the financial information provided in connection with the Transaction.

93.    In addition to failing to bring the overpayment to the customer's attention, Wade made efforts to conceal the fact of the overpayment internally and externally.  For example, Wade instructed the accounting employees referenced above not to mention the overpayment to the customer or other Company executives, directed that the overpayment be booked as a

negative receivable rather than a liability, and intentionally omitted the negative receivable from internal accounts receivable reports.

94.     Further, Wade instructed accounting employees to mislead the Company's outside accounting firm by telling the accountants that the negative receivable was "an unapplied payment and we're working on it with" the customer.  That statement was not true, as the Company was not actually "working on it" with the customer but, at Wade's direction, doing nothing.

95.     Wade took similar steps with regard to a separate $138,000 overpayment received from the same customer in September 2016.

96.     Again, Wade failed to disclose the foregoing information to Capital Trustees and/or Empire (or otherwise) in connection with the Transaction.

97.     Further, Wade concealed this issue by failing to net the amount of the overpayments against the cash paid to him at the closing of the Transaction.  As a result, Wade received from the Company an additional $1,118,093.30 in cash at the closing of the Transaction, and left the post-ESOP Company with a corresponding debt.

***Wade Paid Himself and Others Unapproved and Undisclosed Bonuses.***

98.     Leading up to and immediately following the Transaction, Wade issued undisclosed and/or unauthorized bonuses to himself and to others in amounts that totaled $2,835,500: $1,685,000 to himself on November 21, 2016, and $250,500 on December 17, 2016, both just before the Transaction; and $900,000 on December 31, 2016, the day after the Transaction.

99.     These unauthorized bonuses, in the amount of $2,835,500, were never disclosed to the advisors nor properly accounted for in connection with the Transaction or the valuation of the Company's shares.

100.    In addition, these unauthorized and/or undisclosed bonuses drained the Company's working capital in the period following the Transaction, including up to the date of this Complaint.

***Wade Failed to Pay and/or Disclose Certain Taxes and Debts Owed by the Company Prior to the Transaction.***

101.    Wade further failed to pay and/or disclose certain taxes and debts that were owed by the pre-Transaction Company, including (i) sales and use tax owed to the state of Connecticut in the amount of $62,233.52; (ii) unemployment taxes owed to the state of Vermont in the amount of $23,004.25 and the state of Connecticut in the amount of $40,788.55; (iii) underpaid federal incomes taxes for 2013 and 2014 in the amount of $15,928.26; and (iv) uncashed payroll checks that should have been, but were not, remitted to the Commonwealth of Massachusetts, in the amount of $69,414.00.

102.    Wade knew or should have known of the foregoing debts owed by the Company.

103.    These debts (totaling $211,368.58) should have been paid and/or disclosed prior to the Transaction, but were not, leaving them to be paid by the post-Transaction Company.

## THE DAMAGE TO THE COMPANY

104.    Based on the information obtained to date, including that set forth above, the over valuation of the Company's shares in connection with the Transaction is likely in excess of $18,000,000.

105.    In addition, as referenced above, Wade received a working capital adjustment distribution of approximately $1,5000,000, whereas had all the foregoing information been properly disclosed by Wade, he would have *owed* the Company approximately $1,600,000 at the time the working capital adjustment was paid in mid-2017 (a difference of over $3,000,000). Moreover, Wade caused the Company to borrow approximately $1,800,000 in the fall of 2017, in order to pay this working capital adjustment, highlighting how under-capitalized Wade left the Company following the Transaction.

106.    The Company has also incurred and seeks to recover costs and expenses (including attorney fees, as provided for in the SRA and the SPA) with respect to the investigations necessary to uncover Wade's fraud and to undertake this litigation, and also seeks to recover punitive damages, pre- and post-judgment interest, losses to the Company, disgorgement, and other amounts that will be determined at trial.

107.    Not only would the value placed on Wade's shares in the Company have been materially different had Wade disclosed the truth, but the terms of the Transaction would have been dramatically different as well, including that Wade would not have received cash in the amount of $20,500,000, Subordinated Notes that totaled $17,500,000, or a working capital adjustment in excess of $1,500,000, in connection with the Transaction. And he would not have received interest payments on the Subordinated Notes, which to date totals $1,664,419.

108.    Also as a result of the foregoing issues, the Company's outside accountants have restated the Company's financial statements for 2016.  In addition, due to the foregoing and related issues, the Company's outside accountants have not yet delivered the Company's finalized financial statements for the period ended December 31, 2017.

## DISCOVERY OF WADE'S ACTIONS, WADE'S ATTEMPTS TO COVER UP HIS FRAUD, AND THE REMOVAL OF WADE

109.     In or about August 2018, Tri-Wire received invoices for significant additional, retroactive insurance premiums for certain prior policy years including the pre-Transaction years 2015 and 2016.  The receipt of these invoices caused the Company's Board (and Spinnaker) to begin to review certain of the issues described above and led to the discovery of others.

110.     In addition, in the fall of 2018, several employee complaints concerning Wade surfaced to Spinnaker and the Board. These circumstances caused the Board to form the Special Committee to formally investigate the growing list of issues concerning Wade.

111.     In or about February of 2019, Wade ultimately agreed to take a leave of absence as CEO of the Company after he was suspended as CEO.  But rather than go quietly, Wade removed the Company's finance personnel from having administrative control over the Company's American Express account, and refused the delegate control of the Company's bank accounts to the Company's Chief Financial Officer.

112.     In addition, and also in or about February of 2019, Wade surreptitiously took over administrative control of the Company's email servers – he removed the Company's IT manager from having administrative control of the servers, installed himself as the person with administrative control, changed the password (as well as the security question needed to change the password), and changed the credit card to which the Company's email server charges were billed.  These actions prevented the Company from having ay control over its email server, and allowed Wade to monitor all Company emails and delete emails from the server.

113.    Wade also used his access to the Company's email server in February 2019 to ensure that emails sent or received by certain Company employees would be secretly copied and sent to an email address Wade created to monitor email communications: net@triwire.net.

114.    On information and belief, Wade took these actions, and likely took other actions unknown at this time, to inhibit any investigation into his conduct and prevent the truth of his fraud from being revealed.

115.    Based on facts uncovered during the initial investigation, on April 19, 2019 Wade's employment as CEO was terminated.

116.    On May 2, 2019, the Special Committee requested that Wade repay outstanding debt in the amount of $1,412,611.88, related to the duplicate payments, certain tax liabilities, and other amounts owed to the Company.  The May 2, 2019 letter is attached to the initial Complaint (Dkt. 1) as Exhibit 15.

117.    The investigation continued and more facts were uncovered.  On August 2, 2019, Spinnaker and the Special Committee demanded that Wade immediately reimburse Tri-Wire in an amount in excess of $18,000,000, on account of all of Wade's fraudulent conduct described above; agree to revise the Transaction documents in accordance with the true financial and legal terms that were or should have been known, and should have been disclosed; and resign as Chairman and as a Member of Tri-Wire's Board.

118.    Wade failed to take any action in response to the foregoing demands.  Instead, Wade attempted to assault the integrity of certain Board members and to remove certain Board members without cause.

119.     Despite the passage of many months since Wade was put on notice by the Special Committee and Spinnaker in May 2019 and August 2019, and many failed attempts by Spinnaker and the Special Committee to try to resolve this matter, Wade has failed and refused to repay the amounts owed, or restructure the Transaction to reflect the true value of the Company as of the Transaction date.  Instead, Wade preemptively filed the initial Complaint in this action (Dkt. 1), asserting that everyone who had anything to do with the Transaction or the Company (other than himself, his wife and his two adult children) engaged in a conspiracy to defraud *him*, before and after the Transaction.  Wade's complaint (Dkt. 1) is nothing more than an attempt to deflect attention from himself – the true source of all of the legal violations and fraud in this matter.

## COUNT I
## FRAUD/FRAUDULENT INDUCEMENT

120.     Tri-Wire incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.     In section 3.7 of the SRA, which incorporates by reference the representations made in Article 4 of the SPA, and in connection with the Transaction otherwise, Wade represented and warranted to the Company that:

     i.     the financial statements of Tri-Wire "fairly present as of the date indicated the financial condition, assets and liabilities and results of operations of the Company" and "[a]ll internally-prepared financial statements have been prepared in good faith in a matter consistent with past practice";

     ii.     Tri-Wire had no undisclosed liabilities or obligations, other than those listed in Schedule 4.11(d) of the SPA;

     iii.     the Company did not incur any obligation or liability since December 31, 2015 other than in the "ordinary course" of the Company's business, and that any of those obligations or liabilities would be "not materially adverse" to the Company's business;

iv.      the provisions made for taxes on the balance sheet "are sufficient for the payment of all accrued and unpaid federal, foreign, state, county and local takes of the Company";

v.      "[a]ll such insurance premiums in respect of such coverage have been, and to the Closing Date will be paid, or if not due, properly accrued on the books of the Company as of the Closing date"; and

vi.      the "financial projections provided to the Trustee's independent financial advisor contain no knowingly false information or material omissions and were prepared in good faith."

122.     Wade further represented to the Company, in section 3.8 of the SRA, that "[n]o information, report, financial statement, exhibit or schedule prepared or furnished by or on behalf of [Wade] . . . contained or contains any material misstatement of fact, or omitted or omits to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading."

123.     In addition, on December 30, 2016, Wade certified that the Company's financial projections provided in connection with the Transaction "contain no knowingly false, incomplete, or misleading statements or omissions."

124.     Notwithstanding these representations, as described herein, Wade knew in fact that the foregoing representations were false and/or failed to state material facts known to Wade and necessary to make these statements not misleading, including but not limited to:

i.      Wade stated that all automobile insurance premiums were paid or properly accrued, while failing to disclose to the relevant advisors the truth that the Company had and would receive invoices for retroactive premiums. Wade further manipulated the financial statements and projections to not accrue the invoice received on October 18, 2016 in the amount of $230,184 for policy year 2015, which increased by 2018 to $2,800,000;

ii.      Wade failed to disclose the creation of a Construction Division, and did not incorporate the capital expenditures necessary for this division in the financial projections he provided in connection with the Transaction and

upon which the valuation of the Company's shares and calculation of its necessary working capital relied;

iii.  In 2016, Wade was aware of duplicate payments received from a Tri-Wire customer. Rather than disclosing this fact in connection with the Transaction as he told the accounting employees he would, he never did, and instead he manipulated the financial statements and projections to maximize the amount of cash he received as part of the Transaction;

iv.  Wade failed to disclose the payment of certain bonuses before and immediately after the Transaction in the amount of $2,835,500; and

v.  Wade failed to pay and/or disclose certain taxes and debts owed by the Company, again artificially inflating the value of his shares.

125.   Despite knowledge of each of these misrepresentations, Wade did not disclose the true information to the ESOP and/or the advisors to the ESOP and did not otherwise notify the ESOP and/or the advisors to the ESOP (or himself decide) to materially reduce the purchase price to reflect the truth.

126.   The foregoing representations were made with the intent of inducing the ESOP and the Company to enter into the Transaction.

127.   But for Wade's representations to the ESOP, and the ESOP's resulting decision to enter into the SPA, the Company would not have entered the SRA.

128.   Wade knew that the ESOP, the Company and their advisors' decision to enter into the Transaction and execute the SPA and SRA would be materially based on Wade's representations and the projections prepared by him.

129.   The ESOP, the Company and their advisors justifiably relied on Wade's representations in entering the Transaction.

130.    Prior to the Transaction, only Wade had access to the information concerning the material misrepresentations and/or omissions, and he exclusively controlled the dissemination of the information to the advisors charged with determining the fair market value of the shares.

131.    As a direct and proximate result of Wade's false representations and intentional material omissions, the Company has suffered and will continue to suffer damages, in excess of $18,000,000, plus punitive damages, pre- and post-judgment interest, disgorgement, attorney fees, and other monetary and equitable relief as may be appropriate.

## COUNT II
## INTENTIONAL MISREPRESENTATION

132.    Tri-Wire incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.    Wade made false representations of material fact regarding the financial state of Tri-Wire.

134.    These representations were false when made, and Wade intentionally made such false representations.

135.    These representations had the purpose of inducing the Transaction.

136.    In justifiable reliance on these false representations, the Company entered the Transaction, to its detriment.

137.    As a direct and proximate result of Wade's false representations and intentional material omissions, the Company has suffered and will continue to suffer damages, in excess of $18,000,000, plus punitive damages, pre- and post-judgment interest, disgorgement, attorney fees, and other monetary and equitable relief as may be appropriate.

<u>**COUNT III**</u>
<u>**BREACH OF CONTRACT**</u>

138.     Tri-Wire incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.     Wade made the following representations and warranties, included in the SPA and incorporated by reference in the SRA (section 3.7), as part of the Transaction:

    i.    SPA section 4.11(a), representing and warranting that the financial statements of Tri-Wire "fairly present as of the date indicated the financial condition, assets and liabilities and results of operations of the Company" and "[a]ll internally-prepared financial statements have been prepared in good faith in a matter consistent with past practice";

    ii.    SPA section 4.11(d), representing and warranting that Tri-Wire had no undisclosed liabilities or obligations, other than those listed in Schedule 4.11(d) of the SPA;

    iii.    SPA section 4.12, representing and warranting that the provisions made for taxes on the balance sheet "are sufficient for the payment of all accrued and unpaid federal, foreign, state, county and local takes of the Company";

    iv.    SPA section 4.20, representing and warranting that "[a]ll such insurance premiums in respect of such coverage have been, and to the Closing Date will be paid, or if not due, properly accrued on the books of the Company as of the Closing date";

    v.    SPA section 4.24(a), representing and warranting that between the warranty date and the date of the Transaction the Company has not incurred any obligation or liability other than in the "ordinary course" of the Company's business, and that any of those obligations or liabilities would be "not materially adverse" to the Company's business; and

    vi.    SPA section 4.32, representing that Tri-Wire's "financial projections provided to the Trustee's independent financial advisor contain no knowingly false information or material omissions and were prepared in good faith."

140.     Section 3.8 of the SRA includes the representation by Wade that "[n]o information, report, financial statement, exhibit or schedule prepared or furnished by or on behalf

29

of [Wade] . . . contained or contains any material misstatement of fact, or omitted or omits to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading."

141.    Wade breached the SPA and the SRA as these representations and warranties are in fact false and/or misleading, and by failing to indemnify the Company.

142.    As a result of Wade's breaches, the Company has been damaged in an amount in excess of $18,000,000.

143.    The Company performed its obligations under the SRA and related Transaction documents.

144.    The Company is entitled to compensatory damages as a remedy for these breaches of the SRA, including attorney's fees.

## COUNT IV
## SPECIFIC PERFORMANCE

145.    Tri-Wire incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146.    Under the SRA, Wade agreed to indemnify the Company for losses resulting from any misrepresentation or breach of that agreement.

147.    Under the SRA, the Company is entitled to seek specific performance with respect to the indemnification provisions.

148.    No adequate remedy exists at law to compensate the Company for Wade's failure to provide indemnification.

149.   Tri-Wire is entitled to a decree of specific performance obligating Wade to indemnify the Company as an equitable remedy for his misrepresentations and breaches of the SRA.

## COUNT V
## DECLARATORY JUDGMENT

150.   Tri-Wire incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.   The Company requests that the Court declare its rights under the SRA with respect to these claims and specifically declare that:

    i.    the Company is entitled to indemnification under the SRA for these claims;

    ii.    Wade's duty to indemnify the Company applies to breaches of the representations incorporated or made in the SRA;

    iii.    the exclusive remedy provisions of the SRA (sections 8.3, 8.5, 8.6) are void and unenforceable as a result of the fraudulent conduct alleged herein, through which Wade procured the SRA.

152.   The parties dispute whether these claims form a basis for indemnification under the SRA, or whether the exclusive remedy provisions of the SRA may be enforced.

153.   Justiciable controversies exists between the parties that meets the requirements of the Declaratory Judgment Act.

154.   The Court's resolution of this dispute will resolve the uncertainty between the parties to this action in that the Company is entitled to a declaration that its claims provide the basis for indemnification under the SRA.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Tri-Wire respectfully requests that this Court enter the following Orders:

1.    A decree of specific performance requiring Wade to indemnify the Company;

2.    For Wade to compensate the Company for all damages suffered as a result of his breaches of the SPA and SRA, fraud, and misrepresentation, in an amount to be proven at trial;

3.    For reformation of the Stock Purchase Agreement, Stock Redemption Agreement, Subordinated Notes, Subordinated Loan Agreement and related agreements;

4.    A declaration that (i) Wade is required to indemnify the Company, and (ii) the exclusive remedy provisions of sections 8.3, 8.5 and 8.6 of the Stock Redemption Agreement are void and unenforceable as a result of Wade's fraudulent conduct as alleged herein;

5.    Awarding Tri-Wire its reasonable attorneys' fees and costs incurred in his action;

6.    And, such other relief as this Court deems just and proper.

Respectfully submitted,

TRI-WIRE ENGINEERING SOLUTIONS, INC.

By its attorneys,

*/s/ Timothy H. Madden*
Timothy H. Madden (BBO# 654040)
Nicholas J. Ramacher (BBO# 680258)
DONNELLY, CONROY & GELHAAR, LLP
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
(617) 720-2880 (T)
(617) 720-3554 (F)
thm@dcglaw.com
njr@dcglaw.com

Dated:  June 19, 2020