# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSSETS

| | | |
|---|---|---|
| JOHN R. WADE, III, SHARON WADE, JOHN WADE IV, AND TAYLOR WADE, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| TRI-WIRE EMPLOYEE STOCK OPTION TRUST, SCOTT PERRY, ROBERT R. NEWELL, ROBERT LANDRY, DAVID GESMONDI, CAPITAL TRUSTEES, LLC, SPINNAKER TRUST, ROBERT GOULD, JEANINE PENDERGAST, EMPIRE VALUATION CONSULTANTS, LLC, SES WINDING UP CORPORATION F/K/A SES ADVISORS, INC., SES ESOP STRATEGIES, LLC, AS SUCCESSOR TO SES ADVISORS, INC., BELLMARK PARTNERS, LLC, JOHN MARSH, LORI WENETTA, AND RUBEN KLEIN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1:20-cv-10523-LTS |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF JOHN R. WADE, III's MOTION TO DISMISS SPINNAKER'S COUNTERCLAIMS

## I.     INTRODUCTION

Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), Plaintiff John R. Wade, III ("Mr. Wade" or "John Wade") moves to dismiss all claims for relief made in Spinnaker Trust's Counterclaims (*see* Dkt No. 43) (the "Counterclaims"). As discussed in detail below, Spinnaker lacks standing to prosecute any of the Counterclaims it alleges and, even if it had standing, its Counterclaims are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"). Furthermore, a number of Spinnaker's Counterclaims are barred by the applicable statute of limitations, while still others should be dismissed for failing to state a plausible claim for which relief could be granted by this Court. Finally, most of the Counterclaims are barred by contractual restrictions on claims arising out of the transaction at issue.

## II.   SPINNAKER'S COUNTERCLAIMS ARISE FROM A 2016 PLAN TRANSACTION THAT IS GOVERNED BY ERISA

The Counterclaims are all erroneously built on the assumption that Spinnaker—an ERISA Trustee and fiduciary service that was appointed discretionary trustee of the Tri-Wire Employee Stock Ownership Plan (the "ESOP" or "the Plan") on March 22, 2017—is capable of bringing state law common law claims in connection with a transaction governed by ERISA that closed on December 30, 2016, in which Tri-Wire's majority shareholder sold his shares to the ESOP (the "2016 Transaction"). The Plan's trustee at the time, Capital Trustees, LLC ("Capital Trustees"), and its valuation consultant, Empire Valuation Consultants, LLC ("Empire") arrived at and approved the sale price as "adequate consideration" pursuant to ERISA and published a Fairness Opinion that opined to the 2016 Transaction's compliance with ERISA. Now, through the filing of its Counterclaims, Spinnaker wishes to disturb this reasoned determination, pin the blame for the supposed overvaluation of Mr. Wade's shares (without any accompanying factual support) on the supposed domineering presence of Mr. Wade and bring common law claims, instead of ERISA claims, against Mr. Wade.

Spinnaker's Counterclaims strictly focus on the dynamics of the 2016 Transaction. The 2016 Transaction closed months before Spinnaker assumed its post as the Plan's discretionary trustee and thus, Spinnaker had no role in, or first hand knowledge of, the Transaction. Spinnaker principally claims that Mr. Wade's degree of control and manipulation over the 2016 Transaction resulted in the Company being overvalued and that as a result, the Plan overpaid for his shares.

To the extent that Spinnaker's Counterclaims relate at all to events that occurred later, after the 2016 Transaction and after Spinnaker became Trustee, they concern Mr. Wade's conduct as Chief Executive Officer ("CEO") and as a Board Member, which are positions—and accompanying authority—that were granted to him pursuant to contracts executed contemporaneously with the 2016 Transaction discussed below. The 2016 Transaction consisted of the sale of Mr. Wade's

ownership interest in Tri-Wire to the Company's employees, by creating an Employee Stock Ownership Plan, commonly known as an ESOP. ESOP transactions are heavily regulated, a creature of statute and controlled by ERISA rules and regulations.

ESOP transactions are fairly common: in fact, an entire cottage industry of lawyers, vendors and consultants exists solely to promote and execute such transactions. The 2016 Transaction was the handiwork of numerous members of that industry, who all have extensive experience with ESOP transactions, including expertise specific to valuing ESOP transactions in accordance with ERISA and the Internal Revenue Code (the "IRC" or the "Code) and other pertinent law. [1] Mr. Wade was not part of the interconnected community of ESOP advisors nor is he a repeat player in the ESOP process, as he was selling the shares of the closely held company he founded. [2] There is therefore a substantial question in this case as to whether any of the charges made by Spinnaker in its

---

[1] Here, in addition to the roles of Capital Trustees and Empire discussed herein, during the summer of 2016, Croscut and SG&C were engaged to provide the Company with legal services in connection with the ESOP transaction, and to assist the Company with structuring and planning the ESOP transaction, designing and implementing the ESOP, drafting and negotiating the documents necessary to carry out the ESOP's purchase of Wade's stock, and identifying and engaging the appropriate professionals to serve as ESOP trustees. SES and BellMark were engaged as financial advisors and to provide financial advisory services in connection with the ESOP Transaction, including, among other things, (1) assisting the Company to determine how to carry out the ESOP transaction; (2) developing financial and capitalization models to illustrate the ESOP transaction structures; (3) illustrating and assessing the ESOP transaction; (4) coordinating  preparing for, developing materials, and participating in the due diligence process; (5) assisting with structuring, negotiating, and implementing the ESOP transaction; (6) reviewing documents and providing advice and (7) assisting in providing information to financial institutions to obtain debt financing. ¶¶55-56.

[2] *See e.g.*, the website of Defendant Capital Trustees, LLC ("Capital Trustees"): https://www.captrustees.com (last visited August 18, 2020). Capital Trustees was retained to ensure the ESOP was properly valued and performed in accordance to law. According to its website, Defendant Capital Trustees markets its extensive ESOP experience as follows: "YOUR ESOP EXPERTS. Independent Trustee and Fiduciary Services Specifically Designed with Employee Stock Ownership Plans in Mind." "Whether you have a 100% family-owned business or you have multiple founders, we can help you understand the ins and outs of creating your ESOP." "As a trustee, we will review all the transaction details and valuation, conduct participant education and pass through voting."

Counterclaims are more properly directed, if at anyone, at those advisers, including Capital Trustees, rather than at Mr. Wade. For present purposes, pursuant to the standards that govern motions to dismiss, Mr. Wade will address only the question of the validity of the Counterclaims made against him, regardless of whether Spinnaker's complaints are more properly directed to others.

### III.    FACTS RELATING TO SPINNAKER'S COUNTERCLAIMS

#### A.    The 2016 ESOP Transaction

Mr. Wade founded Tri-Wire Engineering Solutions, Inc. (the "Company" or "Tri-Wire") in 1999, with only six employees and one client, Continental Cablevision, now known as Comcast. *See* Dkt No.1 ¶49.[3] Mr. Wade exponentially grew the Company through a focus on employee development, training, and benefits to enlarge it from six people in 1999 to over 900 people in 2016. The parties to this litigation disagree on much, but agree that at the time of the 2016 Transaction the Company was profitable. *Id.* ¶53.[4]

Mr. Wade possessed no experience devising, structuring and valuing ESOP Transactions and a plethora of independent consultants, lawyers, investment bankers, valuation experts, and ESOP trustees were retained to do so. ¶¶55-56, 69. A Fairness Opinion rendered by Empire and supervised by Capital Trustees, was the basis for the price paid to Mr. Wade for his ownership interest as part of the 2016 Transaction. The Fairness Opinion was based on Company financial information, projections, and industry data. ¶73. After conducting its own due diligence, Empire published a detailed Fairness Opinion that concluded, based on its expertise in valuing ESOP transactions, that (i) the terms and conditions of the ESOP Transaction were "fair to the ESOP from a financial point of view;" (ii) the consideration to be paid by the ESOP for Mr. Wade's shares of Company Stock

---

[3] Spinnaker's Counterclaims can be dismissed under Rule 12(b)(6) based solely on the allegations in its Counterclaims, and facts alleged herein that are extrinsic to the Counterclaims are provided simply for context.

[4] References to the Complaint are made herein as "¶".

was not more than fair market value as defined in ERISA Section 13(18)(B); (iii) the financial terms of the ESOP loan were at least as fair as those that it would have obtained in an arms length transaction; (iv) the interest rate did not exceed a reasonable rate of interest; and (v) the exercise price of the warrants issued by the Company in connection with the transaction is not less than 90% of the fair market value of the Company's common stock after the transaction would be completed. *See* Empire's Fairness Opinion Dkt No. 1-4.[5]

### B.    Mr. Wade Was Appointed CEO and Chairman of the Board as Part of the Terms of the 2016 ESOP Transaction

Mr. Wade and the Company executed an Executive Employment Agreement ("Employment Agreement") on December 30, 2016 which provided that Tri-Wire would employ Mr. Wade as its CEO for 4 years, subject to provisions governing his termination and compensation in the event that either Mr. Wade resigned or the Company terminated his employment prior to the expiration of the 4 year term. ¶¶115-117. In the Employment Agreement, the Company specifically agreed to pay Mr. Wade an annual salary, that could be adjusted upward or downward annually by 5% as determined by the Board of Directors or Compensation Committee, if the Board appointed one. *Id*. Further, the Employment Agreement entitled Mr. Wade to participate in all of the standard benefits available to all employees and in all of the group benefits available to management level employees, along with a vehicle allowance, tuition reimbursement up to $15,000 annually if pre-approved by the Board, necessary and reasonable travel, entertainment and business expenses, and six weeks of paid time off. *Id.*

---

[5] The Fairness Opinion is central to and referenced in Spinnaker's allegations in its Counterclaims, is attached as Exhibit 4 of Plaintiffs' Complaint,  and thus can be considered by this Court in ruling on the instant motion to dismiss. *See e.g, Trans-Spec Truck Serv., Inc. v. Caterpillar Inc*., 524 F.3d 315, 321 (1st Cir. 2008)(exhibits attached to the complaint are properly considered part of the pleadings for all purposes including a Rule 12(b)(6) Motion).

C.      **The Plan**

The Company established the Plan on December 30, 2016 through execution of the Plan Document and adoption of the Plan on behalf of the Company. The Plan Document states it was expressly established by the Tri-Wire Board of Directors to provide "a means for the Company's employees to acquire an equity interest in the Company" and to "recognize the contribution made to the successful operation of the Company by Employees, to encourage broader stock ownership in the Company by Employees, and to share with Employees the benefits of continued growth in Company profitability."[6] According to Section 3.1 of the Plan Document, an employee who is employed by the Company as of the effective date of the Plan, January 1, 2017 "shall automatically commence participation in the Plan." According to Section 3.2 of the Plan Document, a participant shall share in Company Contributions under Section 4.1 for any Plan Year during which he or she (a) is employed on the last day of the Plan Year, and (b) has at least 1,000 Hours of Service during the Plan Year." Section 14.1 of the Plan Document lists the Plan Administrator, the Trustee and the Company as the "Named Fiduciaries" of the Plan within the meaning of ERISA Section 4.02(a). Pursuant to the Plan Document, the Company Board of Directors has the power to appoint a Plan Administrator, the Trustee, and/or a Special Fiduciary as the fiduciaries of the Plan. Section 14.3 of the Plan Document subjects the fiduciaries to the duties of loyalty and prudence set forth in ERISA Section 404.

Under Section 14.1 of the Plan Document, the Trustee, Spinnaker, is a directed trustee for purposes of ERISA, meaning it is subject to the direction and control of the Plan Administrator. The Plan Administrator, under the Plan Document, is Tri-Wire, absent a delegation by Tri-Wire to a committee appointed to serve in that capacity. No such delegation has occurred to the best of Plaintiffs' knowledge. The Plan's original Trust Agreement, executed as part of the 2016

---

[6] *See* Dkt No. 54, Exhibit 1 (the "Tri-Wire Stock Employees Ownership Plan") referred to herein as "the Plan Document."

Transaction, engages the Trustee "solely in its fiduciary capacity as trustee" and enumerates the specific fiduciary powers of the Trustee. Section 5.2 of the Trust Agreement states that "the Trustee shall be directed by the Plan Administrator with regard to all matters including the exercise of all fiduciary powers set forth in Section 2.3." Section 7.6 of the Trust Agreement states that the Trust Agreement "shall apply to any person(s) appointed to succeed any person(s) appointed as Trustee."

### D.  The Counterclaims

The Counterclaims assert the following common law causes of action solely against Mr. Wade: (i) fraud/fraudulent inducement; (ii) intentional misrepresentation; (iii) breach of contract; (iv) violation of the Massachusetts Unfair and Deceptive Trade Practices Act, (v) Specific Performance; and (vi) Declaratory Judgment. No claims under ERISA are pled. These claims are all premised on Mr. Wade's supposed self-dealing in structuring and dominating the 2016 Transaction for his exclusive benefit to the detriment of the Plan.

The basis of the Counterclaims is that "Wade's unilateral control over the advisors hired by the Company to act on behalf of the ESOP, the content and availability of information (particularly projections and financial statements), and the due diligence process generally, resulted in Empire and Capital Trustees using incorrect assumptions and information to value Tri-Wire, resulting in an over-valuation of the Company's shares." Counterclaims ¶28. The Counterclaims allege Mr. Wade failed to disclose material information associated with the Transaction resulting in the overvaluation of its shares. According to Spinnaker, Mr. Wade's purported misconduct was "uncovered" at the conclusion of investigations by Spinnaker and a "Special Committee" convened by the Board of Tri-Wire. *Id.* ¶6. It should not escape the Court's notice, just as it has not escaped Plaintiff's, that Spinnaker's allegations read more as negligence by the advisors retained to perform due diligence for, and to price, the 2016 Transaction, than as alleged misconduct by Mr. Wade. The Counterclaims were asserted only because the Plaintiffs filed suit based on the Defendants' misconduct in operating the Trust, administering the Plan, operating Tri-Wire and complying with the terms of their

contractual commitments to Mr. Wade. In response, Spinnaker has simply sought to blame Mr. Wade, by means of these allegations in the Counterclaims, for errors in the 2016 ESOP Transaction that, even if they exist— which Plaintiffs deny— would have been the fault of the retained advisors, not Mr. Wade.

## IV.   MOTION TO DISMISSS STANDARD

Plaintiff's motion to dismiss seeks dismissal both under Rule 12(b)(6) for failure to state a claim upon which relief can be granted and under Rule 12(b)(1) for lack of subject matter jurisdiction. To survive dismissal under Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Plausible…means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job'" that compels a Court to draw on "judicial experience and common sense." *Lyman v. Baker*, 954 F.3d 351, 360 (1st Cir. 2020)(internal quotations omitted). On a Rule 12((b)(6) Motion a court can consider implications from documents attached to, or fairly incorporated into the complaint, and facts susceptible to judicial notice. *Id.*

Conclusory allegations in the complaint are to be ignored in this analysis. *Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592, 595 (1st Cir. 2011) ("it is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth") quoting *Iqbal,* 129 S.Ct. at 1951.

With regard to Plaintiff's motion to dismiss for lack of subject matter jurisdiction— namely, the absence of constitutional standing— the Counterclaims must "clearly ... allege facts demonstrating" each element necessary to establish standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016), as revised (May 24, 2016)(internal citations omitted). In *Spokeo,* "the Supreme Court…has emphasized that concreteness and particularization are distinct requirements." *Hochendoner v. Genzyme Corp.,* 823 F.3d 724, 731 (1st Cir. 2016)("the

particularization requirement…necessitates that a plaintiff has been affected 'in a personal and individual way'" by the injurious conduct) quoting *Spokeo, Inc.,* 136 S. Ct. at 1548. "The particularization element of the injury-in-fact inquiry reflects the commonsense notion that the party asserting standing must not only allege injurious conduct attributable to the defendant but also must allege that he, himself, is among the persons injured by that conduct." *Hochendoner*, 823 F.3d at 731–32 (1st Cir. 2016). Spinnaker's pleading fails to allege these facts, and its Counterclaims must be dismissed as a result.

### V.   THE COUNTERCLAIMS MUST BE DISMISSED BECAUSE SPINNAKER LACKS CONSTITUTIONAL STANDING

Spinnaker simply lacks standing to bring the Counterclaims. As a matter of law, standing is an absolute requirement, and generally requires that a plaintiff or, as here, counterclaimant, has suffered a redressable injury. To establish standing under Article III of the Constitution, a plaintiff must demonstrate (*inter alia*) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent. *Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1618 (2020). Standing is a constitutional prerequisite, but it is also a pragmatic requirement as well: the law recognizes that a party without actual "skin in the game," in the form of harm that is personal to it, is unlikely to properly and fully present the Court with the necessary backdrop to reach a proper decision. *See e.g. Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 52 (1st Cir. 2014)(standing "exists only when the party soliciting federal court jurisdiction (normally, the plaintiff) demonstrates 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends'")(internal quotations omitted)). Here, although Spinnaker attempts to gloss over it in its pleading, Spinnaker lacks standing. The only concrete harm it alleges occurred was not suffered by Spinnaker. In fact, almost all of the alleged misconduct giving rise to the Counterclaims all occurred, by Spinnaker's own admission, long before Spinnaker even become the trustee. Certainly, any argument that Spinnaker suffered

harm by conduct, and related losses, occurring before it was even appointed trustee, lacks the level of plausibility necessary to survive a Motion to Dismiss.

Moreover, the only concrete harm alleged anywhere in Spinnaker's Counterclaims concerns injury to the value of the Company stock, which is held by the trust on behalf of participants, and not by Spinnaker. Accordingly, and logically, any harm was suffered only by the participants and not by Spinnaker. Spinnaker simply conflates—or tries to conflate—the participants' alleged losses to the value of their stock holdings with injury to it. But Spinnaker is not a participant and does not represent the participants, who are fully entitled to litigate their own claims to such injury if, in fact, any exist or any participants believe they exist. Those participants might have standing to prosecute such claims, but Spinnaker does not.

The only attempt Spinnaker even musters to demonstrate injury directly to it appears in a conclusory assertion that it has incurred legal and investigative expenses in investigating the alleged misconduct of the Company's founder. *See* Counterclaims ¶104. However, this represents merely a conclusory allegation, and lacking any factual allegations sufficient to demonstrate actual losses by it of this nature, cannot be considered by this Court in deciding whether or not standing exists.

Moreover, from the perspective of plausibility, there is no basis for the Court to grant any benefit of the doubt to Spinnaker as to whether it both actually incurred such losses and they are properly attributable to allegedly wrongful conduct by Plaintiff John Wade. As trustee, Spinnaker has its own legal obligation to properly operate the Trust, to which, as a matter of law, it owes duties as a fiduciary under ERISA. Spinnaker's Counterclaims provide the Court with no plausible basis to assign the costs in question to the conduct of John Wade, as Spinnaker alleges, rather than to Spinnaker's own operating obligations with regard to the Trust. Further, Spinnaker's factual allegations do not plausibly support a conclusion that Spinnaker properly incurred any such costs. By Spinnaker's own admission, Tri-Wire's Board of Directors created a Special Committee to investigate and reach conclusions on exactly the same issues that Spinnaker claims it was forced to

incur costs to investigate. The so-called Special Committee was created by a Memorandum of Understanding agreed to and executed by all members of the Board, including John Wade. Specifically, the Memorandum of Understanding[7] expressly provided that two additional independent Board members would be appointed to investigate Spinnaker's unknown claims. The Memorandum of Understanding stated in pertinent part that:

> Without any Party admitting whether the Company has the right to direct the Trustee to act, and without the Trustee admitting whether it may or may not act without direction, the Parties agree to increase the size of the Board to six (6) members, to provide direction to the Trustee to so increase the size of the Board, and to appoint each of Richard Smith and Robert Landry to fill the vacancies on the Board.

> Without any Party admitting or denying the right to form any Committees, the Company, through its Board (including the new members) shall appoint a four (4) member Committee (the "Special Committee") to investigate conduct of the Company's Chief Executive Officer, John Wade, as well as officers, directors, and employees, as such Special Committee sees fit (the "Investigation"). The members of the Special Committee shall be Newell, Perry, Gesmondi and Landry, with Landry serving as chair and having the deciding vote in the event of any ties in the voting. All work performed and commissioned by Newell and Perry prior to the date of this MOU shall be included as part of the Investigation. For the avoidance of doubt, by entering into this MOU, no Party admits or denies the prior existence of the Special Committee or its proper formation, however, the Special Committee shall have the benefit of all work performed with respect to the Investigation prior to the date of this MOU. The Parties agree that the Special Committee shall use its reasonable best efforts to cause the Investigation to move as quickly as possible but shall be under no obligation to have it completed by any specific date.

Whatever expenses Spinnaker claims to have incurred in supposedly investigating the events at issue, there is no plausible reason under the allegations of the Counterclaims to believe they were properly incurred by Spinnaker and not voluntarily and wastefully repetitive of any costs incurred by

---

[7] Spinnaker's Counterclaim expressly references the Special Committee and the Memorandum of Understanding and, thus, this Court can consider the Memorandum in ruling on the instant motion to dismiss. *Clorox Co. P.R. v. Proctor & Gamble Comm. Co.*, 228 F.3d 24, 32 (1st Cir.2000) (in ruling on a Rule 12(b)(6) motion, a district court "may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint").

the Special Committee. The allegations of the Counterclaims simply provide no plausible basis to believe such costs were substantial or necessary and standing therefore is absent. *Thole*, 140 S. Ct. at 1620 ("This Court has rejected the argument that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right'") quoting *Spokeo, Inc*, 136 S.Ct. at 1549.

Even if Spinnaker could properly assert those costs as some type of harm to it, there is nothing in the allegations of the Counterclaims to plausibly demonstrate that such costs were attributable to allegedly wrongful conduct by Mr. Wade instead of being incurred simply as part of Spinnaker's own duties to ensure the proper operation of the Trust as a trustee and fiduciary. The alleged existence of such costs, in the absence of a plausible causal relationship to a defendant, cannot connote standing. *See e.g. Thole*, 140 S. Ct. at 1618 ("To establish standing under Article III of the Constitution, a plaintiff must demonstrate...that the injury *was caused by the defendant*.")(emphasis added).

Finally, the only other injury that Spinnaker's Counterclaims can possibly be construed, if read especially generously, to allege is some type of corporate waste or misuse of corporate assets, such as the wrongful taking of certain additional funds like bonuses. Once again, however, that harm is personal to someone else, namely Tri-Wire itself, and not to Spinnaker. Such allegations relate to the supposed waste of corporate assets by management, and not to the responsibilities or losses of Spinnaker itself.

As the Supreme Court has stated:

> Our cases have established that the "irreducible constitutional minimum" of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. Where, as here, a case is at the pleading stage, the plaintiff must "clearly ... allege facts demonstrating" each element.

*Spokeo, Inc.,* 136 S. Ct. at 1547.

At the current stage of this case, Spinnaker's failure to allege facts sufficient to establish standing requires dismissal of all of its Counterclaims.

## VI.   EVEN IF SPINNAKER HAD STANDING, ALL OF SPINNAKER'S COUNTERCLAIMS ARE PREEMPTED BY ERISA AS A MATTER OF LAW

Even if Spinnaker could sue Mr. Wade in connection with the 2016 Transaction—a Transaction Spinnaker did not participate in—all of its Counterclaims are preempted by ERISA. Congress enacted ERISA to "provide a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004). Most importantly for present purposes, Congress included a broad preemption provision in the statute to effectuate that intent. ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a). For these purposes, a "law 'relates to' an employee benefit plan 'if it has a connection with or reference to such a plan.'" *Zipperer v. Raytheon Co.*, 493 F.3d 50, 53 (1st Cir. 2007). In *Zipperer*, the Court explained:

> While ERISA's preemption is not boundless, it is far reaching. In determining the reach of ERISA preemption, the Supreme Court has cautioned against a literal reading of ERISA § 514(a)'s 'relate to' standard, and ruled that courts must look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive. ERISA's objectives include providing a "uniform national administration of ERISA plans" and avoiding inconsistent state regulation of such plans. Three categories of state regulation that have been identified as conflicting with these objectives are: 1) those that mandate employee benefit structures or their administration; 2) those that bind plan administrators to a particular choice; and 3) causes of action that provide alternative enforcement mechanisms to ERISA's own enforcement scheme.

*Zipperer*, 493 F.3d at 53 (internal citations and punctuation omitted).

This Court must look "to the real nature of the plaintiff's claims, regardless of how they are characterized in his complaint," to determine whether they relate to the purposes of ERISA and are thus preempted. *Id.* at 53-54 quoting *Hampers v. W.R. Grace & Co.*, 202 F.3d 44, 51(1st Cir. 2000).

As this Court recently explained, "ERISA's expansive preemption provision is designed to ensure that employee benefit plan regulation would be exclusively a federal concern." *Feeney Bros. Excavation LLC v. Morgan Stanley & Co. LLC*, 2020 WL 2527851, at *6 (D. Mass. May 18, 2020)(internal punctuation omitted). In this regard, and importantly for purposes of determining the type of claims that relate to a plan and are thus preempted, "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Id*. (quoting *Shaw v. Delta Air Lines*, 463 U.S. 85, 90 (1983). As a result, state law claims that target the core activities of an enterprise regulated by ERISA and that seek to supplement the legal remedies related to those activities granted by ERISA itself are preempted. *See e.g. Zipperer*, 493 F.3d at 54; *Hampers*, 202 F.3d at 49-52. As the First Circuit has explained, examining whether the state law claims at issue strike at the core of ERISA-regulated activities is central to the Court's task of "[d]rawing the line between those state laws that 'relate to' ERISA-regulated plans, and those that are only 'tenuous, remote, or peripheral'" to such plans. *Hampers*, 202 F.3d at 49. The former are preempted, the latter not.

Here, that line drawing establishes that all of Spinnaker's Counterclaims are preempted.  As discussed above, the Counterclaims are all based on the sale of Tri-Wire to its employees as part of the creation of an ESOP. ESOPs are a creature of ERISA, closely governed and controlled by ERISA, heavily regulated under ERISA, and the rules by which they are established are dictated by ERISA.[8] In fact, ERISA itself dictates the requirements by which employer stock can even be sold to

---

[8]  The term "employee stock ownership plan" is expressly defined in 29 U.S.C. § 1107(d)(6). "ERISA governs the creation, maintenance and administration of ESOPs through a number of somewhat complex and interrelated rules." *Reich v. Hall Holding Co*., 990 F. Supp. 955, 957 (N.D. Ohio 1998), aff'd sub nom. *Chao v. Hall Holding Co*., 285 F.3d 415 (6th Cir. 2002). An employer desiring to create an ESOP is required to execute a written document to define the terms of the plan and the rights of the beneficiaries under it. 29 U.S.C. § 1102(a). *Id*.  This plan must also name one or more fiduciaries who are "to control and manage the operation and administration of the plan." *Id*. A trust is established to hold the assets of the ESOP. 29 U.S.C. § 1103(a). *Id*.

a plan. ESOP transactions are protected from the ERISA prohibited transaction rules by ERISA Section 408(e), which states "Sections 1106 and 1107 of this title shall not apply to the acquisition or sale by a plan of qualifying employer securities (as defined in section 1107(d)(5) of this title) or acquisition, sale or lease by a plan of qualifying employer real property…such acquisition, sale, or lease is for ***adequate consideration***." 29 U.S.C.A. § 1108 (emphasis added). Thus, the 2016 Transaction itself, and the challenges to the pricing of the stock in that transaction, is specifically governed by an express statutory provision in ERISA.

In fact, at the core of the rules and regulations under ERISA governing the establishment and operation of an ESOP are standards controlling the valuation of company stock.  At the time of creation of the ESOP, the ESOP purchases the stock holdings of the company for the participants, at a price set by methods dictated by ERISA and the Code. *See* 26 U.S.C. § 401(a)(28)(C))(to be a qualified retirement plan, valuation of employer securities held in an ESOP that are not readily tradable on an established securities market must be made by an independent appraiser); *Ed Thielking, Inc. v. Comm'r of Internal Revenue*, 119 T.C.M. (CCH) 1026 (T.C. 2020)(ESOP failed to satisfy Code's independent appraiser requirement, thereby constituting operational failure disqualifying ESOP from qualified retirement plan status under IRC). Thereafter, proper and independent valuation of the stock is a continuing requirement under ERISA for the remainder of the lifespan of the ESOP.[9] Spinnaker's Counterclaims are entirely based on the valuation of the stock during that entire time period, from establishment of the ESOP through to the present.

---

[9] ERISA Section 103(b)(3) contains a general requirement, applicable to all retirement plans, that the plan's annual report (Form 5500) includes the "current value" of all plan assets. "Current value" is defined in ERISA Section 3(27) to mean "fair market value where available and otherwise the fair value as determined in good faith by a trustee or a named fiduciary (as defined in section 1102(a)(2) of this title) pursuant to the terms of the plan and in accordance with regulations of the Secretary, assuming an orderly liquidation at the time of such determination." An ESOP trustee is therefore obligated under ERISA to determine the fair market value of employer stock in an ESOP in good faith and on an annual basis.

Spinnaker's Counterclaims thus strike directly at the heart of the regulatory regime that, under ERISA, governs ESOPs.  Spinnaker asks this Court—and presumably eventually a jury— to decide whether the valuation was correct and to impose state law liabilities if the Court or the jury concludes to the contrary. Spinnaker is without doubt seeking to alter the standards and regulatory structure at the heart of an ERISA governed enterprise, and its state law claims are thus preempted. This is well-illustrated by the centrality to Spinnaker's pleading of the initial price paid for the stock and the alleged misconduct of Mr. Wade during the creation of the Fairness Opinion by which the transaction was valued. Under ERISA's controlling regulations, the price to be paid for Mr. Wade's shares was to be set by a third party *e.g.* Capital Trustees and Empire, at arm's length, and by means of a Fairness Opinion .*See e.g., Henry v. Champlain Enterprises, Inc*., 445 F.3d 610, 619 (2d Cir. 2006)(ESOP Trustees have the burden, under ERISA and DOL guidance to demonstrate a transaction was for "fair market value" to comply with the ERISA prohibited transaction exemption)(collecting cases). The Fairness Opinion with regard to the instant litigation approved of the price paid for Mr. Wade's shares in the company.  Spinnaker's Counterclaims are at their core entirely based on the charge that the Fairness Opinion was incorrect, but the creation of and reliance upon that Opinion is governed by ERISA itself. There can be no question that Spinnaker's Counterclaims, based on that Opinion, are therefore preempted.

Further, it is also telling that Spinnaker's Counterclaims cannot be decided other than by considering the terms of the ESOP, which dictate the ownership of the stock, how it shall be valued, when it shall be awarded, and similar terms relevant to Spinnaker's claims. The First Circuit has "consistently held that a cause of action 'relates to' an ERISA plan when a court must evaluate or interpret the terms of the ERISA-regulated plan to determine liability under the state law cause of action." *Hampers*, 202 F.3d at 52 (collecting cases).

In fact, the Counterclaims rely on the current value of the stock holdings in the ESOP for their viability. Unless the value of the employee stock holdings are less than they would have been

absent the alleged fraud and other alleged misconduct, Spinnaker lacks damages. At a minimum, Spinnaker's alleged damages cannot be calculated except by comparing the current value of the stock held by the Trust with the alleged overpayment to Mr. Wade. The First Circuit expressly held in *Hampers* that "ERISA preempts state law causes of action for damages where the damages must be calculated using the terms of an ERISA plan." *Id.*

Moreover, Spinnaker is a fiduciary of the Trust under ERISA. ERISA expressly grants causes of action to a fiduciary, just as it does to participants, beneficiaries and the Department of Labor. Importantly, those causes of action are expressly delineated in the statute itself. ERISA Section 502(a), 29 U.S.C. § 1132(a). The First Circuit has explained that in determining whether state law causes of action are preempted, "ERISA's carefully crafted civil enforcement scheme [is] particularly relevant." *Hampers*, 202 F.3d at 49–50. This is because the Supreme Court has "concluded that '[t]he deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive.'" *Id.* quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Quoting the Supreme Court, the First Circuit explained in *Hampers* that the "policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if . . . remedies under state law that Congress rejected in ERISA" were not preempted. *Id.*

Spinnaker has deliberately elected to reject the causes of action granted to it as a fiduciary under ERISA, in favor of state law claims that, presumably, it believes will grant it a better chance of prevailing than those authorized under ERISA. As the First Circuit made clear in *Hampers*, ERISA preemption precludes that election. There is no doubt Spinnaker, as a sophisticated ERISA Trustee and ESOP consultant, is aware that the substance of its claims are governed and thus preempted by ERISA. It even raises ERISA preemption as a reason why it is owed judgment on the pleadings on Plaintiffs' common law causes of action related to the 2016 Transaction. *See* Dkt No. 49 at 7-8.

Spinnaker argues to this Court in that filing that "[e]very action Spinnaker has taken in this matter *has been in its capacity as ESOP trustee* since March 22, 2017…Plaintiffs' allegations against Spinnaker can only arise under ERISA, because the gravamen of the claims are *Spinnaker's actions as a fiduciary*… in order to prevail on their claims against Spinnaker, Plaintiffs "mu*st prove the existence of, or specific terms of, an ERISA plan*." *Id.* Spinnaker's arguments in this regard cannot be reconciled with its belief that it can bring state law Counterclaims against Mr. Wade or that such claims are not preempted.

Spinnaker even raises ERISA preemption in responding to Plaintiffs' Complaint in this action. Spinnaker's Fourth Affirmative Defense to Plaintiffs' Complaint asserts that Plaintiffs' claims are preempted by ERISA. Spinnaker fails in its Counterclaims, however, to explain how its own claims, arising directly from core and regulated ERISA functions, can proceed under state law if, as Spinnaker claims, the far broader claims by Plaintiffs, which have at best a tenuous and remote relationship to core ERISA functions, are somehow preempted. It is hard to overstate the extent to which Spinnaker's Counterclaims are preempted under controlling First Circuit precedent and the facts of the case, as well as in light of Spinnaker's own statements. The Court should dismiss all of Spinnaker's Counterclaims on the ground of preemption.

## VII.   SPINNAKER'S COUNTERCLAIMS ARE NOT PLAUSIBLE BECAUSE THEY IGNORE THE RESPONSIBILITY OF CAPITAL TRUSTEES AND EMPIRE FOR THE ALLEGED OVERPRICING OF THE 2016 TRANSACTION

Pursuant to ERISA, the ESOP Trustee is responsible for ensuring the prudence of an ESOP Transaction and in order to do so, must demonstrate the transaction was for "adequate consideration" as that term is defined in ERISA. *See, e.g., Keach v. U.S. Trust Co*., 419 F.3d 626, 636 (7th Cir.2005) ("In order to rely on the adequate consideration exemption, a trustee or fiduciary has the burden to establish that the ESOP paid no more than fair market value for the asset, and that the fair market value was determined in good faith by the fiduciary"). This requires an analysis of whether

the Trustee "at the time [it] engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *See Champlain Enterprises*, Inc., 445 F.3d at 620.

Here, Defendant Capital Trustees served as the trustee of the ESOP pursuant to 29 U.S.C. § 1103(a) and the Trust Agreement in connection with the 2016 Transaction. As a fiduciary to the ESOP and under the terms of the Trust Agreement and the Plan Document, Capital Trustees was required to act in the best interests of the ESOP and its participants at all times. Capital Trustees' responsibilities to the ESOP at that time included, but were  not limited to, the power (i) to retain agents, attorneys, actuaries, accountants, appraisers, valuation firms, and independent financial advisors for any purpose related to the 2016 Transaction; (ii) to invest in Tri-Wire related stock; (iii) to select an independent appraiser (which was Empire) to assist it in determining the fair market value of stock to be purchased and then held by the ESOP; (iv) to attend shareholder meetings of the company whose stock is held by the ESOP and act as the shareholder of record for the benefit of the ESOP; and (v) to perform any and all other acts that in its judgment are considered necessary and appropriate for the ESOP.  Further, Empire was retained to prepare an independent valuation of the transaction and to render a Fairness Opinion.

As a matter of law, claims must be dismissed if their well-founded factual allegations are not sufficient to render the claims, as pled, plausible, "lest a plaintiff with 'a largely groundless claim' be allowed to 'take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value'" of the ill-supported action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955, 1966, 167 L. Ed. 2d 929 (2007) (internal citations omitted). Spinnaker's Counterclaims fail to clear this bar. As discussed above, Capital Trustees had an affirmative  fiduciary responsibility to perform its responsibilities and to ensure that the stock of Tri-Wire was not sold to the ESOP at an allegedly inflated price. Empire itself had an obligation under ERISA to properly value the transaction. Spinnaker's Counterclaims do not account for the

obligations of those entities. Spinnaker instead simply asserts, in conclusory fashion, that any overpayment is the fault of Mr. Wade.  Under these circumstances, the Counterclaims are simply not plausible: they attempt to assign to Mr. Wade responsibility for the allegedly deficient work of Capital Trustees and Empire without any reasonable factual foundation for doing so. The Counterclaims thus must be dismissed.[10]

## VIII.   COUNT I AND COUNT II ARE OTHERWISE BARRED BY THE STATUTE OF LIMITATIONS

Granting a motion to dismiss based on a limitations defense is entirely appropriate when the pleader's allegations leave no doubt that an asserted claim is time-barred. *LaChapelle v. Berkshire Life Ins. Co*., 142 F.3d 507, 509 (1st Cir. 1998) citing *Street v. Vose*, 936 F.2d 38, 39 (1st Cir.1991); *Kali Seafood, Inc. v. Howe Corp*., 887 F.2d 7, 9 (1st Cir.1989). In Massachusetts, the statute of limitations for fraud claims is three years from the date the action accrues. *See* M.G.L. c. 260 § 2A. The alleged misrepresentations giving rise to the fraud and misrepresentation claims pled in the first two counts of Spinnaker's Counterclaims occurred in fall of 2016.  The three year statute of limitations has thus expired on these claims.

These causes of action accrued at that time and tolling does not exist regardless of whether Spinnaker now claims it did not fully uncover or learn of the alleged misstatements at that time. As a matter of law, "one does not have to fully comprehend the full extent or nature of an injury in order for a cause of action to accrue.." *Koe v. Mercer*, 450 Mass. 97, 876 N.E.2d 831, 837 (2007) citing *Olsen v. Bell Tel. Lab., Inc*., 388 Mass. 171, 175, 445 N.E.2d 609 (1983). Instead, the statute of limitations begins to run when a plaintiff has "knowledge or sufficient notice that [he] was harmed

---

[10] In the context of Spinnaker's failure to file an action against the actual wrongdoers associated with the 2016 Transaction it should also be noted that Spinnaker and the Insider Defendants' during the spring, summer, and fall of 2019, served letters on Mr. Wade that threatened legal action against him for purported misconduct related to the 2016 Transaction, but Spinnaker took no legal action against Mr. Wade until it was sued by Mr. Wade in this present action. *See e.g.,* ¶¶149, 171, 193.

and ... knowledge or sufficient notice of what the cause of the harm was." *Bowen v. Eli Lilly & Co.*, 408 Mass. 204, 208, 557 N.E.2d 739, 742 (1990). Allegations of fraudulent concealment do not modify the requirement that plaintiffs must exercise reasonable diligence in attempting to uncover the bases of their claims. *Salois v. Dime Sav. Bank*, 128 F.3d 20, 26 (1st Cir.1997) ("Irrespective of the extent of the effort to conceal, the fraudulent concealment doctrine will not save a charging party who fails to exercise due diligence"). Simply put, given the allegedly extensive nature of the fraud claimed by Spinnaker, as well as the involvement of multiple advisors—including Spinnaker's predecessor as trustee—who were in a position to investigate the details of the 2016 Transaction at the time of the events in question, there is no plausible basis on the face of the Counterclaims to treat the claims as having accrued at anytime after 2016.

The First Circuit Court of Appeals has noted that "[w]hen the allegations in a complaint show that the passage of time between the events giving rise to the claim and the commencement of the action exceeds the applicable limitations period…a court should grant a 12(b)(6) motion by the defense if the complaint 'fails to 'sketch a factual predicate that would' provide a basis for tolling the statute of limitations.'" *Abdallah v. Bain Capital LLC*, 752 F.3d 114, 119 (1st Cir. 2014) quoting *Trans–Spec Truck Serv., Inc.*, 524 F.3d at 320 (1st Cir.2008); *LaChapelle*, 142 F.3d at 509–10 (1st Cir.1998)).

Spinnaker brings fraud based claims in Count I (fraud/fraudulent inducement) and Count II (intentional misrepresentation[11]) rooted in Mr. Wade's perceived misrepresentations and omissions made in the 2016 Transaction, that closed on December 30, 2016. Three years have thus passed since the accrual of such claims. Spinnaker does not demonstrate it has exercised reasonable diligence to pursue its claims before the period closed. These Counts should therefore be dismissed as time barred.

---

[11] A three-year statute of limitations governs the intentional misrepresentation claims. *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 761 (1st Cir. 1996) citing Mass. Gen. L. ch. 260, § 2A

IX.    **SPINNAKER FAILS TO PLEAD THE FRAUD BASED CLAIMS WITH REQUISITE PARTICULARITY**

To plead a claim of fraud, a plaintiff, among other requirements, "must establish that the defendant 'made a false representation of a material fact with knowledge of its falsity.'"" *Squeri v. Mount Ida Coll*., 954 F.3d 56, 70 (1st Cir. 2020) citing *Russell v. Cooley Dickinson Hosp., Inc*., 437 Mass. 443, 772 N.E.2d 1054, 1066 (2002) (quoting *Danca v. Taunton Sav. Bank*, 385 Mass. 1, 429 N.E.2d 1129, 1133 (1982)). Separately, "fraud by omission requires both concealment of material information and a duty requiring disclosure." *Id.* citing *Sahin v. Sahin*, 435 Mass. 396, 758 N.E.2d 132, 138 n.9 (2001).  Under Fed. R. Civ. P. 9(b), a complaint must "state with particularity the circumstances constituting fraud." *Dickey v. U.S. Bank Trust, N.A.*, No. CV 19-12504-FDS, 2020 WL 4474273, at *4 (D. Mass. Aug. 3, 2020). Under this heightened pleading requirement, a complaint "must state the time, place, and content of the alleged false or fraudulent representations to state a claim for fraud." *Id.* citing *Epstein v. C.R. Bard, Inc*., 460 F.3d 183, 190–91 (1st Cir. 2006). [12]

Spinnaker's alleged fraudulent statements are contractual clauses of the SPA and SRA. The Counterclaims are devoid of claims that these contractual provisions were separate from the contract and that John Wade made these affirmative misrepresentations with knowledge of their falsity at the time they were made. Rather, the Counterclaims allege that John Wade omitted to affirmatively supply "material" information on (i) the Company's Auto Insurance expenses; (ii) the intention to build a Construction Division; (iii) the existence of duplicate payments from a customer; (iv) the existence of bonuses to him and Company employees; and (v) taxes and debts owed by the Company. Counterclaims ¶¶49-101. But these supposed "material" omissions are

---

[12] Spinnaker's fraud based claims are Count I (fraud/fraudulent inducement), Count II (intentional misrepresentation) and Count IV (93A Claim), all of these claims are subject to the Rule 9(b) requirement.

baseless, false, do not meet the particularity requirement of 9(b), and do not show knowing concealment and materiality. Fatally, Spinnaker fails to plead facts that demonstrate Mr. Wade actively concealed these facts and/or had a duty to affirmatively disclose them as part of the 2016 Transaction.

### X.   SPINNAKER'S COUNTERCLAIMS MUST BE DISMISSED IN LIGHT OF THE EXCLUSIVE REMEDY PROVISIONS OF THE SPA AND THE SRA

#### A.   The SPA Contains An Exclusive Remedy Provision that Limits Any Recovery Related to the 2016 Transaction

Section 9.1 of the SPA provides that the Seller—which is Mr. Wade—will indemnify the Purchaser for certain losses, subject to certain terms, related to the transaction.  Dkt. 1-10 at p.24. Section 9.6 of the SPA states in relevant part that "[i]ndemnification under this Article 9 will be the exclusive remedy of the Purchaser with respect to any and all claims for damages for breach of any representation or warranty in this Agreement, and no other remedy will exist either at law or equity in favor of the Purchaser with respect to such claims…except for rights of action or claims… on (a) specific performance; or (b) statutory and/or common law fraud." *Id.* at p. 25. *See* Dkt 1-10.

Section 9.5 of the SPA provides that a claim for indemnification under Article 9 of the SPA based on a breach of representation or warranty is barred if "not filed within 18 months after the Closing or 30 days following the delivery to the Purchaser off the accountant-prepared audited financial statements for December 31, 2017," except, with exceptions not relevant here, "claims involving fraud, which may be made at any time." *Id.*

**B.     All of the Counterclaims Other than the Fraud and Specific Performance Counts Are Barred By the Terms of the SPA**

Spinnaker's Counterclaim for fraud fails and must be dismissed, as discussed above, for reasons entirely independent of Article 9 of the SPA and thus the exception for fraud claims in the indemnification provision of the SPA is irrelevant to the instant Motion. However, the fraudulent inducement claim in Count I, the intentional misrepresentation claim in Count II, the breach of contract claim in Count III, the Chapter 93A claim in Count IV and the declaratory judgment claim in Count VI are all barred by the contractual undertaking set out in the SPA, which limits recovery only to claims for indemnification, fraud and specific performance.[13] They therefore fail as a matter of law and must be dismissed.

It is worth pausing briefly to discuss the declaratory judgment claim further from this perspective. The parties, by contract, agreed to eliminate the right of the Purchaser to seek such a declaration. In Article 9, the parties declared that, other than claims of fraud, indemnification and specific performance are the parties' "exclusive remedy." *Id.* To clarify the breadth of this waiver of claims and remedies, the parties provided in the contract that, other than those remedies, "no other rights of action or claims will exist in favor of the Purchaser, at law *or in equity*." *Id.* (emphasis added).  By this language, the parties expressly declared that equitable remedies other than specific

---

[13] This provision is enforceable as a matter of law. Spinnaker was not a party to the SPA and has no standing to enforce its terms, but even if it did, it does not allege any facts demonstrating this provision is unconscionable, a product of duress, or against public policy –the types of justifications typically given for voiding contractual provisions.  *See e.g., CareOne Mgmt., LLC v. Navisite, Inc*., 2017 WL 2803060, at *8 (Mass. Super. Apr. 25, 2017)("To demonstrate that a contract provision is unconscionable and therefore unenforceable, a party must demonstrate that, as of 'the time of the execution of the agreement, the contract provision could result in unfair surprise and was oppressive to the allegedly disadvantaged party.'") citing *Miller v. Cotter*, 448 Mass. 671, 680 (2007), quoting *Zapatha v. Dairy Mart*, Inc., 381 Mass. 284, 293 (1980). This section of the SPA is thus enforceable and precludes Spinnaker's Counterclaims.

performance are relinquished; this specifically includes declaratory relief, a classic form of equitable relief.

Furthermore, the Court should not exercise its discretion to enter declaratory relief here, particularly since the parties specifically agreed that there shall be no declaratory actions over the terms of the SPA. Spinnaker requests a declaratory judgment that (i) the ESOP and the Company are entitled to indemnification from Mr. Wade under the SPA and SRA; (ii) Wade's duty to indemnify the ESOP arise from breaches of the representations in the SPA and SRA and (iii) that the exclusive remedy provisions of the SPA and SRA should be voided and unenforceable.

The Declaratory Judgment Act, 28 U.S.C. § 2201, states in relevant part that "[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." In deciding whether to exercise the power to grant declaratory judgment, given to them by 28 U.S.C. § 2201 and Fed.R.Civ.P. 57, courts examine whether the declaratory judgment will serve the interests of the litigants or the public. *Metro. Prop. & Liab. Ins. Co. v. Kirkwood*, 729 F.2d 61, 62 (1st Cir. 1984) citing *Public Affairs Associates v. Rickover*, 369 U.S. 111, 112, 82 S.Ct. 580, 581, 7 L.Ed.2d 604 (1962) (per curiam); 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil § 2759, at 645–51 (2d ed. 1983). This is a highly discretionary analysis in which the following questions are asked "Do considerations of efficiency, fairness and practical convenience for the court and parties warrant the court's granting a declaration of right…Will a declaratory judgment help clarify the legal questions at issue? Will it relieve the uncertainty or insecurity that gave rise to the dispute?" *Id.* citing *President v. Vance*, 627 F.2d 353, 364 n. 76 (D.C.Cir.1980); *Alsager v. District Court*, 518 F.2d 1160, 1163–64 (8th Cir.1975); 10A C. Wright, A. Miller & M. Kane, supra, § 2759, at 646–51 (quoting E. Borchard, Declaratory Judgments 299 (2d rev. ed. 1941)). A declaratory

judgment is a remedy committed to judicial discretion and "the exercise of that discretion is properly informed by considerations of equitable restraint." *Montalvo v. LT's Benjamin Records, Inc.*, 56 F. Supp. 3d 121, 140 (D.P.R. 2014) quoting *In re Worksite Inspection of Quality Products, Inc.*, 592 F.2d 611, 616 (1st Cir.1979). "All this is summed up in the general rule that the declaration is an instrument of practical relief and will not be issued where it does not serve a useful purpose." *Id.* citing *United States v. Esso Standard Oil Co.*, 584 F.Supp. 157, 159 (D.P.R.1984).

Here, Spinnaker's declaratory judgment claim is self-serving, premature, does not assist in resolving the dispute between the parties and does not serve any useful purpose. If Spinnaker believes it has a claim for indemnification or other recovery based on the terms of the SPA or the SRA, then its proper remedy is to prosecute claims alleging those violations. Such claims can then be decided as concrete contractual disputes, and not as hypothetical declarations. Since contractual remedies exist, there is no purpose in the Court exercising its discretion to consider the same issues instead in the context of declaratory relief.

## XI.   SPINNAKER'S COUNTERCLAIM FOR SPECIFIC PERFORMANCE FAILS AS A MATTER OF LAW

To make a claim for specific performance, a party must show that an adequate remedy at law is unavailable, and that the burdens of enforcement are not disproportionate to the advantages gained. *ER Holdings, Inc. v. Norton Co.*, 735 F. Supp. 1094, 1103 (D. Mass. 1990) citing *Sanford v. Boston Edison Co.*, 316 Mass. 631, 634–35, 56 N.E.2d 1 (1944); E.A. Farnsworth, Contracts 826–38 (in addition to unavailability of adequate remedy at law, "a number of other limitations restrict the availability of specific performance"); *Quinn v. Mar-Lees Seafood, LLC*, 69 Mass. App. Ct. 688, 704–05, 871 N.E.2d 511, 525 (2007) quoting *Fleming v. Fleming*, 34 Mass.App.Ct. 913, 913, 608 N.E.2d 1064 (1993)(specific performance is most commonly sought in real estate transactions, it may also be appropriate, for example, "where repeated actions to recover monthly damages as they are incurred would be needed").

{14221/A0555043.1}                    - 26 -

Here, Spinnaker alleges that "it is entitled to seek specific performance" against Mr. Wade with respect to the indemnification provisions of the SPA and SRA. This argument suffers from a number of errors. First, Spinnaker can, at most, only claim relief under the indemnification provisions of the SPA because the ESOP was not a party to the SRA.  Thus, its only claim for indemnification, and for which it seeks specific performance, lies under Article 9 of the SPA. However, and fatal to Spinnaker's Counterclaim, Section 9.1 of the SPA specifically grants a set financial recovery if the terms of recovery under the SPA are proven.  This section defines the indemnification amount exclusively as the "amount by which the fair market value of the Shares as of Closing is less than the purchase price paid to the Seller at Closing as a result of the misrepresentation or  the breach of any representation." *See* Dkt 1-10 at p. 24. This provision expressly provides for an adequate remedy at law, in the event the Court finds that an actionable violation of the SPA occurred and that  the indemnification provisions of the SPA are triggered.

Accordingly, an adequate remedy exists at law for Spinnaker's claims.  As a matter of law, this renders specific performance an unavailable equitable remedy and the claim should be dismissed.

## XII.   ALL OF THE COUNTERCLAIMS MUST THEREFORE BE DISMISSED IN LIGHT OF THE TERMS OF THE SPA

As discussed above, all of the Counterclaims except two—for fraud and specific performance— are barred by the terms of the SPA. As is also discussed above, the fraud and specific performance Counterclaims fail independent of the terms of the SPA. Accordingly, all of Spinnaker's Counterclaims are subject to dismissal at this time.

XIII.   **THE SRA CONTAINS MATCHING INDEMNIFICATION
PROVISIONS AND THUS THE COUNTERCLAIMS MUST ALSO
BE DISMISSED TO THE EXTENT BASED ON THE TERMS OF
THE SRA**

The SRA contains effectively identical indemnification provisions to those set forth in the

SPA and discussed above, at least to the extent those indemnification terms are relevant to the instant

motion to dismiss. *See* Dkt. 1-5 at pp. 12-13. Accordingly, to the extent that Spinnaker seeks to rely

on the SRA for purposes of its Counterclaims, they are subject to dismissal for the same reasons,

discussed above, that the Counterclaims are subject to dismissal under the terms of the SPA.

XIV.   **SPINNAKER CANNOT ENFORCE THE TERMS OF THE SPA OR
SRA AND ITS COUNTERCLAIMS MUST BE DISMISSED AS A
RESULT**

In order to state a claim for breach of contract, a plaintiff must allege facts sufficient to show

that an express or implied binding agreement existed between him and the defendants. *Flattery v.

Gregory, et al*., 397 Mass. 143, 145, 489 N.E.2d 1257 (1986); C*hoate, Hall & Stewart v. SCA

Services, Inc*., 378 Mass. 535, 543, 392 N.E.2d 1045 (1979). According to Massachusetts law, to

satisfy this requirement, a plaintiff must either be in privity of contract or establish that he was an

intended third-party beneficiary. *Paoluccio v. Wells Fargo, N.A*., No. CV 17-11918-TSH, 2019 WL

181288, at *2 (D. Mass. Jan. 11, 2019) citing *Monahan v. Town of Metheun*, 408 Mass. 381, 391,

558 N.E.2d 951 (1990) (holding that the "contract claims must fail" since "[t]here is no allegation of

any privity of contract ... And there is no indication or argument presented which would allow the

[plaintiffs] to recover under a third party beneficiary theory").

Here, Spinnaker in its fiduciary or corporate capacity was not a party to the SPA or SRA

agreements which were executed on December 30, 2016. The Company executed the SRA and

Richard Heeter, Managing Director of Capital Trustees executed the SPA as an authorized officer of

Capital Trustees. Spinnaker was later appointed discretionary trustee of the Plan in March 2017.

Spinnaker cannot sue for beach of contract, specific performance, or ask for a declaratory judgment with respect to a contract it did not negotiate, execute, and had no part in. Spinnaker's Counterclaims that are based on violations or terms of those contracts must be dismissed for this reason as well.

### XV.   CONCLUSION

For the reasons stated herein, Spinnaker's  Counterclaims against Mr. Wade should be dismissed.


**Date:** August 19, 2020                    **Respectfully submitted,**

*/s/ Stephen D. Rosenberg*
Stephen D. Rosenberg [BBO #558415]
srosenberg@wagnerlawgroup.com
**Wagner Law Group, P.C.**
99 Summer Street, 13th floor
Boston, Massachusetts 02110
tel:(617) 357-5200
fax:(617) 357-5250